1  Mark E. Haddad, SBN 205945
   mhaddad@sidley.com
2  Sean A. Commons, SBN 217603
   scommons@sidley.com
3  Nitin Reddy, SBN 229451
   nreddy@sidley.com
4  **SIDLEY AUSTIN LLP**
   555 West Fifth Street, Suite 4000
5  Los Angeles, California  90013
   Telephone:  (213) 896-6000
6  Facsimile:  (213) 896-6600

7  **Attorneys for SALOV NORTH AMERICA CORP., INC.**

8                 UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10                    OAKLAND DIVISION

11 | ROHINI KUMAR, an individual, on behalf of | ) | Case No. 4:14-cv-02411-YGR |
   | herself, the general public and those similarly | ) | |
12 | situated, | ) | Assigned to: Hon. Yvonne Gonzalez Rogers |
   | | ) | |
13 |              Plaintiff, | ) | **DEFENDANT SALOV NORTH AMERICA** |
   | | ) | **CORP., INC.'S OPPOSITION TO** |
14 | vs. | ) | **PLAINTIFF KUMAR'S MOTION FOR** |
   | | ) | **CLASS CERTIFICATION** |
15 | SALOV NORTH AMERICA CORP., | ) | |
   | | ) | Date: May 10, 2016 |
16 |              Defendant. | ) | Time: 2:00 p.m. |
   | | ) | Courtroom: 1 |
17 | | ) | |
   | | ) | **[Declarations Of Sean Commons, Thomas** |
18 | | ) | **Mueller, And Keith R. Ugone]** |
   | | ) | |
19 | _____ | ) | |

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................ 1

II.   FACTUAL BACKGROUND .......................................................................... 1

    A.    The Labeling of Filippo Berio Products ................................................ 2

    B.    The Pricing of Filippo Berio Products ................................................... 3

    C.    Studies On Consumer Preferences & Practices Regarding Reading Back Labels .................................................................................................... 4

    D.    The Facts Surrounding Plaintiff's Claims ............................................. 5

    E.    Plaintiff's Proposed Damages Model .................................................... 7

III.  LEGAL STANDARD ..................................................................................... 7

IV.  ARGUMENT ................................................................................................. 8

    A.    Plaintiff Is Not Adequate or Typical ..................................................... 8

    B.    Individual Issues Predominate Regarding Proving Consumer Understanding, Materiality/Causation/Reliance, Exposure, and Ascertainability. ....................... 10

        1.    There is No Uniform Understanding Of "Imported From Italy". ............. 11

        2.    Materiality Is Incapable Of Classwide Proof. ............................................ 13

        3.    Many Class Members Were Not Exposed To "Imported From Italy." .... 15

        4.    The Proposed Class Is Unascertainable. ................................................... 17

    C.    Plaintiff's Damages Model Violates The Minimum Requirements of *Comcast* ..................................................................................................... 18

        1.    The Model Impermissibly Rests On A Fraud-On-The-Market Theory. ......................................................................................................... 19

        2.    The Model Fails To Isolate A Premium Stemming Solely From The Allegedly Misleading Interpretation Of "Imported From Italy." ............. 20

        3.    The Model Fails To Control For Other Variables That Affect Price ........ 21

        4.    A Before-And-After Comparison Confirms There Was No Premium. ..... 23

        5.    The Model Does Not Limit Relief to Restitution. ................................... 24

    D.    Class Proceedings Are Not Superior ..................................................... 24

V.   CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Algarin v. Maybelline, LLC*,
  300 F.R.D. 445 (C.D. Cal. 2014) ....................................................................... 11, 13, 18, 23, 25

*Allen v. Hyland's Inc.*,
  300 F.R.D. 643 (C.D. Cal. 2014) ............................................................................................. 15

*Am. Meat Institute v. United States Dep't of Agriculture*,
  760 F.3d 18 (D.C. Cir. 2014) .................................................................................................. 11

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................................................ 17

*Astiana v. Ben & Jerry's Homemade, Inc.*,
  No. 10-4387, 2014 WL 60097 (N.D. Cal. Jan 7, 2014) .......................................................... 23

*Binder v. Gillespie*,
  184 F.3d 1059 (9th Cir. 1999) ................................................................................................. 19

*Bodner v. Oreck Direct, LLC*,
  No. 06-4756, 2007 WL 1223777 (N.D. Cal. Apr. 25, 2007) ................................................... 10

*Bohn v. Pharmavite, LLC*,
  No. 11-10430, 2013 WL 4517895 (C.D. Cal. Aug. 7, 2013) ........................................... 8, 9, 10

*Brazil v. Dole Packaged Foods, LLC*,
  No. 12-01831, 2014 WL 5794873 (N.D. Cal. Nov. 6, 2014) ................................... 18, 21, 22, 23

*In re Brazilian Blowout Litig.*,
  2011 WL 10962891 (C.D. Cal. April 12, 2011) ...................................................................... 15

*Brown v. Hain Celestial Grp., Inc.*,
  2014 WL 6483216 (N.D. Cal. Nov. 18, 2014) ........................................................................ 15

*Carrea v. Dreyer's Grand Ice Cream*,
  10-01044, 2011 WL 159380 (N.D. Cal. Jan. 10, 2011), *aff'd*, 475 F. App'x 113
  (9th Cir. 2012)......................................................................................................................... 13

*Carrera v. Bayer Corp.*,
  727 F.3d 300 (3d Cir. 2013)..................................................................................................... 17

*Colgan v. Leatherman Tool Group, Inc.*,
  38 Cal. Rptr. 3d 36 (2006) ...................................................................................................... 12

*Comcast Corp. v. Behrend*,
   133 S. Ct. 1426 (2013) ............................................................................. 18, 19, 20, 21, 23, 24

*In re: ConAgra Foods*,
   90 F. Supp. 3d 919 (C.D. Cal. Feb. 23, 2015) ......................................................... 20

*Creative Montessori Learning Centers v. Ashford Gear LLC*,
   662 F.3d 913 (7th Cir. 2011) ...................................................................................... 10

*Drimmer v. WD-40 Co.*,
   343 Fed. Appx. 219, 2009 WL 2519188 (9th Cir. Aug. 19, 2009) ........................ 8, 10

*Erica P. John Fund v. Halliburton*,
   131 S. Ct. 2179 (2011) .............................................................................................. 19

*Faulk v. Sears Roebuck & Co.*,
   11-02159 (YGR), 2013 WL 1703378 (N.D. Cal. April 19, 2013) .................. 8, 15, 25

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992) ...................................................................................... 8

*Hinojos v. Kohl's Corp.*,
   718 F.3d 1098 (9th Cir. 2013) .................................................................................. 15

*Hodes v. Van's Intern. Foods*,
   No. 09-01530, 2009 WL 2424214 (C.D. Cal. July 23, 2009) ...................... 13, 18, 24

*In re Hotel Telephone Charges*,
   500 F.2d 86 (9th Cir. 1974) ................................................................................ 24, 25

*Jones v. ConAgra Foods, Inc.*,
   No. C 12-01633, 2014 WL 2702726 (N.D. Cal. June 13, 2014) ...... 11, 13, 15, 17, 21

*Jovel v. Boiron, Inc.*,
   No. 11-10803, 2014 WL 1027874 (C.D. Cal. Feb. 27, 2014) ........................... 8, 9, 10

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134 (2003) ............................................................................................ 24

*Kosta v. Del Monte Foods, Inc.*,
   308 F.R.D. 217 (N.D. Cal. 2015) ..................................... 7, 11, 12, 13, 15, 16, 17, 18

*Kwikset Corp. v. Super. Ct.*,
   51 Cal. 4th 310 (2011) .............................................................................................. 24

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013) .................................................................................... 24

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) .................................................................................... 16

iii

*McKinnon v. Dollar Thrifty Automotive Group, Inc.*,
No. 12-04457 (YGR), 2016 WL 879784 (March 8, 2016) .......................................... 7, 8

*Mead Johnson & Co. v. Abbott Labs.*,
201 F.3d 883, *amended on denial of reh'g,* 209 F.3d 1032 (7th Cir. 2000) .............................. 12

*Minkler v. Kramer Labs., Inc*,
No. 12-9421, 2013 WL 3185552 (C.D. Cal. March 1, 2013) ......................................... 14, 16, 25

*Mirken v. Wasserman*,
5 Cal. 4th 1082 (1993) ........................................................................................... 19

*Moheb v. Nutramax Labs., Inc.*,
No. 12-3633, 2012 WL 6951904 (C.D. Cal. Sept. 4, 2012) .................................. 10, 11

*Mullins v. Direct Digital, LLC*,
795 F.3d 654 (7th Cir. 2015) ......................................................................... 17

*Otto v. Abbott Labs. Inc.*,
No. 5:12-cv-01411, 2015 WL 9698992 (C.D. Cal. Sept. 29, 2015) ..................................... 11, 13

*Paduano v. Am. Honda Motor Co.*,
169 Cal. App. 4th 1453 (2009) ....................................................................... 13

*In re POM Wonderful LLC*,
No. ML 10-02199, 2014 WL 1225184 (C.D. Cal. March 25, 2014) ............................. 18, 19, 20

*Pulaski v. Middleman, LLC v. Google, Inc.*,
802 F.3d 979 (9th Cir. 2015) ................................................................. 24

*Rahman v. Mott's LLP*,
No. 13-03482, 2014 WL 6815779 (N.D. Cal. Dec. 3, 2014)................................ 25

*Ries v. Arizona Beverages USA LLC*,
No. 10-01139, 2013 WL 1287416 (N.D. Cal. Mar. 28, 2013) ................................... 24

*Rikos v. Procter & Gamble Co.*,
799 F.3d 497 (6th Cir. 2015) ............................................................. 17

*Saavedra v. Eli Lilly and Co.*,
2:12-9366, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014)............................... 25

*Saavedra v. Eli Lilly and Co.*,
No. 2:12-9366, 2015 WL 9916598 (C.D. Cal. July 21, 2015)................................. 19

*Sethavanish v. ZonePerfect Nutrition Co.*,
No. 12-2907, 2014 WL 580696 (N.D. Cal. Feb. 13, 2014) ............................... 17, 18

*Sevidal v. Target Corp.*,
189 Cal. App. 4th 905 (2010) ..................................................................... 11

iv

*Sipper v. Capital One Bank*,
   No. 01-9547, 2002 WL 398769 (C.D. Cal. Feb. 28, 2002) ....................................... 10

*Stearns v. Ticketmaster Corp.*,
   655 F.3d 1013 (9th Cir. 2011) ....................................................................................... 15

*Tucker v. Pacific Bell Mobil Servs.*,
   208 Cal. App. 4th 201 (2012) ............................................................................... 11, 13

*Turcios v. Carma Labs., Inc.*,
   296 F.R.D. 638 (C.D. Cal. 2014) ................................................................................. 25

*Unites States v. Mead*,
   121 S. Ct. 2164 (2001) .................................................................................................. 11

*Werdebaugh v. Blue Diamond Growers*,
   No. 12-02724, 2014 WL 7148923 (N.D. Cal. Dec. 15, 2014)............................ 19, 21, 22, 23, 25

**Statutes & Rules**

28 U.S.C. § 2072(b) ............................................................................................................ 17

Cal. Bus. & Prof. Code § 6147 ......................................................................................... 10

Cal. Rules of Prof'l Conduct, Rule 2-200 .......................................................................... 10

Fed. R. Civ. 23 .............................................................................................................. 7, 17

Fed. R. Evid. 609(a)(1) ....................................................................................................... 9

**Other Authorities**

AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000) ............................ 12

MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.m-w.com ...................................... 12

OXFORD ENGLISH DICTIONARY ONLINE, www.oed.com .................................................. 12

## I. INTRODUCTION

Plaintiff seeks to certify a California class of consumers who purchased six different lines of Filippo Berio olive oil products over a five-year period because, she contends, the phrase "Imported from Italy" was false and deceptive.  Plaintiff contends that consumers misunderstood the phrase "Imported from Italy" to mean that the oil was made exclusively from Italian olives.  But plaintiff has no evidence that even she, let alone all California consumers, misunderstood the phrase in that way.  Plaintiff's deposition testimony is that she understands "imported" to mean "shipped out of," which is accurate and consistent with standard usage, but defeats her claim.  This failure of proof alone renders plaintiff inadequate as a representative and defeats class certification.

Plaintiff's purchasing experience also illustrates why individual issues would predominate over common issues.  Plaintiff has no proof that she ever purchased Filippo Berio olive oil, does not recall when she bought the product, whether the label said "Imported from Italy," or what price she paid.  Plaintiff also admitted that her standard practice is to turn over the bottle and look for the "best by" date, which on Filippo Berio products is adjacent to a clear disclosure that the oil is "Packed in Italy with oils from Italy, Spain, Greece, and Tunisia."  If plaintiff is typical of other consumers, then any class would include thousands of persons who likewise cannot remember where or when they purchased a covered product, which product they purchased, how much they paid for it, what parts of the label they read, or what they understood the challenged statement to mean.

Plaintiff's damages model fares no better.  It assumes liability for every purchaser and that the market price of Filippo Berio olive oil products was artificially inflated for consumers who did not read or misunderstand the phrase "Imported from Italy."  As a matter of law, this model reflects a "fraud on the market" approach to damages that does not apply to consumer goods.  Moreover, plaintiff's expert proposes a damages model, not one for restitution or disgorgement.  The model thus does not fit the theory of liability as alleged under the UCL and FAL claims.  For these and other reasons set forth below, the Court should deny class certification.

## II. FACTUAL BACKGROUND

Defendant Salov North America Corp. ("SNA") is the exclusive U.S. distributor of Filippo Berio olive oil.  Mueller Decl. ¶ 4.  SNA has always stood behind the quality of its products, offering

consumers full refunds or replacements for any reason.  *Id.* ¶ 39; Commons Decl. Ex. B 155:20-156:24, 157:13-159:7.

During the class period, the Filippo Berio brand has included six distinct lines: Robusto Extra Virgin Olive Oil; Delicato Extra Virgin Olive Oil; Organic Extra Virgin Olive Oil; Extra Virgin Olive Oil; Olive Oil; and Extra Light Tasting Olive Oil.  Mueller Decl. ¶ 12.  Each Filippo Berio product has a unique flavor profile achieved by master blenders in Italy, using olive oils from Italy, Spain, Greece, and Tunisia.  *Id*. ¶¶ 7-9; Commons Decl. Ex. B 342:8-24.  Prior to bottling, the olive oils in Filippo Berio products undergo multiple, rigorous chemical and organoleptic tests at a state-of-the-art facility in Massarossa, Italy, to ensure superior quality and a consistent taste profile.  Mueller Decl. ¶¶ 4-9.  The products are then exported from Italy to the United States.

Plaintiff alleges that a claim formerly printed in small text on the top left corner of labels – "Imported from Italy" – is false and misleading and that, as a result of this claim, every California consumer overpaid for Filippo Berio olive oil products.  The record shows, however, that all Filippo Berio olive oil products regularly undergo U.S. Customs inspections, frequent testing/inspections by Italian authorities, as well as FDA testing.  Mueller Decl. ¶¶ 10-11.  U.S. Customs typically inspects Filippo Berio products several times a year.  It has never rejected a shipment of Filippo Berio on the ground that the products were improperly labeled as "Imported from Italy."  *Id.*; Commons Decl. Ex. B 396:14-397:3.  Nor would there be any reason to do so.  With minor variations, every bottle has stated that it is "Packed in Italy with oils from Italy, Spain, Greece, and Tunisia," and Filippo Berio is a unique product created by artisans in Italy.  Mueller Decl. ¶¶ 5, 7-11 & Ex. A.

## A.    The Labeling of Filippo Berio Products

The challenged phrase "Imported from Italy" was barely legible during the class period on those bottles on which it appeared.  For example, on the 16.9 ounce size bottles (the most popular size of Filippo Berio), the phrase shrunk from eight-point black font, to less than eight-point black font, to less than six-point black font, and often was against a dark green field on the Extra Virgin product lines.  Mueller Decl. ¶¶ 15, 17-19 & Exs. A-B (reproducing labels); Commons Decl. Ex. B 348:12-349:11; Simplicio Decl. Ex. 8 at 106:24-107:25.  A version of the Organic Extra Virgin Olive Oil label dropped all references to the product being "Imported from Italy," and bottles lacking

the "Imported from Italy" phrase were sold side-by-side with challenged products during the class period, with no price difference (Mueller Decl. ¶¶ 15-16) and – given the small font – likely no customer noticing a difference.  SNA also ran periodic promotions during the class period using "neck collars".  Neck collars entirely obscure the top half of labels, including the phrase "Imported from Italy." *Id.* ¶¶ 35-36 & Ex. C; Commons Decl. Ex. B 428:6-430:12, 430:25-431:24; Ex. C.

SNA decided to remove "Imported from Italy" from all Filippo Berio labels before this lawsuit due to a prior lawsuit in the District of Columbia.  Mueller Decl. ¶¶ 20-21; Commons Decl. Ex. B 93:11-25.  Although products with the new labeling appeared on retailers' shelves at different times, depending on retailer, product, line, and bottle size, the new labels first appeared in mid-2015, and no later than September 2015.  Mueller Decl. ¶ 22; Commons Decl. Ex. B 277:2-278:24.  SNA did not lower the price for Filippo Berio olive oils due to the label change, nor did it change the methodology it used to set regular and promotional pricing.  Mueller Decl. ¶ 33.

**B.      The Pricing of Filippo Berio Products**

The market for olive oils is highly competitive, with multiple brands and retailers competing for market share. *Id.* ¶¶ 23-26.  Depending on the year and region, SNA generally has accounted for between 0.5% and 2% of the California market. *Id.* ¶ 38.  SNA's pricing has needed to be competitive in California, resulting in ███████ the class period. *Id.*

SNA does not set the prices charged to consumers, which vary by retailer, location, time (e.g., due to fluctuations in bulk oil prices), and due to promotions, coupons, and rewards. *Id.* ¶ 37; Commons Decl. Ex. B 316:11-322:12.  SNA offers coupons and promotions throughout the year. *Id.* Filippo Berio products can be among the most affordable olive oils on a store shelf, if not the most affordable.  Mueller Decl. ¶ 37.  But because SNA does not control retail pricing, at any given time, two consumers could pay anywhere between $4.99 to $10.99 for the same Filippo Berio product. *Id.*

During the time when the labels included the phrase "Imported from Italy," SNA never priced its products as if they contained 100% Italian olive oil or in any way pegged its pricing to that of 100% Italian olive oil products. *Id.* ¶ 27.  This is because SNA does not position its products as single-country sourced products. *Id.*  Single-sourced products typically emphasize the use of "100% [name of country] olive oil," describe themselves as a "Product of [name of country]," and often sell

at higher prices. *Id.* SNA is not aware of any product sold in California (or the U.S.) that contains 100% Italian olive oil, but describes the product as merely "*Imported* from Italy," much less that would do so with small font in the corner of a label. *Id.* ¶ 28. SNA also is not aware of any product sold in California (or the U.S.) labeled as Light Olive Oil, Light Tasting Olive Oil, or Olive Oil (as opposed to Virgin or Extra Virgin olive oil) that contains 100% Italian olive oil. *Id.* ¶¶ 29-32.

SNA's pricing to retailers has not changed since it replaced "Imported from Italy" with "Imported". *Id.* ¶¶ 32-34; Commons Decl. Ex. B 427:6-428:5. SNA prices those products exactly the same as, and shipped them alongside, products with the old labels. *Id.* SNA is not aware of any instance where a wholesaler or retailer asked to pay a different or lower price due to the label change, or where a wholesaler or retailer instituted different pricing because of the label change. *Id.* Based on all of the information available to SNA, the label change has had no impact on retail pricing. *Id.* If anything, the unit retail price of Filippo Berio has increased since the change. *Id.*

### C.   Studies On Consumer Preferences & Practices Regarding Reading Back Labels

Plaintiff has offered no evidence about how consumers construe the phrase "Imported from Italy" or whether a measurable percentage of California purchasers of Filippo Berio both mistakenly read the front label as implying that a bottle contained 100% Italian olive oil *and* never read the back label to clear up that misunderstanding. Plaintiff's evidence relates only to the general question of whether consumers care about the country of origin for olive oils. And that evidence unequivocally demonstrates that country of origin is immaterial to most consumers.[1]

The surveys reveal that consumers report being influenced by myriad factors, such as price, advertising, product placement, container type (tin, glass, or plastic), packaging appearance, tinting (opaque or clear), oil color (e.g., green or yellow), recipes (e.g., on labels or hang tags), nutritional information, package size, recommendations (e.g., by family, friends, experts, bloggers, and food sites), the "best-by" date, product descriptions on back labels, organic, all natural, quality seals, and

---

[1] *E.g.*, Simplicio Decl. Ex. 20, SNA-0005700 ("Most say that country of origin is [sic] doesn't matter"), SNA-0005719 (62% agree that: "When I buy olive oil, it doesn't really matter to me which country the olive oil comes from"), Ex. 23, SNA-0011123, Q.24 (only 2-7% consider country of origin important), SNA-0011127 (52% do *not* know where olive oil comes from); Commons Decl. Ex. J at 7 ("Most respondents (60 percent) were neutral" as to domestic or imported oil and, of those with a preference, imported beat domestic by just 24% to 16%).

statements about intended uses.  *E.g.*, Simplicio Decl. Ex. 20 at SNA-0005717-18, Ex. 22 at SNA-0014177-8586, Ex. 23 at SNA-0011097, 0011123-26; Commons Decl. Ex. J at 4-6.  Relevant here, several surveys confirm that many olive oil purchasers read the back label prior to purchase.  *E.g.*, Simplicio Decl., Ex. 20 SNA-0005717 (nearly a third of consumers).  As many as 80% of consumers look for the "best-by" date (*id.* Ex. 23, SNA-001112), which has always been on the back label of Filippo Berio products in close proximity to the statement "Packed in Italy with oils from Italy, Spain, Greece, and Tunisia."  Mueller Decl. Ex. A

### D. The Facts Surrounding Plaintiff's Claims

In January 2014, plaintiff met a friend for lunch.  The friend – now her lawyer in this case – raised the subject of olive oil litigation and the Filippo Berio brand.  Commons Decl. Ex. D 151:11-156:19, 159:1-25; Ex. G 21:15-25:16, 27:2-30:9, 141:20-142:11.  Plaintiff had never intended to discuss olive oil.  *Id.* Ex. D 151:18-152:8.  Prior to that lunch, she never had any complaints about olive oil or Filippo Berio.  *Id.* 18:1-5, 18:20-19:3.  She had never asked SNA or a retailer for a refund or replacement.  *Id.* 18:6-19, 19:4-7.  Not long after the lunch, she was persuaded to file two lawsuits.  *Id.* Ex. G 31:7-33:11.

Plaintiff has never purchased five of the six Filippo Berio products at issue.  She *never* purchases non-extra virgin olive oils.  Commons Decl. Ex. D 98:21-99:5 ("Have you ever purchased a non-extra-virgin olive oil product?  A. I have not."); *but see Id.* Ex. E (verified interrogatory response stating plaintiff "typically purchases" extra virgin).  The only Filippo Berio purchase she recalls is of a single bottle of Filippo Berio Extra Virgin Olive Oil.  *Id.* Ex. D 62:19-66:10.  Her complaint and interrogatory responses state it occurred at a Safeway in Berkeley (Compl. ¶ 48), though it could have been at a Target or Berkeley Bowl (*id.* Ex. D 61:9-16).  She cannot recall the month or year of the alleged purchase, except that it was before the January 2014 meeting recruiting her to file this lawsuit.  *Id.* 143:12-19.  Although she typically uses a credit card and club card, she has been unable to produce a receipt, credit card statement, club card statement, or other evidence to prove that she ever purchased Filippo Berio, let alone the date, size, labeling, or price.  *Id.* 39:5-42:25, 129:19-23; Ex. G 70:2-72:9; Ex. F at 43-46, Ex. L at 4-5, 7-8.  She has not purchased Filippo Berio since and has no plans to do so in the foreseeable future.  *Id.* Ex. D. at 160:23-162:17.

According to the complaint, plaintiff "specifically reviewed" the "Imported from Italy" phrase prior to purchase and allegedly misunderstood the phrase to mean "made from olives that were grown and pressed [exclusively] in Italy." Compl. ¶ 47. The complaint further alleges that plaintiff would not have purchased the bottle, or would have paid less, had she known it was not 100% Italian olive oil. Compl. ¶¶ 49, 72. At deposition, plaintiff's story changed. She was not certain whether the label said "Imported from Italy." Commons Decl. Ex. D 192:19-22. She also testified that she understands "imported" to mean "shipped out of that country but -- yeah, mainly that" (*id.* at 151:2-10). All Filippo Berio products are shipped out of Italy. Mueller Decl. ¶¶ 10-11.

Discovery also uncovered no evidence that plaintiff prefers 100% Italian olive oils. She has not produced a single receipt, or any other evidence, that she purchases olive oils labeled as "Italian olive oil," "100% Italian Olive Oil," or "Product of Italy." Commons Decl. Ex. F at 10-13 (denying that plaintiff has purchased olives oils with this labeling). Instead, she buys olive oils from "Greece or Italy or Spain," among other countries, or California varietals. *Id.* Ex. G 37:17-39:3; Ex. D. 19:24-20:7. Plaintiff could not recall whether the price of Filippo Berio Extra Virgin Olive Oil was the same or cheaper than other extra virgin olive oils on sale at Safeway the day of her alleged purchase. *Id.* Ex. D. 146:7-23.

As for reading back labels, plaintiff refused to admit in response to written discovery that she looked at the "best by" date prior to purchase. Commons Decl. Ex. F at 14-15 ("Plaintiff does not recall"). But plaintiff has now testified twice that her practice is to look at best-by dates, including before her alleged purchase of Filippo Berio:

> Q. Do you typically look at best-by dates?
> A. Yeah. I try and look at the "best by" dates of products that are a perishable product.
> Q. Do you consider olive oil a perishable product?
> A. I do, yes.

*Id.* Ex. G. 78:14-20; Ex. D 131:12-25, 139:17-25, 142:20-143:11, 149:23-150:14, 195:5-15. She agrees that, in her experience, the "best by" date appears on the back label of olive oil bottles (*id.* Ex. D at 139:16-25), and the undisputed evidence is that the "best by" date has always and only appeared on the back label of Filippo Berio products. *Id.* Ex. B 374:3-25; Mueller Decl. Ex. A. Her

testimony contradicts her counsel's representations to this Court in opposing a motion to dismiss: "The response is quite simple; that she does not allege that she read the back of the bottle.  In fact, she did not read the back of the bottle."  Commons Decl. Ex. A 3:16-4:1.  Plaintiff's counsel assured the Court that, "I can say as a matter of fact that she did not read the back of the bottle before purchasing it."  *Id.* 6:18-19.  The representation was material to the Court's order on the motion to dismiss.  Dkt. # 50 (denying motion in part due to lack of allegation that plaintiff read back label).

### E.    Plaintiff's Proposed Damages Model

Plaintiff's motion relies on a so-called "hedonic regression" model sponsored by Colin Weir. The model assumes a product is priced as the sum of its attributes, each attribute affecting consumer utility and, thus, price.  Commons Decl. Ex. H 82:8-20; *but see* Mueller Decl. ¶¶ 23-26.  Mr. Weir claims the phrase "Imported from Italy" is a product attribute, and that his model can measure an aggregate "price premium" over the class period for all product lines and sizes, as a percentage of the aggregate retail price.  To do this, his model compares aggregate sales data for Filippo Berio products against aggregate sales and pricing data for other olive oil products from other brands, and purports to control for certain attributes.  Weir Decl. ¶¶ 18, 20, 40; Commons Decl. Ex. H 73:7-74:17.  For his aggregate damages model to function, Mr. Weir's model assumes liability has been established as to every purchase of Filippo Berio during the class period, regardless of whether an individual saw the labeling, understood the labeling, read the back label, relied upon the labeling prior to purchase, saved money by purchasing Filippo Berio, or still would have purchased Filippo Berio for the same price even with perfect information.  *Id.* 71:4-19, 76:5-9, 76:23-78:13.

## III.    LEGAL STANDARD

Plaintiff has the burden to establish the requisites of class certification, which include showing that she is an adequate class representative, that her claims are typical of others, that individual issues will not predominate over common issues, that she has an adequate model for establishing classwide injury and damages, and that a class action is superior.  *See* Fed. R. Civ. 23; *McKinnon v. Dollar Thrifty Automotive Group, Inc.*, No. 12-04457 (YGR), 2016 WL 879784, *4-5 (March 8, 2016); *accord Kosta v. Del Monte Foods, Inc.*, 308 F.R.D. 217, 222-23 (N.D. Cal. 2015); *Faulk v. Sears Roebuck & Co.*, 11-02159 (YGR), 2013 WL 1703378, *5 (N.D. Cal. April 19, 2013).

1

## IV.    ARGUMENT

### A.    Plaintiff Is Not Adequate or Typical.

A plaintiff "subject to unique defenses, which threaten to become the focus of the litigation" is neither adequate or typical. *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508-09 (9th Cir. 1992); *McKinnon*, 2016 WL 879784, at *9.  Inconsistent testimony, evidence of selective recall, and questions about credibility that expose named plaintiffs to challenge render them inadequate. *Jovel v. Boiron, Inc.*, No. 11-10803, 2014 WL 1027874, at *4-5 (C.D. Cal. Feb. 27, 2014); *Bohn v. Pharmavite, LLC*, No. 11-10430, 2013 WL 4517895, at *2 (C.D. Cal. Aug. 7, 2013).  Furthermore, plaintiffs who are friends with class counsel, or who unduly rely on their counsel, are inadequate because they cannot be trusted to place the interests of the class above the interests of their lawyers in obtaining fees. *Drimmer v. WD-40 Co.*, 343 Fed. Appx. 219, 2009 WL 2519188, at *1 (9th Cir. Aug. 19, 2009); *Bohn*, 2013 WL 4517895, at *3-4.  Here, plaintiff is inadequate and not typical for all of these reasons.

First, the number and strength of SNA's defenses against plaintiff's own claim render her inadequate.  Plaintiff will be hard-pressed to prove even that she purchased any Filippo Berio product.  She lacks any tangible proof of having made her one alleged purchase.  Her memory of her purchase is inconsistent and incomplete (e.g., about when and where it occurred, the price she paid, and of comparable products for sale).  She was recruited to be a plaintiff, she had to be coached during a break to remember how to spell the name of the brand, and her general purchasing practices do not appear to favor oils imported from Italy or 100% Italian olive oils. *See supra* II.D; Commons Decl. Ex. D 19:8-22:11; Ex. G 37:17-39:3; *Faulk*, 2013 WL 1703378, at *9-10 (denying certification, citing plaintiff's "own tire purchase history" as "cast[ing] doubt" on his claims).

But even if she could prove that she purchased a bottle of Filippo Berio, SNA has strong grounds to argue that she was not misled.  Plaintiff understands "Imported" to mean "shipped out of," and it is undisputed that Filippo Berio is "shipped out of" Italy.  Commons Decl. Ex. D 151:2-10.  She admitted that she read the "best by" date on the back label prior to purchase, which states "Packed in Italy with oils from Italy, Spain, Greece, and Tunisia." *Id.* 131:12-25, 139:17-25, 142:20-143:11, 149:23-150:14, 195:5-15; Ex. G 78:14-20.  She was not certain that the label on her

8

bottle said "Imported from Italy," raising questions about whether she read the challenged statement at all. *Id.* Ex. D. 192:19-22.  And even assuming that she saw "Imported from Italy" and thought this meant "100% Italian," she will face great difficulty proving this mattered to her, as she has no evidence of ever having purchased oil that is "100% Italian" in origin, and she testified that her practice is to buy oils sourced from a number of different countries. *See supra* II.D.  These strong defenses to her individual claim compromise her ability to represent a class. *See Bohn*, 2013 WL 4517895, at *3 (denying certification because of "serious questions about [the plaintiff's] standing to assert the UCL and CLRA claims").

Second, given her lack of tangible evidence, her claim turns on her word, and her credibility is subject to challenge.  To credit her claim, a fact finder would need to believe she purchased Filippo Berio, read and misunderstood small text on the top left corner of the front label, overlooked prominent text about the countries of origin despite reading the adjacent "best by date," and was prompted by her misunderstanding of the country of origin to buy the product, even though this did not matter to her when she made other olive oil purchases.  Plaintiff also undercut her credibility by providing incomplete deposition and discovery responses that conflict with each other as well as allegations in the complaint, while recalling minutiae when asked questions by her counsel. *See Bohn*, 2013 WL 4517895, at *2-3 (finding plaintiff's testimony that she was "certain" she "read and relied" on the disputed claim "troubling" given her inability to remember "almost every other circumstance of her purchase").  Plaintiff also admits to having been convicted of a felony, which further undercuts her credibility.  Commons Decl. Ex. D 48:9-11; Fed. R. Evid. 609(a)(1).  Where credibility is front and center, and the record raises doubts, courts deny certification. *E.g.*, *Jovel*, 2014 WL 1027874, at *4 (denying certification in false labeling case because of credibility issues about "whether [the plaintiff] actually relied on Oscillo's label").

Third, plaintiff's personal ties with counsel exacerbate the concerns about her credibility and supposed independence.  Beyond the fact of her recruitment to be a plaintiff, she has no independent knowledge of facts underlying key aspects of the complaint. *See*, *e.g.*, Commons Decl. Ex. D 95:3-102:2, 118:21-23.  She could not testify whether verified discovery responses were truthful because she had relied entirely on counsel. *Id.* 51:5-61:16, 75:5-85:23; Exs. E-F.  Her long-standing personal

relationship with counsel combined with a *de minimis* personal stake poses "'the danger of champterty,' especially when the attorney's fees 'will vastly exceed what any of the class members will receive.'"  *Bohn*, 2013 WL 4517895, at *3; *see also Drimmer*, 2009 WL 2519188, at *1 (affirming denial of certification because personal relationship created risk that plaintiff's "decisions may not be based on the best interests of class members, but on the best interests of his attorney"); *Moheb v. Nutramax Labs., Inc.*, No. 12-3633, 2012 WL 6951904, at *5-6 (C.D. Cal. Sept. 4, 2012) (denying certification where counsel researched possibility of suit before recruiting plaintiff, who was a friend of counsel's mother).

Finally, plaintiff's counsel cannot fill plaintiff's credibility gap.  Plaintiff's counsel told this Court that plaintiff did not turn the bottle over prior to purchase to defeat a motion to dismiss.  *See* Commons Decl. Ex. A 3:16-4:1.  That was false, yet counsel never corrected the record.  Plaintiff's counsel also repeatedly attempted to enforce subpoenas in violation of a discovery stay.  Commons Decl. ¶ 12 & Exs. M-O.  And plaintiff's lawyers appear to have violated Rule 2-200 of the Rules of Professional Conduct and Business & Professions Code § 6147(a)(2).  *See* Commons Decl. ¶ 13 & Ex. P.  "When class counsel have demonstrated a lack of integrity, a court can have no confidence that they will act as conscientious fiduciaries of the class."  *Creative Montessori Learning Centers v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011); *Bodner v. Oreck Direct, LLC*, No. 06-4756, 2007 WL 1223777, at *2-3 (N.D. Cal. Apr. 25, 2007) (denying certification because of counsel's unethical "cart before the horse" approach of constructing lawsuit before it had a plaintiff); *cf. Sipper v. Capital One Bank*, No. 01-9547, 2002 WL 398769, at *3-5 (C.D. Cal. Feb. 28, 2002) (denying certification due to class counsel's failure to disclose to court business relationship with plaintiff).

Consequently, the motion should be denied due to lack of adequacy and typicality.

### B.  Individual Issues Predominate Regarding Proving Consumer Understanding, Materiality/Causation/Reliance, Exposure, and Ascertainability.

The record on plaintiff's personal claims underscores why individual issues will predominate and overwhelm any common issues as to the fraud, UCL, FAL, and CLRA claims asserted here. Each of these claims requires a material misrepresentation, and the CLRA and fraud claims require proof of individual reliance and deception.  *Otto v. Abbott Labs. Inc.*, No. 5:12-cv-01411, 2015 WL

10

9698992, at *5 (C.D. Cal. Sept. 29, 2015); *Kosta*, 308 F.R.D. at 224.  Even under the broadest possible construction, class actions involving claims sounding in fraud or deception cannot include persons who were not exposed to allegedly misleading statements or provide monetary relief to persons when there is no connection between alleged misstatements and purchasing decisions.  *E.g.*, *Sevidal v. Target Corp.*, 189 Cal. App. 4th 905, 929 (2010) (describing issue as "well settled"); *Moheb*, 2012 WL 6951904, at *7 (collecting federal and California authorities).  Contrary to what plaintiff suggests, "causation and injury" cannot "be inferred on a class-wide basis' in every case." *Jones v. ConAgra Foods, Inc.*, No. C 12-01633, 2014 WL 2702726, at *14 (N.D. Cal. June 13, 2014).  The record must support it, and this record does not.  *See Tucker v. Pacific Bell Mobil Servs.*, 208 Cal. App. 4th 201, 229 (2012).

### 1.    There is No Uniform Understanding Of "Imported From Italy".

The labeling for Filippo Berio products changed throughout the class period, but even assuming the "challenged statements were uniform," individual issues predominate when "consumers' *understanding* of those representations would not be."  *Jones*, 2014 WL 2702726, at *14, 16.  Plaintiff argues this rule should apply only when product labels vary, but *Jones* and other courts (including this one) have applied the rule assuming uniform labeling.  *Kosta*, 308 F.R.D. at 229 (denying certification setting aside "variation on the labeling and packaging").

Plaintiff has offered no evidence whatsoever that consumers misunderstood the phrase "Imported from Italy."  She cites advisory letters that have no force of law and a case about a First Amendment dispute.  *See Unites States v. Mead*, 121 S. Ct. 2164, 2175 (2001) ("Any suggestion that [CBP] rulings intended to have the force of law are being churned out at a rate of 10,000 a year at an agency's 46 scattered offices is simply self-refuting."); *Am. Meat Institute v. United States Dep't of Agriculture*, 760 F.3d 18, 24 (D.C. Cir. 2014).  Neither opines on consumer understanding.

In contrast, the evidence is that consumers, including the named plaintiff, interpret "Imported from Italy" to mean "shipped from Italy," which would preclude those consumers from seeking monetary relief, as it is undisputed that Filippo Berio olive oil products are shipped from Italy.  *See* Commons Decl. Ex. D. 151:2-10; *Algarin v. Maybelline, LLC*, 300 F.R.D. 445, 457, 459 (C.D. Cal. 2014) (rejecting class certification where evidence showed some consumers did not interpret "24

hour" to mean cosmetics would last for 24 hours).  Dictionaries better reflect common usage than agency letters, and dictionaries define "import" as "[t]o bring or carry in from an outside source, especially to bring in (goods or materials) from a foreign country for trade or sale."  AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000).[2]  "[P]hilologists and others who contribute to dictionaries devote their lives to discovering usage and interpreting nuance.  It would be a bad idea to replace the work of these professionals with the first impressions of people on the street."  *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 886 (rejecting false advertising claim), *amended on denial of reh'g,* 209 F.3d 1032 (7th Cir. 2000); *Colgan v. Leatherman Tool Group, Inc.*, 38 Cal. Rptr. 3d 36, 51 (2006) (citing dictionary to evaluate if "made in U.S.A." was misleading).

Plaintiff also has offered no evidence that any purported misunderstanding about the meaning of "Imported from Italy" can be shown with common proof.  *See Kosta*, 308 F.R.D. at 229.  Given obvious differences in pricing and labels, any consumer who paused at a store shelf could distinguish between single-sourced olive oils and those merely imported from a country.  Mueller Decl. ¶¶ 27-32.  Plaintiff does not account for any of the factors that shape consumer understanding.  She relies on evidence about consumer *preferences*, which shows that, among myriad factors, some consumers care about country of origin.  *See, e.g*., Simplico Decl. Ex. 22 at SNA-0014177; Ex. 23 at SNA-0011123-24.  But consumer preference is different than consumer understanding; were it otherwise, then these data would show that country of origin is unimportant to perhaps 93-98% of consumers, further confirming that certification is inappropriate.  *Id*. Ex. 23 at SNA-0011123, Q.24.

Even if plaintiff could (belatedly) offer evidence in her reply submission on consumer understanding of the phrase "Imported from Italy", that would not suffice.  Plaintiff still would have no way to distinguish between putative class members who understood the phrase and those who purportedly misunderstood it to mean "Imported from Italy using 100% Italian olive oils."  Moreover, as many as 80% of consumers (like plaintiff) look for "best by" dates, which means the vast majority of consumers presumptively saw the statement "Packed in Italy with oils from Italy,

---

[2] *See also* OXFORD ENGLISH DICTIONARY ONLINE, www.oed.com ("To bring in or cause to be brought in (goods or merchandise) from a foreign country, in international commerce. Opposed to export."); MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.m-w.com (defining "imported" as "to bring (as merchandise) into a place or country from another country").

Spain, Greece, and Tunisia" next to the "best by" date on Filippo Berio bottles.  Mueller Decl. Ex.

A.  Plaintiff has no common evidence to distinguish between people who might have misunderstood

the phrase, but read the back label and then understood the meaning of the phrase.  *Paduano v. Am.*

*Honda Motor Co.*, 169 Cal. App. 4th 1453, 1469-70 (2009) (holding brochure page advertising "51

mpg" in large yellow font not actionable where another page explained the rating referred only to

manual not automatic models); *Carrea v. Dreyer's Grand Ice Cream*, 10-01044, 2011 WL 159380,

*6 (N.D. Cal. Jan. 10, 2011) (evaluating claims looking at "statements on the . . . packaging taken as

a whole"), *aff'd*, 475 F. App'x 113 (9th Cir. 2012).  Individual issues relating to how consumers

understood the phrase "Imported from Italy" thus defeat class certification.

### 2.      Materiality Is Incapable Of Classwide Proof.

Plaintiff has failed to "offer evidence that the materiality of the alleged unlawful, deceptive,

or misleading statements could be established on a classwide basis."  *Kosta*, 308 F.R.D. at 229.

"[I]n all but the most unusual case, plaintiffs must offer some means of proving materiality and

reliance by a reasonable consumer on a classwide basis in order to certify a class."  *Id.* at 225.  When

materiality and reliance "vary from consumer to consumer," they are "not subject to common

proof …." *Tucker*, 208 Cal. App. 4th at 228.[3]  Indeed, "it is evident that common issues do not

predominate" when materiality and reliance turn on "individual purchasing inquiries."  *Algarin*, 300

F.R.D. at 459.  For instance, in *Algarin*, the court found "materiality and reliance" were "not subject

to common proof" because consumers made purchasing decisions for myriad reasons aside from an

allegedly deceptive statement of "24 hour" on the label.  *Id.* at 453-454, 457.  This Court and many

others have rejected class certification in labeling cases for the same reason.  *E.g.*, *Kosta*, 308 F.R.D.

at 229-30 (rejecting certification due to lack of common proof of materiality); *Otto*, 2015 WL

9698992, at *5-6 (denying certification because materiality of statement "rebuild strength" would

vary by consumer); *Jones*, 2014 WL 2702726, at *16 (denying certification because of "numerous

reasons a customer might buy Hunt's tomatoes" aside from "100% natural" labeling); *Minkler v.*

---

[3] *See also Hodes v. Van's Intern. Foods*, No. 09-01530, 2009 WL 2424214, at *4 (C.D. Cal. July 23,
2009) (explaining that "[w]hile proof of individual reliance may not be necessary to assert claims
under the FAL and UCL," "Courts in the Ninth Circuit and in California have regularly found that
where such inquiries predominate …, courts may refuse to certify a class action").

1    *Kramer Labs., Inc*, No. 12-9421, 2013 WL 3185552, at *4, 6 (C.D. Cal. March 1, 2013) (denying

2    certification because of need to exclude consumers for whom "the appearance of the products'

3    packaging would not have been important to their purchasing decision").

4         Consumers buy olive oils for myriad reasons apart from country of origin.  In fact, country of

5    origin is not material to a majority of consumers – perhaps as few as 2-7% – and certainly less

6    important compared to factors like product type, price, flavor, and brand.  Simplicio Decl. Ex. 20 at

7    SNA-0005700, SNA-0005719, Ex. 23 at SNA-0011123, SNA-0011127; Commons Decl. Ex. J at 7.

8    No regular "Olive Oil" or "Light Tasting Olive Oil" sold in California (or the U.S.) has been

9    marketed as 100% Italian (Mueller Decl. ¶ 29), proving that no one in the marketplace believes

10   consumers of these products value use of 100% Italian olive oils.  Plaintiff points to surveys that

11   suggest some consumers believe the best olive oil comes from Italy (Mot. 19), but the surveys do not

12   purport to explain what motivates purchasing decisions or whether consumers will pay more.  They

13   also are equally consistent with consumers preferring oils imported from Italy (regardless of whether

14   they are 100% Italian) due to Italian quality control, culinary expertise, or artisanal blending.

15        Plaintiff next argues that consumers associate the Filippo Berio brand with Italy, but that is

16   natural, as the brand was founded in Italy, has an Italian name, and the products are blended in Italy.

17   Mueller Decl. ¶¶ 4-5.  In any event, such surveys are beside the point,[4] because the question is

18   whether consumers who would interpret the phrase "Imported from Italy" to mean "100% Italian

19   olive oil" would consider the phrase material, not whether they associate Filippo Berio with Italy.

20   The lack of importance of country of origin is evident because SNA relegated "Imported from Italy"

21   to ever smaller fonts in the corner of labels over the years, and replacing the phrase with "Imported"

22   has had no impact on pricing or demand.  *Id.* ¶¶ 14-22, 33-34.  Plaintiff's own testimony shows that

23   she regularly purchases oils from Greece, Spain, and California, among other regions – i.e., is

24   agnostic about country of origin.  *See supra* II.D; *see also Faulk*, 2013 WL 1703378, at *9-10 (citing

25   _____

26   [4] Plaintiff's expert cites a nationwide survey of multiple brands as evidence that "71% of users
     believe their olive oil comes from Italy."  Weir Decl. ¶ 16 (Dkt. 84-35).  He omits that this statistic
27   relates to a *minority* of survey respondents who had answered an earlier question confirming that
     they knew where their olive oil came from.  Simplicio Decl. Ex. 23 at SNA-0011127.  Until 2014,
28   Italy always had been the largest exporter of olive oil for decades, so it is not surprising that a
     majority of respondents would believe their olive oil came from Italy.  Mueller Decl. ¶ 20.

1  plaintiff's "tire purchase history" as bearing on the viability of his claims).

2          Plaintiff tries to circumvent her obligation to prove materiality by arguing that cases like this

3  Court's decision in *Kosta* and the *Jones* decision did not assert a claim "under the UCL

4  'unlawfulness' prong that does not depend on materiality." Mot. 20. This Court, however, has

5  already found that argument unavailing:

6          [T]he Court is not persuaded by Plaintiffs' argument that their claim under the
           UCL's unlawful prong, based on violation of California's Sherman Law … is
7          subject to classwide proof without the need to show materiality or reliance. As
           the California Supreme Court held in *Kwikset,* with respect to similar statutory
8          violations, the question of consumer deception still requires a showing of
           reliance.
9

10 *Kosta*, 308 F.R.D. at 230-31; *Jones*, 2014 WL 2702726, at *14 n. 27 ("An 'unlawful' theory will not

11 solve Plaintiff's reliance problem."). Implying that this Court overlooked Ninth Circuit authority,

12 plaintiff argues that *Hinojos v. Kohl's Corp.*, 718 F.3d 1098 (9th Cir. 2013) supports her

13 construction of the UCL's "unlawful" prong. Mot. at 20. But *Hinojos* held that the UCL's unlawful

14 prong requires reliance and but-for causation (718 F.3d at 1109), and, in any event, the language

15 plaintiff quotes relates to a motion to dismiss, not class certification (*id.* at 1107). Plaintiff cites one

16 district court that has misconstrued *Hinojos*, but it is out of step with decisions by this Court and

17 others. *See* Mot. 20 (citing *Rahman v. Mott's LLP*, No. 13-03482, 2014 WL 6815779, at *7 (N.D.

18 Cal. Dec. 3, 2014)).[5] Thus, plaintiff has not satisfied her burden to demonstrate classwide

19 materiality, including under the UCL's unlawful prong.

20          **3.       Many Class Members Were Not Exposed To "Imported From Italy."**

21          Individual issues also predominate over the threshold question of whether putative class

22 ─────────────────
   [5] Plaintiff cites *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022-23 (9th Cir. 2011), *Brown v.
23 Hain Celestial Grp., Inc.*, 2014 WL 6483216, *17 (N.D. Cal. Nov. 18, 2014), and *Allen v. Hyland's
   Inc.*, 300 F.R.D. 643, 667 (C.D. Cal. 2014) for the unremarkable proposition that differences in the
24 factors that motivate purchases will not always defeat predominance. Mot. 17. SNA is not arguing
   for a blanket rule, only that differences matter here. *Allen* and *Stearns* both recognized that
25 certification was improper where, as here, either materiality varies among consumers or plaintiff
   cannot establish classwide exposure (*Allen*, 300 F.R.D. at 668; *Stearns*, 655 F.3d at 1022-23). For
26 the same reasons, the cases plaintiff cites on pages 17-18 of her Motion are distinguishable. *See,*
   *e.g.*, *Kosta*, 308 F.R.D at 225 n.5 (distinguishing *In re Steroid* as "unusual case" because product
27 contained undisclosed illegal drug); *In re Brazilian Blowout Litig.*, 2011 WL 10962891, at *7-8
   (C.D. Cal. April 12, 2011) (certifying because no questions were raised regarding exposure, and
28 defendant "failed to present any evidence that any unnamed class members did not rely on the
   alleged misrepresentations").

members were exposed to the "Imported from Italy" labeling at all.  It is well established that causation or reliance may not be presumed, and class certification should be denied, where "it is likely that many class members were never exposed to the allegedly misleading" statements.  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595-96 (9th Cir. 2012); *Kosta*, 308 F.R.D. at 223; *Minkler*, 2013 WL 3185552, at *6.  Here, the record rebuts any presumption that all purchasers were exposed to the phrase "Imported from Italy", rendering exposure incapable of class-wide proof.

First, at various times during most years throughout the class period, many Filippo Berio products wore neck collars containing marketing information, recipes, and coupons.  The neck collars covered about half of the front label, including the "Imported from Italy" statement—which was itself not prominent, appearing only in the top left corner in small black print (often on a dark green background).  Mueller Decl. ¶¶ 35-36 & Ex. C; Commons Decl. Ex. B 428:6-430:12, 430:25-431:24; Ex. C.  Unless a particular consumer lifted the neck collar to review the top left corner, she would not have been exposed to "Imported from Italy" prior to purchase.  *Id.*  To be sure, individuals might assert that they lifted the neck collar, but resolving such issues would itself require individual inquiries.  *See Mazza*, 666 F.3d at 596; *Minkler*, 2013 WL 3185552, at *6.

Second, the class period includes periods where labels on bottles did not contain the challenged statement.  *See supra* II.A.  Consumers who purchased a bottle that did not contain the challenged claim certainly could not have been "harmed" in any way and thus could not be part of the class.  Because the availability of the new labels appeared gradually over time, and the Filippo Berio Organic olive oil without the challenged claim was used during the class period, there is no way to know absent individualized inquiries whether any particular consumer purchased a bottle with the challenged claim as opposed to a bottle that removed the "Imported from Italy" statement.

Third, exposure cannot be assumed merely because the phrase "Imported from Italy" appeared on front labels.  On the 16.9 ounce size of Filippo Berio olive oil, the phrase "Imported from Italy" often appeared in less than 6 point font, often against a dark green background.  Mueller Decl. ¶¶ 15-19 & Exs. A-B; *cf. Conservatorship of Link*, 158 Cal. App. 3d 138, 141-42 (1984) (noting text smaller than 6 point font "is all but illegible to a person of normal vision and in no manner would notify one of the many visually impaired members of society").  The 16.9 ounce size

accounts for nearly half of the sales, according to plaintiff's expert.  *See* Weir Decl. Tbl. 3.  It is unreasonable to think that many consumers would actually notice the challenged phrase.  At smaller than a 6 point font, it is decorative, not substantive.  But Plaintiff contends not only that consumers read and accord meaning to that single short line, but also overlook the two lines "Packed in Italy with select olive oils from Italy, Spain, Greece & Tunisia" that appear more prominently on the back label.  Plaintiff cannot reasonably have it both ways.

Because determining whether people were exposed to or noticed the "Imported from Italy" phrase requires individualized evidence, and plaintiff lacks a classwide method of proof, the Court should deny class certification.

### 4.    The Proposed Class Is Unascertainable.

Whether viewed through the lens of manageability, superiority, or predominance, "the party seeking class certification must demonstrate that an identifiable and ascertainable class exists." *Sethavanish v. ZonePerfect Nutrition Co.*, No. 12-2907, 2014 WL 580696, at *4 (N.D. Cal. Feb. 13, 2014); *Jones*, 2014 WL 2702726, at *8.  As this Court recently explained, a plaintiff "must establish ascertainability by demonstrating that class members can be identified readily by clear, objective, criteria." *Kosta*, 308 F.R.D. at 223, 227.  Unable to offer any evidence on this point (e.g., customer lists, registration cards, etc.), plaintiff argues that she should be excused from her burden.[6]  Mot. 11-12.  Rule 23 does not elevate procedure over substantive rights.  That would deprive SNA of its right to test a person's eligibility to participate in the class, violating both the Rules Enabling Act and Due Process. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613 (1997); 28 U.S.C. § 2072(b) (federal rules of civil procedure "shall not abridge, enlarge or modify any substantive right").

Ascertainability presents insurmountable hurdles here.  Plaintiff and undoubtedly many class members lack any proof of purchase for Filippo Berio, and many of their purchasing histories will show that they likely never purchased Filippo Berio.  *See Kosta*, 308 F.R.D. at 299; *supra* II.D.

---

[6] Plaintiff attacks *Carrera v. Bayer Corp.*, 727 F.3d 300, 308-09 (3d Cir. 2013), a leading authority on ascertainability, claiming two circuits have "disagreed" with *Carrera*.  But one of those two cases involved online sales, which allow for ready identification of purchasers (*Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 527 (6th Cir. 2015)), while the second merely found that ascertainability should be considered under superiority.  *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663-64 (7th Cir. 2015).  Neither condones proceeding with a class without a way to tell who is participating.

1   Because plaintiff's legal claims depends on having paid more for Filippo Berio than "comparable"

2   products (Compl. ¶ 44), consumers also would need to remember which Filippo Berio product they

3   purchased, at what price, from what retailer, and how many times to determine whether they paid

4   less, more, or the same price as "comparable" products.  In addition, due to the use of hang tags, the

5   small font size of "Imported from Italy," and the practice of many people to turn over the bottle,

6   plaintiff would need a classwide method to separate out who was, and was not, exposed to the phrase

7   "Imported from Italy" and potentially deceived by it.

8       Any one of these would render a class unascertainable, yet plaintiff's damages expert does

9   not propose a methodology to address any of these maters.  He merely assumes the Court or an

10  "administrator" will solve them.  Commons Decl. Ex. H. at 73:23-76:4.  Plaintiff must offer

11  methodologies, not unsupported assurances.  Class member declarations and claim forms are not

12  administratively feasible methods to resolve disputes about class membership, particularly for small-

13  value purchases where the date, location, and price paid (among other things) impact the viability of

14  individual claims.  *E.g.*, *Sethavanish*, 2014 WL 580696, at *4-6; *Hodes*, 2009 WL 2424214, at *4;

15  *Algarin*, 300 F.R.D. at 455-56, 461; *POM*, 2014 WL 1225184, at *6.  As a result, the lack of

16  ascertainability further precludes certification.

17      **C.      Plaintiff's Damages Model Violates The Minimum Requirements of *Comcast*.**

18      Yet another independent ground for denial of class certification is that plaintiff's damages

19  model "falls far short of establishing that damages are capable of measurement on a classwide

20  basis."  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013).  The Supreme Court in *Comcast*

21  held that "a model purporting to serve as evidence of damages in [a] class action must measure only

22  those damages attributable" to the alleged misconduct and "be consistent with [the plaintiff's]

23  liability case[.]"  *Id*. at 1433.  The Court further held that it is "the court's duty to take a 'close look'

24  at" the model and "conduct a 'rigorous analysis' to determine whether that is so."  *Id*. at 1432-33.  If

25  the model fails this test, class certification is improper.  *In re POM Wonderful LLC*, No. ML 10-

26  02199, 2014 WL 1225184, at *4-5 (C.D. Cal. March 25, 2014); *Brazil v. Dole Packaged Foods,

27  LLC*, No. 12-01831, 2014 WL 5794873, at *11-14 (N.D. Cal. Nov. 6, 2014); *Werdebaugh v. Blue

28  Diamond Growers*, No. 12-02724, 2014 WL 7148923, at *10-14 (N.D. Cal. Dec. 15, 2014).

Mr. Weir's damages model cannot survive the "rigorous analysis" *Comcast* requires.  It rests on untenable legal premises and unsupported factual assumptions.  It is also inapposite, as it proposes a method to calculate aggregate damages not recoverable under the UCL or FAL.

**1.      The Model Impermissibly Rests On A Fraud-On-The-Market Theory.**

Mr. Weir's damages model rests on a "fraud-on-the-market" theory.  In an efficient market, the theory goes, the market price automatically adjusts to the disclosure of new material information because such information presumptively impacts demand.  *Erica P. John Fund v. Halliburton*, 131 S. Ct. 2179, 2185 (2011).  The theory only works, however, in an efficient market, where each purchase and sale presumptively reflects all material public information.  *Id*.  California and Ninth Circuit authority have rejected fraud on the market theories outside of open securities exchanges, because the markets for most goods (unlike the stock market) are not at all efficient – that is, they do not reflect and predictably respond to changes in information.  *See Binder v. Gillespie*, 184 F.3d 1059, 1064 (9th Cir. 1999); *Mirken v. Wasserman*, 5 Cal. 4th 1082, 1108 (1993); *POM*, 2014 WL 1225184, at *3 ("Frauds on the market are only possible in efficient markets, where the price of (in most cases) a stock is determined by openly disseminated information about a business.").

As courts have recognized, the retail market for consumer goods is not efficient.  Plaintiff cannot obtain damages (or restitution) under a model that assumes false advertising inflates market prices and that, informed of the true facts about a product, retail prices would have been lower.  *POM*, 2014 WL 1225184, at *4.  A class certification motion that depends upon such a model for calculating damages/restitution necessarily fails as a matter of law.  *Id.* at *3-4 (rejecting price premium model in food labeling case); *Saavedra v. Eli Lilly and Co.*, No. 2:12-9366, 2015 WL 9916598, at *3 (C.D. Cal. July 21, 2015) (following *POM* and rejecting price premium model).

Mr. Weir all but admits that his model presumes that the consumer goods market is efficient.  Weir Decl. ¶ 87 (asserting the "price premium does not depend on an individual interpretation of the Claim" because "[i]f the market price for the Products was higher as a result of the Claim, then ALL consumers would have paid a higher price than if the Claim had not been made, regardless of their personal interpretations"); *see also id.* at ¶¶ 86, 88-91; Commons Decl. Ex. H 71:4-19, 76:5-9, 76:23-78:13.  His model is no different than the one rejected in *POM*.  Like the flawed model in

*POM*, Mr. Weir's assumes "(1) that a presumption of reliance dependent upon Defendant's alleged material misrepresentations establishes the existence of a fraud on the entire [olive oil] market, (2) that because of that fraud on the market, every consumer who purchased Defendant's [olive oil] was similarly damaged, regardless of motivation or satisfaction, and (3) damages can therefore be measured on a class wide basis" in the aggregate.  2014 WL 1225184, at *4; Ugone Decl. ¶¶ 24-31.

But, as in *POM*, Mr. Weir has not shown and cannot show that the olive oil market is efficient.  The price of olive oil does not change every time information about the product – such as on the label – changes.  Mueller Decl. ¶¶ 23-26; Ugone Decl. ¶¶ 29-31.  Retail prices and pricing strategies for the exact same product vary widely from location to location, and from retailer to retailer.  Mueller Decl. ¶¶ 32, 35, 37; Ugone Decl. ¶¶ 39-51.  Some retailers engage, for example, in "line pricing," where every product is priced the same, even if the products contain material differences that, in the judgment of the manufacturer or other retailers, support significant price differences.  Mueller Decl. ¶ 26.  This Court should reject Mr. Weir's model on this ground alone. *POM*, 2014 WL 1225184, at *4.[7]

### 2.    The Model Fails To Isolate A Premium Stemming Solely From The Allegedly Misleading Interpretation Of "Imported From Italy."

Mr. Weir's model is also unsound because it cannot isolate a price premium attributable solely to the alleged misinterpretation of "Imported from Italy."  The court in *In re: ConAgra Foods*, 90 F. Supp. 3d 919 (C.D. Cal. Feb. 23, 2015) *twice* rejected Mr. Weir's hedonic regression under *Comcast* for this exact reason:

> Weir again fails to provide an acceptable damages methodology that isolates and quantifies damages associated with plaintiffs' specific theory of liability—that they were misled to believe that Wesson Oils contained no GMOs or GMO ingredients because of the "100% Natural" label. … Weir focuses solely on the "price premium" attributable to the "100% Natural" label; he makes no efforts to segregate the price premium attributable to a consumer's understanding that "100% Natural" means the cooking oils contain no genetically modified organisms.

*Id.* at 1024.  Mr. Weir's model fails here for the same reason.  Ugone Decl. ¶¶ 32-38.  Plaintiff has

---

[7] To the extent plaintiff contends that she does not need to demonstrate market efficiency because, for liability purposes, reliance is presumed—though, it cannot be here (*see supra* IV.B.1-IV.B.3)— *POM* rejected that argument.  2014 WL 1225184, at *4 ("By definition, an efficient market prices a good on the basis of all available material information. … Reliance comes after the fact.").

1   not shown all consumers understood "Imported from Italy" to mean "100% Italian-grown and

2   pressed olives," rather than its plain English meaning:  shipped from Italy.  *See supra* IV.B.1.  Mr.

3   Weir confirmed that his model does not segregate out various understandings of the challenged

4   phrase.  Commons Decl. Ex. H 71:4-19.[8]  Because the model does not isolate a price premium

5   attributable solely to the misinterpretation of "Imported from Italy" as alleged in the Complaint, it

6   does not satisfy *Comcast*.  *ConAgra Foods*, 90 F. Supp. 3d at 1025.[9]

7             **3.      The Model Fails To Control For Other Variables That Affect Price.**

8             Mr. Weir's model also fails to comply with *Comcast* because it does not and cannot control

9   for other obvious variables that impact price.  Courts in this district have twice decertified classes in

10  labeling cases where a plaintiff failed to meet her "burden to show that the model [s]he proposes is

11  capable of controlling for all other factors and isolating the price premium attributable to [the

12  challenged] label only."  *Brazil*, 2014 WL 5794873, at *13; *Werdebaugh*, 2014 WL 7148923, at *12

13  ("As the model does not control for the impact of advertising on price, the Court is unable to

14  determine how much of the purported price premium is due to Defendant's use of the at-issue

15  labeling claims, as opposed to Defendant's successful advertising campaigns or promotions.").  Mr.

16  Weir's proposed model fails to control for four sets of variables.

17            *First*, it does not control for advertising.  It is axiomatic that a company's advertising can

18  affect demand, and thus price; were that not so, companies would not advertise.  "[I]t is precisely

19  because advertising may impact the price premium that [the] damages model must control for

20  advertising."  *Werdebaugh*, 2014 WL 7148923, at *12; *see also Brazil*, 2014 WL 5794873, at *11;

21  Ugone Decl. ¶ 85.

22  _____

[8] The two studies cited by Mr. Weir concerned different target consumers, products, and labeling.
23  One used hedonic regression to find Portuguese consumers prefer Portuguese olive oil.  Weir Decl.
    ¶ 9 & n.7.  It conceded that regression has "several limitations," including an inability to account for
24  "information on demand and supply side factors likely to affect price" and "limited data available."
    Commons Decl. Ex. K at 11.  The other study relied on a conjoint analysis (a form of consumer
25  survey) for Toronto and Ontario consumers, and does not appear to have tested "Imported from
    Italy."  Weir Decl. ¶ 10 & n.9.

26  [9] The *ConAgra* court eventually allowed Mr. Weir's hedonic regression model to be utilized only
    after he put forward a consumer survey designed to uncover the various understandings consumers
27  had of the challenged claim.  Plaintiff does not offer that approach here, and the time for providing
    expert reports in support of class certification has expired.  In any event, the court in *ConAgra* did
28  not address the other flaws identified in more detail here.

*Second*, Mr. Weir's model fails to control for numerous attributes on product labels that (according to hedonic regression) impact price.  For example, the model does not control for the fact that many labels include the descriptor "first cold pressed" or "Heart Healthy" (among many other descriptors).  Commons Decl. Ex. B 279:23-282:13; 374:3-14; Mueller Decl. Ex. A.  SNA's expert, Dr. Keith Ugone incorporated "first cold pressed" into Mr. Weir's model and found that this variable alone caused any supposed price premium to evaporate.  Ugone Decl. ¶¶ 81-84.

*Third*, Mr. Weir's model does not control for product packaging and overall appearance.  He disregards whether bottles were clear or tinted, as well as the color of the oil (Commons Decl. Ex. H 64:15-65:1), although studies show "44% of users prefer clear glass bottles" because they want to see the color, clarity, consistency, and purity of olive oils (Simplicio Decl. Ex. 23 at SNA-001197, 0011125), and many Filippo Berio bottles were made of clear glass during the class period (Compl. ¶ 38).  Likewise, he disregards differences in the design of (or historical changes to) the packaging of the products, the presence of recipes, or the use of neck collars or other messaging attached to products.  *See* Simplicio Decl. Ex. 20 at SNA-0005717 (19% pay attention to attached recipes).

*Fourth*, the model does not control for several demand and supply side factors that affect price.  Olive oil pricing to retailers necessarily varies between companies, by distribution channel, regionally, and over time, based on among other things, bulk oil costs and monthly trade deals.  *See* Commons Decl. Ex. B. 317:17-322:24; Simplicio Decl. Ex. 7 at SNA-0000840-41.  Retailers, not SNA, then set the prices charged to consumers based on their inventories, targets, and other factors.  Those prices necessarily vary by retailer, consumer, over time, product size, and variety, based on among other things, promotions, coupons, and rewards.  *Id.*  Instead of controlling for these variations (because that would require individualized inquiry), Mr. Weir uses aggregate sales data and calculates an aggregate average price premium over the entire proposed class period.  But the price paid by one consumer in one location at one time for an olive oil product is not indicative of the price, let alone the alleged price premium, paid by another consumer in a different location at a different time, even assuming they are purchasing the exact same product.  Mueller Decl. ¶ 37; Ugone Decl. ¶¶ 39-51.

These defects cannot be cured by running more regressions.  Mr. Weir conceded at his

deposition that "if you put too many variables into a regression ... even if they may have an impact themselves, you will actually cause the regression to provide worse results ...."  Commons Decl. Ex. H 120:2-121:2.  As a result, the model cannot control for factors that admittedly impact price and thus is deficient under *Comcast*.  *See Algarin*, 300 F.R.D. at 460-61 (rejecting model that did not control for how "prices in the retail market differ and are affected by the nature and location of the outlet in which they are sold and/or the use of promotions and coupons"); *Astiana v. Ben & Jerry's Homemade, Inc.*, No. 10-4387, 2014 WL 60097, at \*12 (N.D. Cal. Jan 7, 2014).[10]

4.     **A Before-And-After Comparison Confirms There Was No Premium.**

Mr. Weir's entire damages methodology is unreliable because the claimed price premium simply does not exist.  The Court need not speculate about this issue.  SNA did not change its pricing after dropping the phrase "Imported from Italy" and, if anything, has seen a slight increase in per unit pricing in California.  Mueller Decl. ¶¶ 33-34.  Independent third-party data also exists on before and after pricing.  *See Algarin*, 300 F.R.D. at 460 ("To establish that any difference in price is attributed solely to the alleged misrepresentation, the Court must use a product, exactly the same but without the [challenged] claim. ... the Court would have to control and neutralize all other product differences.").  Dr. Ugone – SNA's expert – analyzed that data and conclusively determined that there were no discernible price differences before and after the labeling change.  Ugone Decl. ¶¶ 53-57.  These data conclusively confirm that the phrase "Imported from Italy" supported no price premium, and independently defeat class certification.  *See Ben & Jerry's*, 2014 WL 60097, at \*10, 12 (denying certification where defendant presented expert evidence that retail prices did not alter when challenged "all natural" labeling was removed).[11]

---

[10] The courts in *Brazil* and *Werdebaugh* rejected hedonic regressions because of unverified assumptions about comparator labels.  *Brazil*, 2014 WL 5794873, at \*12 ("Dr. Capps' failure to adequately verify the labels of non-Dole products is fatal to his analysis."); *Werdebaugh*, 2014 WL 7148923, at \*13.  Likewise here, for roughly a third of the labels in his model, Mr. Weir simply assumed the labels made geographical claims, and made assumptions nearly 90% of the time regarding how long labels remained in use. Weir Decl. ¶54 n.34; Commons Ex. H 158:6-22 & Ex. I.

[11] Mr. Ugone also identified myriad other flaws in Mr. Weir's model that make it unreliable.  *See* Ugone Decl. §§ VI-VII (in particular ¶¶ 62-80, discussing Mr. Weir's significant design and data errors and finding no price premium).

5.    **The Model Does Not Limit Relief to Restitution.**

Mr. Weir's model also does not fit the legal theories in the Complaint, as required by *Comcast*. First, restitution under the UCL and FAL "requires both that money or property have been lost by a plaintiff, on the one hand, *and that it have been acquired by defendant on the other*." *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 336 (2011) (emphasis added). SNA operated ████ ████████████████████████████ during the class period. Mueller Dec. ¶ 38. It was not unjustly enriched and, thus, is not subject to equitable restitution. Second, the UCL and FAL do not permit damages (*Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1150-51 (2003)), yet that is what Mr. Weir attempts to model. Commons Decl. Ex. H at 131:20-132:10 ("I haven't been asked to opine about [disgorgement]"). Third, Filippo Berio is a high quality olive oil, and Mr. Weir cannot say whether any particular class member received olive oil of equal of greater value than the price paid. *E.g.*, *Ries v. Arizona Beverages USA LLC*, No. 10-01139, 2013 WL 1287416, at *7-8 (N.D. Cal. Mar. 28, 2013) (decertifying class where plaintiffs could not account for value).

*Leyva v. Medline Indus. Inc.*, 716 F.3d 510 (9th Cir. 2013) and *Pulaski v. Middleman, LLC v. Google, Inc.*, 802 F.3d 979 (9th Cir. 2015) are not to the contrary. They merely hold that individual damages calculations *alone* do not bar certification, *Pulaski*, 802 F.3d at 988, but affirm *Comcast*'s fundamental holding that "plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Levya*, 716 F.3d at 514. In both, the plaintiffs could readily isolate the harm caused by the allegedly offending conduct. In both, there was no serious dispute about who fell within the class or would be entitled to relief.

D.    **Class Proceedings Are Not Superior.**

Finally, the proposed class does not meet the test of superiority. Superiority turns on "the likely difficulties in managing a class action" (*Hodes*, 2009 WL 2424214, at *4), as well as whether a class action appears likely to offer real benefits that outweigh the procedural overhead and expenses associated with certification (*In re Hotel Telephone Charges*, 500 F.2d 86, 91 (9th Cir. 1974)). "Whenever the principal, if not the only, beneficiaries to the class action are to be the attorneys for the plaintiffs and not the individual class members, a costly and time-consuming class action is hardly the superior method for resolving the dispute." *Id.* at 91. Particularly when a

24

proposed class promises class members at most a pittance, "Courts are 'reluctant to permit [an] action to proceed' where there are 'formidable ... difficulties of distributing any ultimate recovery to the class members,' because such actions 'are not likely to benefit anyone but the lawyers who bring them.'" *See Algarin*, 300 F.R.D. at 461; *Minkler*, 2013 WL 3185552, at *7. Courts also consider the availability and benefits of alternatives to class litigation, such as refund and exchange policies. *See Turcios v. Carma Labs., Inc.*, 296 F.R.D. 638, 648-49 (C.D. Cal. 2014) (holding superiority not met where (as here) defendant had full refund policy).

The proposed class does not satisfy the superiority test. Rather than seek a refund or replacement from SNA or a retailer, plaintiff proposes proceeding with a class action so that she and others can recover something of far less value: 21 cents. The substantial costs associated with class notice and administering an opt-out process would dwarf any theoretical recovery. And all of the time, effort, and expense to resolve myriad individual issues would be over a practice SNA decided to change before this lawsuit was filed, has since fully implemented, and which never mattered because removing the phrase has had no impact on pricing. Mueller Decl. ¶¶ 20-21, 33-34; *Faulk*, 2013 WL 1703378, at *10 (finding manageability concerns weighed against finding class superior). Courts do not "certify a damages class solely to allow [a plaintiff's] attorneys to recover their fees and costs." *Id.* at *11 n.11.[12]

## V.   CONCLUSION

For all these reasons, the Court should deny Plaintiff's Motion for Class Certification.

Dated: March 15, 2016                      SIDLEY AUSTIN LLP

                                           By:  /s/ Sean A. Commons
                                               Sean A. Commons
                                               Attorneys for Defendant
                                               SALOV NORTH AMERICA CORP., INC.

---

[12] For similar reasons, plaintiff's footnote requesting certification of a liability-only class would accomplish nothing. It would not avoid individualized issues or advance resolution of claims. *See Werdebaugh*, 2014 WL 7148923, at *14 n.9 (refusing to certify liability-only class); *Rahman*, 2014 WL 6815779, at *9 (same); *Saavedra v. Eli Lilly and Co.*, 2:12-9366, 2014 WL 7338930, at *11 (C.D. Cal. Dec. 18, 2014) (same).