UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

|  |  |
|---|---|
| ROHINI KUMAR, an individual, on behalf of herself, the general public and those similarly situated, <br><br>     Plaintiff, <br><br>     v. <br><br> SALOV NORTH AMERICA CORP., <br><br>     Defendant. | Case No. 4:14-cv-02411 |

**<u>DECLARATION OF KEITH R. UGONE, PH.D.</u>**

**March 15, 2016**

REDACTED

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

# DECLARATION OF KEITH R. UGONE, PH.D.

## March 15, 2016

I.      OVERVIEW OF ASSIGNMENT ................................................................... 1

II.     SUMMARY OF OPINIONS ......................................................................... 3

    A. The Claimed Damages Approach Proposed By Mr. Weir Does Not Yield A
    Reliable Or Relevant Measure Of Economic Harm On A Class-Wide Basis ............. 3

    B. Mr. Weir's Preliminary Regression Analysis Is Unreliable And Incapable Of
    Demonstrating Or Quantifying Claimed Economic Harm On A Class-Wide Basis .... 6

III.    QUALIFICATIONS AND EXPERIENCE ..................................................... 8

IV.     FACTS, DATA, AND INFORMATION RECEIVED .................................... 9

V.      OVERVIEW OF PARTIES ........................................................................ 10

    A. Named Plaintiff ................................................................................... 10

    B. SNA ................................................................................................... 11

VI.     MR. WEIR'S PROPOSED APPROACH FOR CALCULATING A CLAIMED
    PRICE PREMIUM DOES NOT YIELD A RELIABLE OR RELEVANT
    MEASURE OF ECONOMIC HARM ON A CLASS-WIDE BASIS ........................ 11

    A. Mr. Weir's Proposed Determination Of A Class-Wide Claimed Price Premium
    Ignores Individualized Factors That Must Be Evaluated To Determine Whether
    And To What Extent Putative Class Members Suffered Economic Injury ............... 12

        1. Putative Class Members Who Purchased The Challenged Products For
        Reasons Unrelated To The Challenged Claim Suffered No Economic Injury ..... 12

        2. Putative Class Members Who Understood The Literal Interpretation Of The
        Challenged Claim Suffered No Economic Injury ................................................. 20

        3. The Wide Range Of Prices Paid By Putative Class Members Necessitates
        An Individualized Approach To Determining Whether Putative Class
        Members Paid A Claimed Price Premium Due To The Challenged Claim .......... 24

            i. Retail Prices Vary Depending Upon Date Of Purchase................................. 26

            ii. Retail Prices Vary By Sales Channel............................................................ 28

            iii. Retail Prices Vary By Package Size ........................................................... 29

            iv. Retail Prices Vary Depending Upon Promotional Activity ........................... 31

            v. Summary Of Variation In Retail Prices ........................................................ 32

    B. Mr. Weir's Proposed Approach Assumes No Variation In The Impact Of The
    Challenged Claim.................................................................................... 32

    C. Mr. Weir's Proposed Approach Contradicts Economic Evidence Of No
    Discernible, Systematic, And Persistent Retail Price Difference For Challenged
    Products Before And After "Imported From Italy" Claim Was Removed ................ 33

    D. Mr. Weir Provided No Method For Allocating Claimed Damages To Putative
    Class Members Without Individualized Inquiry ....................................................... 36

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

**VII.**   **MR. WEIR'S PRELIMINARY REGRESSION ANALYSIS IS UNRELIABLE AND INCAPABLE OF DEMONSTRATING OR QUANTIFYING CLAIMED ECONOMIC HARM ON A CLASS-WIDE BASIS** ...................................... 38

   A. Mr. Weir's Regression Conflates The Impact (If Any) Of The Challenged Claim With The Impact Of Other Italy-Related Claims........................................................ 39

      1. Mr. Weir's Regression Analysis Is Designed To Ignore Differences In The Effects (If Any) Of Various Different Italy-Related Label Statements ................ 39

      2. Mr. Weir's Assertion That His Grouping Of Italy-Related Label Statements Is Supported By The Named Plaintiff's Theory Of Liability Is Incorrect............ 40

      3. Mr. Weir's Regression Shows No Statistically Significant Impact On Retail Prices When Adjusted To Separate The Challenged Claim From Other Italy-Related Label Statements.................................................................................... 42

   B. Mr. Weir's Regression Results Are Driven By A Data Categorization Error That, When Fixed, Eliminates The Estimated Claimed Price Premium For ██████ Of Challenged Product Sales ............................................................................................ 46

   C. Mr. Weir's Regression Does Not Demonstrate That All Putative Class Members Paid A Claimed Price Premium For Italy-Related Claims (Let Alone For The Challenged Claim) ...................................................................................................... 50

   D. Mr. Weir's Preliminary Analysis Ignores Important Variables That Would Have Affected The Claimed Price Premium Associated With The Challenged Products Under His Framework.................................................................................................. 53

## DECLARATION OF KEITH R. UGONE, PH.D.

### March 15, 2016

I, Keith R. Ugone, make the following declaration under penalty of perjury:

## I.    OVERVIEW OF ASSIGNMENT

1.    I am an economist and have been retained by SALOV North America Corp. ("SNA" or "Defendant") to offer my opinions regarding various economic and associated class certification issues relevant to the matter of *Rohini Kumar v. SALOV North America Corp.*   I understand that Ms. Rohini Kumar ("Named Plaintiff" or "Ms. Kumar") alleges that SNA has engaged in false and deceptive marketing and advertising relating to its Filippo Berio olive oil products (the "Challenged Products").[1]   Ms. Kumar alleges that an "Imported from Italy" label statement (the "Challenged Claim") appearing on the Challenged Products is "false and deceptive" because it "lead[s] consumers to believe that these Products are made from Italian olives or, at a minimum, are pressed in Italy."[2] I understand that Ms. Kumar seeks certification of a putative Class consisting of "[a]ll purchasers in California of liquid Filippo Berio brand olive oil of any grade (including extra virgin, pure, or extra light tasting), between May 23, 2010 and August 31, 2015."[3]

2.    Mr. Colin B. Weir submitted a declaration on January 19, 2016 in support of class certification in this matter (the "Weir Declaration").   Mr. Weir opined that "it is possible

---

[1]  Class Action Complaint filed May 23, 2014, pp. 1 and 3 – 6; and Memorandum of Points and Authorities in Support of Plaintiff's Motion for Class Certification filed January 19, 2016, p. 1.

[2]  Class Action Complaint, p. 4.

[3]  Notice of Motion and Motion for Class Certification, p. vii.   SNA currently sells six distinct types of olive oil products under the Filippo Berio brand name in California: Filippo Berio Olive Oil (or Pure Olive Oil); Extra Light Tasting Olive Oil; Extra Virgin Olive Oil; Organic Extra Virgin Olive Oil; Robusto Extra Virgin Olive Oil; and Delicato Extra Virgin Olive Oil.   (Defendant's Answer to Plaintiff's Class Action Complaint, p. 7 and Defendant's Supplemental Responses to Plaintiff's First Set of Interrogatories, pp. 2 – 3.)

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

_____

to determine class-wide damages in this case."[4]   Mr. Weir proposed to calculate claimed "price premium" damages by using a hedonic regression approach to determine "the difference between the value (purchase price) of the Products and value of the Products had the Claim not been made."[5]   Mr. Weir opined that "hedonic regression does not require individual analysis to provide a class-wide result" and "[t]his is a mechanical truth as to how the technique works."[6]

3.      Mr. Weir presented a "preliminary" hedonic regression analysis in his declaration, which he claimed "confirms the existence of a price premium attributable to the 'Imported from Italy' Claim."[7]   Based upon his "preliminary" regression results, Mr. Weir concluded that a claimed "price premium" attributable to the Challenged Claim accounts for ███ to ███ of the retail prices of the Challenged Products in California, depending upon the grade of olive oil.[8]

4.      I have been requested by counsel for SNA to evaluate from an economic perspective:

   a.   whether standard economic analysis can be used to quantify reliably on a class-wide basis (using common proof) the economic injury and economic damages being claimed in this matter; and

   b.   whether Mr. Weir's proposed methodology for evaluating Class-wide damages using common proof yields reliable results.

---

[4]  Declaration of Colin B. Weir dated January 19, 2016 ("Weir Declaration"), p. 6.

[5]  Weir Declaration, p. 6.

[6]  Weir Declaration, p. 8.

[7]  Weir Declaration, pp. 17 and 20.

[8]  Mr. Weir concluded that the claimed "price premium" attributable to the Challenged Claim accounts for (a) ███ of the retail price of extra virgin olive oil products bearing the Challenged Claim, (b) ███ of the retail price of extra light tasting olive oil products bearing the Challenged Claim, and (c) ███ of the retail price of pure olive oil products bearing the Challenged Claim.  (Weir Declaration, p. 20.)  By applying these claimed "price premium" factors to estimated retail sales of the Challenged Products in California during the putative Class period (i.e., May 23, 2010 to August 31, 2015), Mr. Weir presented a "preliminary" estimate of claimed Class-wide damages totaling approximately ███  (Weir Declaration, p. 23.)

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

## II.    SUMMARY OF OPINIONS[9]

5.    My evaluation of the Named Plaintiff's assertion that claimed damages can be quantified reliably on a Class-wide basis using common proof, and as described in the Weir Declaration, is based upon (a) my economics and damage quantification training and experience, (b) documentary evidence, (c) deposition testimony, (d) analysis of retail sales and pricing data associated with the Challenged Products, (e) my review of the Weir Declaration, and (f) my review of the other materials identified herein.   My conclusions are summarized here with the detail to my conclusions provided later in my declaration.

### A.    The Claimed Damages Approach Proposed By Mr. Weir Does Not Yield A Reliable Or Relevant Measure Of Economic Harm On A Class-Wide Basis

6.    From an economic and claimed damages perspective, Mr. Weir's proposed approach does not provide a reliable or relevant measure of the claimed harm suffered by putative Class members (i.e., a loss caused by the Challenged Claim) for at least the following reasons.

   a.    Mr. Weir's Proposed Approach Ignores Individualized Factors That Must Be Evaluated To Determine Or Quantify Economic Injury.   Determining whether and to what extent putative Class members were injured as a result of the Challenged Claim requires individualized inquiry and is not amenable to proof on a Class-wide (i.e., common proof) basis.   Proof of alleged injury and resulting damages, if any, depends upon individualized inquiry into the facts and circumstances of each putative Class member's purchase of the Challenged Products for at least the following reasons.

      i.    Mr. Weir Fails To Acknowledge Or Analyze Variations In The Reasons For Purchase.   Consumers purchase olive oil products (and Filippo Berio branded olive oil products in particular) for a variety of reasons, including but not limited to health benefits, taste / flavor / quality, price, brand, and grade of the olive oil (e.g., pure, extra light tasting, and extra virgin).   Consumers who purchased the Challenged Products solely or in large part for reasons other than the Challenged Claim were not injured or were not injured to the same degree as consumers who purchased solely or in large part because of the Challenged Claim.   In economic terms, such purchasers received the value that was paid for.   Therefore, individual inquiry is required to evaluate each putative Class member's reasons

_____
[9] This Summary of Opinions is intended to be an overview.   A full description of my opinions is contained throughout my declaration (i.e., narrative and associated exhibits).

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

_____

for purchasing the Challenged Products and whether a corresponding claimed injury may exist.  Mr. Weir's proposed approach does not take into account the variations in the reasons for purchase of the Challenged Products.  (*See* **Section VI.A.1**.)

ii.  <u>Mr. Weir Fails To Acknowledge Or Analyze Consumer's Knowledge And Perceptions Relating To The Challenged Claim</u>.  Each putative Class member's interpretation of the Challenged Claim affects the determination of whether purchaser suffered injury attributable to the Challenged Claim.  An individual consumer's interpretation of the "Imported from Italy" claim may vary with respect to whether the claim suggests that (1) the products were imported from Italy to the U.S. (i.e., a literal interpretation) or (2) only Italian-grown and pressed olives were used to make the products (i.e., the alleged message that the Named Plaintiff contends was communicated by the claim).  From an economic perspective, putative Class members who were not misled by the Challenged Claim were not harmed by the Challenged Claim.  Mr. Weir's proposed approach does not take into account the knowledge and perceptions of the consumers purchasing the Challenged Products.  (*See* **Section VI.A.2**.)

iii.  <u>Mr. Weir Fails To Properly Analyze The Significant Variations In Prices Paid</u>.  Analysis of California weekly average retail prices indicates that the prices putative Class members paid for the Challenged Products varied substantially depending upon the circumstances surrounding their purchases, including the date of purchase, sales channel (e.g., ███████████████████████████████), promotional activity, and bottle size purchased, among other factors.    Therefore, individualized inquiry would be required to determine the actual price paid by any particular putative Class member and the extent to which the price paid may have been greater than the value received by that individual, if at all.  Mr. Weir's proposed approach does not take into account the significant variations in the prices paid by the putative Class members.  (*See* **Section VI.A.3**.)

Absent individualized analyses into the above considerations for each putative Class member, an evaluation and calculation of claimed damages on a Class-wide basis would not be reliable from an economic perspective.

b.  <u>Mr. Weir's Proposed Approach Assumes No Variation In The Impact Of The Challenged Claim</u>.  Mr. Weir failed to acknowledge that the asserted impact of the Challenged Claim (if any) on retail prices might vary for different groups of putative Class members (e.g., individuals who purchased at different times).  Mr. Weir's

_____

[10] As an example, California weekly average retail prices for Filippo Berio Extra Virgin Olive Oil over the May 2010 to August 2015 time period ranged from (a) ███ to ███ (a difference of ███ for a 16.9 fl. oz. bottle; (b) ███ to ███ (a difference of ███) for a 25.3 fl. oz. bottle; and (c) ███ to ███ (a difference of ███) for a 50.7 fl. oz. bottle.  (*See* **Section VI.A.3 i**.)  For purposes of my analyses, I have calculated percentage differences in average retail prices for the Challenged Products as: (higher price − lower price) / lower price.  Additional comparisons of the variability of prices over time, across sales channels, by promotional activity, and across bottle sizes are provided later in my declaration.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

proposed approaches would yield a result that by construction would be uniform (as a dollar amount or as a percentage of purchase price) across putative Class members who purchased different products at different times, from different retailers, in different geographic locations, with and without promotional discounts, even if the impact of the Challenged Claim on prices actually varies substantially across those characteristics.  (**Section VI.B**.)

c. <u>No Discernible, Systematic, And Persistent Retail Price Difference For Challenged Products Before And After "Imported From Italy" Claim Was Removed</u>.  SNA's label change that removed the "Imported from Italy" phrase (and replaced it with "Imported") during the time period from the first quarter to the third quarter of 2015 allows for price comparisons between (i) prices of the Challenged Products before the label change (i.e., while bearing the "Imported from Italy" phrase) and (ii) prices of the same products after the label change (i.e., without the "Imported from Italy" phrase).  These price comparisons demonstrate that there was no discernible, systematic, and persistent decrease in retail prices following the removal of the "Imported from Italy" claim.  This analysis indicates that there was no retail "price premium" associated with the "Imported from Italy" claim that could be quantified on a Class-wide basis – negating Mr. Weir's proposed approach.   (**Section VI.C**.)

d. <u>No Allocation Method Has Been Presented By Mr. Weir</u>.  Mr. Weir has not provided any mechanism for allocating to individual putative Class members the claimed damages associated with each individual putative Class member's purchase(s).  Mr. Weir's proposed approaches would require individualized inquiry and receipts in order to allocate claimed damages to individual putative Class members.  (**Section VI.D**.)

7. Given the above considerations, it is likely that (a) many putative Class members suffered no economic injury as a result of the Challenged Claim and (b) a common proof approach <u>would not isolate those putative Class members</u> from a Class-wide claimed damages calculation.  Addressing these issues on a Class-wide rather than on an individual basis necessarily would compensate Class members that were not injured.  Given that Mr. Weir's proposed determination of a claimed price premium on a Class-wide basis ignores the individualized considerations discussed throughout my declaration, Mr. Weir's proposed approach cannot provide a reliable determination of whether or to what extent putative Class members suffered economic injury as a result of the Challenged Claim.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

---

**B. Mr. Weir's Preliminary Regression Analysis Is Unreliable And Incapable Of Demonstrating Or Quantifying Claimed Economic Harm On A Class-Wide Basis**

8.      Mr. Weir's preliminary regression analysis is unreliable and incapable of demonstrating (using common proof) that all putative Class members paid a claimed price premium associated with the Challenged Claim for at least the following reasons.

a. Mr. Weir's Regression Conflates The Impact (If Any) Of The Challenged Claim With The Impact Of Other Italy-Related Claims. Mr. Weir's preliminary analysis conflates the impact (if any) of the Challenged Claim with the impact of other Italy-related claims (e.g., "100% Italian Olives") on retail prices. Hence, Mr. Weir has not identified a claimed "price premium" attributable to the specific Challenged Claim at issue in this matter (i.e., "Imported from Italy"). When Mr. Weir's preliminary analysis is adjusted (within his framework) to attempt to identify the impact (if any) of the "Imported from Italy" claim separate from other Italy-related claims, the adjusted regression analysis shows no statistically significant, positive impact of the Challenged Claim on average retail prices. **(Section VII.A.)**

b. Mr. Weir's Regression Results Are Driven By A Data Categorization Error That, When Fixed, Eliminates The Estimated Claimed Price Premium For ███ Of Challenged Product Sales. Mr. Weir significantly overstated the claimed "price premium" (if any) associated with Italy-related claims due to a mis-categorization of certain retail sales and pricing data underlying his analysis.[11] When Mr. Weir's data is categorized correctly, his regression analysis yields no statistically significant impact of Italy-related claims on retail prices of extra virgin or extra light tasting olive oil products, which account for ███ of total Challenged Product sales. In addition, the claimed price premium he estimated for pure olive oil products declines significantly after this adjustment (within the framework of Mr. Weir's analysis). **(Section VII.B.)**

c. Mr. Weir's Regression Does Not Demonstrate That All Putative Class Members Paid A Claimed Price Premium For Italy-Related Claims (Let Alone For The Challenged Claim). Mr. Weir's preliminary regression model does not appropriately account for numerous factors affecting actual prices putative Class members paid (and price premiums paid, if any) for the Challenged Products. Mr. Weir's preferred approach

---

[11] In Mr. Weir's calculations, he treated the ███████████ and ██████████ fields in the IRI data he obtained as pertaining to ████████████ (rather than the ████████████ However, as Mr. Weir acknowledged at his deposition, the sales and pricing patterns in the IRI data suggest that the ████████████ fields likely correspond to ████████████ rather than only ████████████ (*See* Deposition of Colin B. Weir taken on February 24, 2016 ("Weir Deposition"), pp. 142 – 145.) I have reviewed and analyzed additional retail sales and pricing data that IRI provided to counsel for SNA, and comparisons between that data and the data obtained by Mr. Weir confirm that the ████████████ fields in the data Mr. Weir obtained represent sales and pricing data for ████████████

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

appears to be to calculate one price premium for each grade of olive oil (as a percentage of purchase price) for all putative Class members.   The resulting estimate ignores the large degree of pricing (and other types of) variation across putative Class members and across Challenged Products.   (**Section VII.C.**)

d.   <u>Mr. Weir's Preliminary Analysis Ignores Important Variables That Would Have Affected The Claimed Price Premium Associated With The Challenged Products Under His Framework.</u>   Mr. Weir claims that his "preliminary model produced robust results."[12]   Mr. Weir appears to base this statement on the adjusted R-squared, t-statistic, and F-statistic results he obtains and (according to Mr. Weir) "[t]he stability of the results across different model specifications."[13]   However, Mr. Weir's preliminary model does not produce robust results (i.e., his results are not stable across different model specifications[14]).   Widely varying statistical significance and widely varying coefficients (and implications for a claimed price premium) result when additional theoretically correct explanatory variables are included in Mr. Weir's regression model.[15]   (**Section VII.D.**)

9.   Correcting the numerous errors and omissions in Mr. Weir's preliminary analysis results in wide variations in estimated coefficients, statistical significance, and estimated claimed price premiums.   Even adjusting Mr. Weir's preliminary analysis to correct a small subset of Mr. Weir's errors leads to the conclusion that his regression model cannot show a statistically significant, positive price premium associated with Italy-related label statements for any grade of olive oil products, let alone a systematic claimed price premium paid by all putative Class members specific to the Challenged Claim.

_____

[12] Weir Declaration, p. 19.   Mr. Weir's claims that his model produced robust results are undermined by the fact that (a) his results were based upon mis-categorized retail sales and pricing data and (b) when Mr. Weir's data is categorized correctly, his model yields no statistically significant impact of Italy-related claims on retail prices of extra virgin or extra light olive oil products (which account for ▇▇▇ of total Challenged Product sales).

[13] Weir Declaration, p. 19.

[14] In the context of regression analysis, a "model specification" represents the selection of the dependent variable and explanatory variables to be included in the regression model.   Mr. Weir stated that his results were "stab[le]" (i.e., similar) across "different model specifications."   (Weir Declaration, p. 19.)   However, Mr. Weir's results change substantially even when minor changes are made to the list of included explanatory variables.

[15] For example, when an additional variable is added to Mr. Weir's model to capture whether each product label included a ▇▇▇▇▇▇▇ statement (i.e., a product attribute that was available in Mr. Weir's data but omitted from his regression analysis), the estimated effect of Italy-related label statements (a) becomes statistically insignificant for extra light olive oil products and (b) is reduced by approximately ▇▇▇ for pure olive oil products.   Moreover, if the ▇▇▇▇▇▇▇▇▇ omitted variable is added to Mr. Weir's model in combination with correcting his mis-categorization of sales data, Mr. Weir's adjusted preliminary regression analysis yields no statistically significant, positive claimed price premium for Italy-related label claims on any grade of olive oil.   (**Section VII.D.**)

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

10.     The details of my analyses and the bases for my opinions are contained in the remainder

of this declaration.

### III.     QUALIFICATIONS AND EXPERIENCE

11.     I am a Managing Principal at Analysis Group, Inc. ("AG").   AG provides economic,

financial, and business strategy consulting to its clients and specializes in the

interpretation of economic and financial data and the development of economic and

financial models.   Internationally, AG consists of approximately 600 professionals who

specialize in, among other things, the fields of economics, accounting, finance, statistics,

and strategy consulting.

12.     My primary responsibility at AG is to provide economic, financial, and/or damages-

related consulting services to clients.   Throughout my career I have provided these

consulting services in class certification matters, antitrust cases, breach of contract cases,

intellectual property cases, fraud-related cases, business tort cases, business interruption

cases, and securities-related cases, among others.   I have worked on engagements (or

submitted reports) relating to class certification issues numerous times, including but not

limited to matters relating to beverages, fast food, non-stick cooking sprays, gas mileage,

hand soap, facial cream, sunscreen, lipstick, foundation, and probiotics, among others.

13.     I specialize in the application of economic principles to complex commercial disputes,

and I am generally retained in cases requiring economic, financial, and/or damages-

related analyses.   Financial models I have constructed or evaluated in the past have

contained as components revenue analyses, cost analyses, assessments of capacity,

assessments of profitability, assessments of reasonable royalties, and assessments of the

competitive business environment.   I also have evaluated various claims of economic

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

value using peer group comparisons and/or discounted cash flow analyses relating to projected future earnings streams.  During the course of my career, I have frequently performed economic analyses using large databases of information and complex computer models.  I have provided expert testimony in deposition and trial settings numerous times.

14.    I received my B.A. in Economics from the University of Notre Dame in 1977, my M.A. in Economics from the University of Southern California in 1979, and my Ph.D. in Economics from Arizona State University in 1983.  Attached as **Exhibit 1** is a true and correct copy of my current resume.  A listing of publications I have authored is contained in my resume.  Attached as **Exhibit 2** is a listing of my trial and deposition testimony experience.  My business address is Analysis Group, Inc., Park Place Center, 2911 Turtle Creek Blvd., Suite 600, Dallas, Texas, 75219.

15.    AG is being compensated based upon hours incurred and the hourly rates of the personnel involved.  Payment to AG is not contingent upon my findings or the outcome of this matter.  AG is being compensated at a rate of $600 per hour for my time.  Hourly rates for other staff at AG assisting me with this matter range from $200 to $435 per hour, depending upon the level and experience of the staff involved.

## IV.    FACTS, DATA, AND INFORMATION RECEIVED

16.    The facts, data, and information available to me in forming my opinions are contained in **Exhibit 3** or elsewhere in my declaration (including footnotes and exhibits).  Examples of the types of information available to me include the following:

a.    legal documents (e.g., Class Action Complaint; Memorandum of Points and Authorities in Support of Plaintiff's Motion for Class Certification);

b.    declarations (e.g., Declaration of Colin B. Weir dated January 19, 2016);

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

    c.   deposition transcripts (e.g., deposition of Rohini Kumar taken on October 27, 2015; deposition of Colin B. Weir taken on February 24, 2016);

    d.   documents produced by SNA (e.g., Filippo Berio Olive Oil financial data; product labels; consumer studies relating to olive oil products);

    e.   retail sales and pricing data (e.g., IRI weekly retail ████████████ ████████████ over the weeks ended January 10, 2010 through February 21, 2016); and

    f.   information independently obtained (e.g., information from SNA's website).

17.    Contained in **Exhibit 4** are the names, company affiliations (if any), and positions of each of the individuals whose deposition transcripts are cited in the text of my declaration.

18.    My analyses and opinions are based upon the information available, standard economic theory, and my education and training.   The information I am relying upon is information typically relied upon by experts in my field.  I reserve the ability to (a) review documents, deposition transcripts, expert reports, or other information produced by the parties to this dispute and (b) supplement my opinions based upon that review, if appropriate.   I also reserve the ability to use demonstrative exhibits and/or other information to explain and illustrate my opinions.

## V.    OVERVIEW OF PARTIES

### A.  Named Plaintiff

19.    Ms. Rohini Kumar has been a resident of California since 2008.[16]   Ms. Kumar testified that she purchased various brands of extra virgin olive oil during the time period from 2010 to 2014, including "at least one bottle" of Filippo Berio extra virgin olive oil.[17]

---

[16]  Deposition of Rohini Kumar taken October 27, 2015 ("Kumar Deposition"), pp. 7 – 8.

[17]  Kumar Deposition, pp. 44 – 47, 62 – 63, and 182 – 183.   Other brands of olive oil Ms. Kumar has purchased include Bertolli, Star, Berkeley Bowl, California Olive Ranch, Safeway, Trader Joe's, and Target brand.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

      **B.**  **SNA**

20.     SALOV North America Corp. ("SNA") is a wholly-owned sales and marketing subsidiary of SALOV S.p.A. based in Lyndhurst, New Jersey.[18]  SNA imports, markets, distributes, and sells the Filippo Berio brand of olive oil in the U.S. and has been the sole U.S. distributor of Filippo Berio products since its formation in 1988.[19]  In California, SNA sells Filippo Berio brand olive oil products to several retailers and wholesale customers, including Albertsons, Kroger, Raley's, Safeway, Save Mart, Vons, Target, Walmart, CVS, and C&S Wholesale, among others.[20]

**VI.**   **MR. WEIR'S PROPOSED APPROACH FOR CALCULATING A CLAIMED PRICE PREMIUM DOES NOT YIELD A RELIABLE OR RELEVANT MEASURE OF ECONOMIC HARM ON A CLASS-WIDE BASIS**

21.     Mr. Weir described "price premium damages" as "the difference between the market price of the Products and the market price that would exist but for Defendant's [alleged] misrepresentation."[21]  Mr. Weir proposed to calculate claimed "price premium" damages on a Class-wide basis using hedonic regression analysis.[22]  From an economic and claimed damages perspective, Mr. Weir's proposed price premium approach does not

_____

[18] SALOV S.p.A. produces the Filippo Berio brand of olive oil, in addition to other olive oil brands and other types of edible oils.  SALOV S.p.A. blends, bottles, and packages Filippo Berio olive oil products at its facilities in Massarosa, Italy, and exports Filippo Berio olive oil products to 60 countries, including the U.S.    ("An Immersion in Filippo Berio Olive Oil," Filippo Berio Presentation (SNA-0000804 – 872 at 811 – 812); Defendant's Answer to Plaintiff's Class Action Complaint, p. 3; Defendant's Supplemental Responses to Plaintiff's First Set of Interrogatories, pp. 4 – 5; and Deposition of B. Thomas Mueller taken on October 21, 2015 ("Mueller Deposition (10/21/2015)"), p. 20.)

[19] "An Immersion in Filippo Berio Olive Oil," Filippo Berio Presentation (SNA-0000804 – 872 at 812); and Defendant's Answer to Plaintiff's Class Action Complaint, pp. 6 – 7.

[20] Defendant's Supplemental Responses to Plaintiff's First Set of Interrogatories, p. 11; and Deposition of B. Thomas Mueller taken on October 22, 2015 ("Mueller Deposition (10/22/2015)"), pp. 288 – 293.

[21] Weir Declaration, p. 6.    (Bracketed text added for clarification.)

[22] Weir Declaration, p. 6.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

yield a reliable or relevant measure of the claimed harm suffered by putative Class members (i.e., a loss caused by the Challenged Claim) for at least the following reasons.

**A. Mr. Weir's Proposed Determination Of A Class-Wide Claimed Price Premium Ignores Individualized Factors That Must Be Evaluated To Determine Whether And To What Extent Putative Class Members Suffered Economic Injury**

22. Accurately assessing whether and to what extent a putative Class member suffered economic injury as a result of the Challenged Claim requires an evaluation of the price paid versus value received from purchase(s) of the Challenged Product(s) and the extent to which that difference (if any) is attributable to the Challenged Claim. In the present matter, performing such an evaluation requires individualized information specific to each putative Class member. This individualized information includes, *inter alia*:

a. reasons for purchasing the Challenged Product(s) (and whether related to the Challenged Claim);

b. knowledge and perceptions relating to the Challenged Claim; and

c. the price(s) paid by the putative Class member for the Challenged Product(s) (and the extent to which the price paid may or may not have been greater than the value received by that individual).

23. Mr. Weir's proposed determination of a claimed price premium on a Class-wide basis ignores these individualized factors that must be evaluated to determine whether and to what extent putative Class members suffered economic injury. Hence, Mr. Weir's proposed approach cannot provide a reliable determination of Class-wide damages using common proof.

**1. Putative Class Members Who Purchased The Challenged Products For Reasons Unrelated To The Challenged Claim Suffered No Economic Injury**

24. Mr. Weir's proposed approach does not address the fact that consumers who purchased the Challenged Products for reasons unrelated to the Challenged Claim suffered no

economic loss.  From an economic perspective, a person who purchased Filippo Berio olive oil for a reason or reasons unrelated to the Challenged Claim (e.g., a person who bought because he or she enjoyed the taste of the product or bought based upon recommendations from friends, family, or websites) did not suffer economic injury attributable to the Challenged Claim.  In economic terms, that purchaser received the value that was paid for.  Therefore, individualized inquiry and analyses regarding putative Class members' motivations in purchasing the Challenged Products are required to determine whether individual putative Class members suffered economic injury attributable to the Challenged Claim.

25. Documentary evidence and deposition testimony confirm that consumers purchase olive oil products (and Filippo Berio brand olive oil products in particular) for a variety of reasons, including but not limited to health benefits, taste / flavor / quality, brand, price, and grade of the olive oil (e.g., pure, extra light tasting, and extra virgin).  The rationale behind each consumer's decision to purchase a particular olive oil product will vary across putative Class members.  Specifically, at least the following considerations may have influenced various putative Class members' purchases of olive oil products, including the Challenged Products.

   a. <u>Health Benefits</u>.  Documentary evidence indicates that health benefits associated with olive oil products are a primary consideration for consumers who decide to purchase and use olive oil products instead of other oils.  In a March 2011 consumer survey performed by Bauman Research & Consulting ("Bauman"), ████ of olive oil users indicated that they started using olive oil because they were "making changes to try to eat healthier" (i.e., the No. 1 reason).[23]  Similarly, in a March 2014 study, Bauman found that "most all Olive Oil users ████ say that they use Olive Oil rather than other oils because it is healthier," with "the vast majority of Olive Oil users

---

[23]  Olive Oil Attitude & Usage Study, Bauman Research & Consulting, March 7, 2011 (SNA-0005698 – 729 at 699 and 712).

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

agree[ing] 'Olive Oils are healthier than other fats and cooking oils' ▮."[24]
Consistent with these market research studies, Mr. Scheiber testified that health
benefits are important to consumers.[25]

b. Taste / Flavor / Quality.  Documentary evidence indicates that taste, flavor, and/or
quality of olive oil products are primary considerations among consumers both when
(i) deciding to purchase olive oil products rather than other oils and (ii) deciding
which olive oil product to purchase.

    i. Decision To Use Olive Oil Rather Than Other Oils.  In its March 2011 study,
    Bauman stated that olive oil users indicated, "Olive Oil's taste and flavor is what
    makes it special, as much as the health benefits."[26]  In its March 2014 study,
    Bauman found that ▮ of Olive Oil users say they prefer the taste of Olive Oil
    to other types of oils and ▮ say they prefer their Olive Oil to add flavor to the
    food they are preparing."[27]

    ii. Decision To Purchase A Particular Olive Oil Product.  In its March 2011 study,
    Bauman found that, among olive oil users, ▮ chose their brand due to its
    "taste" (i.e., the ▮ reason).[28]  Similarly, in its March 2014 study, Bauman
    found that ▮ of olive oil users indicated "flavor / taste" was important in their
    decision of which olive oil to purchase (i.e., the ▮ reason).[29]  Further, in a
    June 2014 study, Bauman found that ▮ (in 2013) to ▮ (in 2014) of Filippo
    Berio olive oil users selected Filippo Berio due to its "flavor / taste" (i.e., the ▮
    ▮ reason in 2013 and the ▮ reason in 2014).[30]  Consistent with these market
    research studies, Mr. Scheiber testified that "quality, flavor, [and] performance of
    the oil" were important to olive oil consumers.[31]

c. Price.  The price of olive oil products is another primary consideration among
consumers in choosing among various olive oil products.  In the March 2011 study,
Bauman found that ▮ of olive oil users chose their preferred brand due to "price,
cheaper than others" and ▮ chose their preferred brand due to it being "on sale, on
sale often" (i.e., the ▮ and ▮ reasons, respectively).[32]  Similarly, in the March

_____

[24] Olive Oil Attitude & Usage Study, Bauman Research & Consulting, March 7, 2014 (SNA-0011095 – 141 at 096, 098, and 114).

[25] Deposition of David L. Scheiber taken on November 3, 2015 ("Scheiber Deposition"), p. 68.

[26] Olive Oil Attitude & Usage Study, Bauman Research & Consulting, March 7, 2011 (SNA-0005698 – 729 at 700).

[27] Olive Oil Attitude & Usage Study, Bauman Research & Consulting, March 7, 2014 (SNA-0011095 – 141 at 096 and 114).

[28] Olive Oil Attitude & Usage Study, Bauman Research & Consulting, March 7, 2011 (SNA-0005698 – 729 at 713).

[29] Olive Oil Attitude & Usage Study, Bauman Research & Consulting, March 7, 2014 (SNA-0011095 – 141 at 123).

[30] Olive Oil Pre/Post Study, Bauman Research & Consulting, June 27, 2014 (SNA-0014167 – 193 at 177).

[31] Scheiber Deposition, pp. 68 – 70.    (Bracketed text added for clarification.)

[32] Olive Oil Attitude & Usage Study, Bauman Research & Consulting, March 7, 2011 (SNA-0005698 – 729 at 713).

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

2014 study, Bauman found that ▓▓ of olive oil users indicated that "price / sale / promotion" was important in their decision of which olive oil product to purchase (i.e., the ▓▓ consideration).[33]  Relating to Filippo Berio in particular, Bauman found in its 2014 study that ▓▓ (in 2013) to ▓▓ (in 2014) of Filippo Berio olive oil users selected Filippo Berio due to the "Price" and ▓▓ (in 2013) to ▓▓ (in 2014) selected Filippo Berio because it was "on sale" (both of which were among the ▓▓ reasons in both years).[34]

d.  <u>Brand</u>.  Brand is another factor considered by many consumers when choosing among olive oil products.  For example, in the March 2011 study, Bauman found that ▓▓ of olive oil users were brand loyal and those users stated that they typically purchased their preferred brand.[35]  In its March 2014 study, Bauman found that ▓▓ of olive oil users indicated "brand name" was important in their decision of which olive oil to purchase (i.e., the ▓▓ consideration).[36]

e.  <u>Grade Of Olive Oil</u>.  Consumers consider the grade of olive oil (e.g., pure/regular, extra virgin, or extra light tasting) when choosing among various olive oil products.  In the March 2014 study, Bauman found that ▓▓ of olive oil users indicated the "type [of olive oil] (extra virgin, regular, light [tasting], etc.)" was important in their decision of which olive oil to purchase (i.e., the ▓▓ consideration).[37]

f.  <u>Country Of Origin</u>.  Documentary evidence indicates that country of origin is a factor considered by some (but not the majority of) consumers in choosing among olive oil products.  However, the relative importance of this variable has been decreasing over time.  In the March 2011 study, Bauman found that 38% of olive oil users "pay attention to which country the olive oil comes from" when they purchase olive oil.[38]  In the March 2014 study, Bauman found that only 7% of olive oil users identified "country of origin" as important in the decision of which olive oil to

---

[33] Olive Oil Attitude & Usage Study, Bauman Research & Consulting, March 7, 2014 (SNA-0011095 – 141 at 123).

[34] Olive Oil Pre/Post Study, Bauman Research & Consulting, June 27, 2014 (SNA-0014167 – 193 at 177).

[35] Olive Oil Attitude & Usage Study, Bauman Research & Consulting, March 7, 2011 (SNA-0005698 – 729 at 717) and Filippo Berio Olive Oil Attitude & Usage Study, Bauman Research & Consulting, April 13, 2011 (SNA-0008691 – 711 at 702).

[36] Olive Oil Attitude & Usage Study, Bauman Research & Consulting, March 7, 2014 (SNA-0011095 – 141 at 123). In the June 2014 study, Bauman found that only ▓▓ of Filippo Berio olive oil users (in both 2013 and 2014) selected Filippo Berio due to "brand reputation, trusted."  (Olive Oil Pre/Post Study, Bauman Research & Consulting, June 27, 2014 (SNA-0014167 – 193 at 177).)  However, given that brand preference for Filippo Berio was a stated predicate acknowledged in the question (i.e., "And why did you choose your preferred brand, Filippo Berio?  What was it about this brand that caused you to choose it?") and the survey question was presented in an "open ended" format, it is possible that many survey respondents who considered the brand to be important did not view it as responsive to the question that was asked.   Also, many of the responses appear to state reasons why the respondents prefer the Filippo Berio brand (e.g., "Used by mother/family tradition" (▓▓), "Habit/familiarity/used in the past" ▓▓, "Good/like it - general" ▓▓.

[37] Olive Oil Attitude & Usage Study, Bauman Research & Consulting, March 7, 2014 (SNA-0011095 – 141 at 123). (Bracketed text added for clarification.)

[38] Olive Oil Attitude & Usage Study, Bauman Research & Consulting, March 7, 2011 (SNA-0005698 – 729 at 719).

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

purchase (i.e., the No. 8 consideration).[39]   The latter study also found that 52% of consumers were not sure what country or place the olive oil products they used came from.[40]   Similarly, a May 2013 study by the UC Davis Olive Center, cited in the Weir Declaration,[41] found that "respondents are largely unconcerned about the origin of the olive oil."   Specifically, the study found that 60% of respondents were neutral as to whether they had a preference for domestic or imported olive oil, 24% preferred imported olive oil, and 16% preferred domestic olive oil.[42]   Further, Mr. Scheiber testified that SNA concluded from its market research that "[t]he country of origin is of very little interest to consumers."[43]   Mr. Scheiber further testified that being of Italian heritage is "not an advantage" in the market because "[t]here's so many brands that come from [Italy] and/or that sound Italian that are not Italian."[44, 45]

26.   A summary of product attributes found important by olive oil users (of any brand) is presented in **Table 1** and a summary of product attributes and other considerations found important by Filippo Berio olive oil users is presented in **Table 2**.[46]

---

[39]  Olive Oil Attitude & Usage Study, Bauman Research & Consulting, March 7, 2014 (SNA-0011095 – 141 at 123).

[40]  Olive Oil Attitude & Usage Study, Bauman Research & Consulting, March 7, 2014 (SNA-0011095 – 141 at 127).

[41]  Weir Declaration, p. 16, n. 41.

[42]  "Survey: Consumer Attitudes on Olive Oil," Wang et al., UC Davis Olive Center, May 2013, p. 7.

[43]  Scheiber Deposition, pp. 68 – 70 and 161.

[44]  Scheiber Deposition, pp. 60 – 61.   (Bracketed text added for clarification.)

[45]  Bauman's studies found that less than 50% of olive oil users believed that the best olive oil comes from Italy. Specifically, in the March 2011 study, Bauman found that 43% of olive oil users believed that the best olive oil comes from Italy, followed by Greece (8%), Spain (3%), and California (2%), with the remaining 44% indicating they did not know or thought there was no difference.   (Olive Oil Attitude & Usage Study, Bauman Research & Consulting, March 7, 2011 (SNA-0005698 – 729 at 720).)   Similarly, in the March 2014 study, Bauman found that 45% of olive oil users believed that the best olive oil comes from Italy, followed by Greece (9%), California (6%), Spain (5%), and other countries (2%), with the remaining 33% indicating they did not know or thought there was no difference.   (Olive Oil Attitude & Usage Study, Bauman Research & Consulting, March 7, 2014 (SNA-0011095 – 141 at 127 – 128).)

[46]  Consistent with documentary evidence and SNA deposition testimony, Ms. Kumar identified several considerations that affected her decision of which olive oil product to purchase, including (a) type (or grade) of olive oil, (b) country of origin, (c) brand name, and (d) price.   (Kumar Deposition, pp. 144 – 145 and 149 – 150.)

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

_____

**Table 1**
**Considerations Affecting Olive Oil Consumer Purchase Decisions**
**As Presented In The March 2014 Olive Oil Attitude & Usage Study[47]**

| Olive Oil Product Attribute | Percentage Of Consumers That Identified Each Attribute As Among Top 2 Purchase Considerations |
|---|---|
| Type (Extra Virgin, Regular, Light Tasting) | |
| Price / Sale / Promotion | |
| Flavor / Taste | |
| Brand Name | |
| Organic | |
| Certified Quality Seal | |
| Size of Container | |
| Country of Origin | 7% |
| Type of Container (Glass, Plastic, Tin) | |
| Packaging / Label | |
| Some Other Reason | |

**Table 2**
**Considerations Affecting Filippo Berio Consumer Purchase Decisions**
**As Presented In The June 2014 Olive Oil Attitude & Usage Study[48]**

| Olive Oil Product Attribute | Among Consumers Who Selected Filippo Berio As Preferred Brand: Percentage That Identified Each Attribute As A Reason For Choosing Filippo Berio | |
|---|---|---|
| | 2013 | 2014 |
| Flavor / Taste | | |
| Price | | |
| On Sale | | |
| Used by Mother / Family Tradition | | |
| Available / Popular / Easily Found in Stores | | |
| Good / Like It – General | | |
| Quality | | |
| Have Coupons | | |
| Cooks Well | | |
| Recommendation | | |
| Habit / Familiarity / Used in the Past | | |
| Bulk Sizing, Purchasing | | |
| Brand Reputation, Trusted | | |
| Variety of Flavors, Products | | |
| Authentic | | |
| Bottle, Packaging | | |
| Healthy, Low Fat | | |
| Texture, Consistency | | |
| All Other Reasons | | |

_____

[47] Olive Oil Attitude & Usage Study, Bauman Research & Consulting, March 7, 2014 (SNA-0011095 – 141 at 123).

[48] Olive Oil Pre/Post Study, Bauman Research & Consulting, dated June 27, 2014 (SNA-0014167 – 193 at 177).

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

27.   Because purchasers of the Challenged Products could and did make purchases for reasons

other than the Challenged Claim, it is necessary to examine why each putative Class

member purchased the Challenged Product(s) in order to evaluate alleged injury, if any.

Consumers who purchased a Challenged Product solely or in large part for reasons other

than the Challenged Claim were not injured or were not injured to the same extent as

those who purchased solely or in large part due to the Challenged Claim.   This aspect of

the economic injury and causation analysis cannot be determined using common proof.

28.   Mr. Weir asserted that "[i]ndividual reasons for purchase are irrelevant" because "if there

is a price premium included in the price of the Products as a result of the Claim and

consumers buy the Product, they will pay that premium regardless of their reasons for

purchase."[49]   Mr. Weir asserted that "individual reasons for purchase do not change the

price paid" by an individual because "[i]ndividual consumers do not negotiate the price

of the Products at retail."[50]   However, this oversimplification by Mr. Weir ignores the

complexities associated with consumers' actual purchase decisions, including the

availability of competitive (i.e., substitute products) at a range of prices, the ability to

comparison shop across retailers, and the potential to use coupons and shopper cards or

wait for a product to go "on sale" before purchasing, *inter alia*.

29.   Mr. Weir's assertion that the presence of the Challenged Claim caused all purchasers to

pay a higher price for the Challenged Products is essentially a "fraud on the market"

theory, a term borrowed from security class action matters.   However, class certification

issues and class-wide damages issues in consumer product class action matters such as

_____

[49]  Weir Declaration, p. 25.

[50]  Weir Declaration, p. 25.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

this case can differ significantly from those present in "fraud on the market" security

class action matters.

a.  "Fraud On The Market" Theory In Security Class Action Matters.  A "fraud on the market" type of security class action generally is predicated upon an efficient market premise.  It is generally assumed that new information is disseminated quickly and reflected in the market price of the security in question.  Generally, shareholders observe one market price of the security (an any moment in time) due to the national exchange nature of the security at issue.  The allegedly fraudulent misrepresentation or omission is assumed to be incorporated into this single market price, as is the asserted corrective disclosure, and most putative class members (in many cases) are asserted to have been impacted equally on a per share basis.

b.  "Fraud On The Market" Theory Cannot Be Applied In This Matter.  In contrast, in a consumer product-related case such as this one, a different set of dynamics often is present.  Consumers may purchase an olive oil product and derive value for many different reasons (e.g., health benefits or taste / flavor / quality).  Even with the same allegedly misleading labeling, the impact of the Challenged Claim on putative Class members may be different for a number of reasons (as discussed throughout my report).  In addition, instead of one market price (as in the case of a security), the retail prices of a consumer product vary by sales channel, package size, timing, and whether promotional discounts are applied (and often by retailer and geographic area) – leading to the necessity of individualized inquiry.  Given the diversity of reasons for purchase, the diversity in interpretations of the Challenged Claim, and the diversity in prices paid, a "fraud on the market" approach (i.e., identifying one Class-wide claimed price differential associated with the Challenged Claim) fails as a reliable measure of claimed damages.

30.  For example, if a particular retailer at a particular time attempted to charge a "price

premium" for the Challenged Products because of the "Imported from Italy" claim, many

consumers (e.g., those for whom that label statement is not a substantial motivation for

purchasing the product) may choose to (a) wait for the product to go "on sale," (b) obtain

a coupon or shopper card in order to receive a discount, (c) purchase the product at a

different retailer (i.e., a retailer that does not attempt to charge a price premium

associated with the claim), or (d) purchase a different brand of olive oil that does not bear

an "Imported from Italy" claim (and perhaps choose one of the other options mentioned

above the next time the consumer chooses to shop for Filippo Berio olive oil).  From the

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

_____

retailer's perspective, it would recognize that not all potential buyers would be willing to pay a premium for the Challenged Products because of the "Imported from Italy" claim, and the retailer would have the option (among others) of attempting to charge a premium within its everyday prices but removing that premium from time to time by placing the product "on sale" in order to sell to more consumers (including those who do not place value on the Challenged Claim).

31.    Given the complexities associated with putative Class members' actual purchase decisions (and retailers' pricing decisions), including the above-mentioned options available to putative Class members when shopping for Filippo Berio olive oil products, Mr. Weir is incorrect to suggest that putative Class members who placed no value on the "Imported from Italy" claim had no choice but to pay a claimed price premium for it. Contrary to Mr. Weir's assertions, there is not one uniform "market price" for the Challenged Products nor one uniform claimed "price premium" (if any) for the Challenged Claim that all putative Class members were required to pay across all sales channels, retailers, geographic locations, and over time regardless of individual reasons for purchase.

**2.    Putative Class Members Who Understood The Literal Interpretation Of The Challenged Claim Suffered No Economic Injury**

32.    Mr. Weir's proposed approach does not address the fact that different putative Class members may have different interpretations and/or perceptions relating to the "Imported from Italy" claim.   An individual consumer's interpretation of the "Imported from Italy" claim may vary with respect to whether the consumer views the claim as suggesting that (a) the products were imported from Italy to the U.S. (i.e., a literal interpretation) or (b) only Italian olives were used to make the products (i.e., the alleged message that the

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

Named Plaintiff contends was communicated by the claim).[51]   If both of these (and possibly other) interpretations of the Challenged Claim exist among various consumers, Mr. Weir has not provided a methodology that can isolate the claimed pricing impact of the alleged misleading interpretation from the impact of a literal (i.e., non-misleading) interpretation of the Challenged Claim.

33.   Mr. Scheiber testified that the "Imported from Italy" statement indicates that "this product was exported from Italy to the United States."[52]   Similarly, Mr. Mueller testified that the "Imported from Italy" statement means that "the container of olive oil has been brought to the United States from Italy" and he believes consumers understand "Imported from Italy" to have this same meaning.[53]   Mr. Mueller further testified that most consumers read both the front and back labels of Filippo Berio olive oil products,[54] which suggests that many consumers would have been able to ascertain the country of origin of the olives (as indicated on the back label of the Challenged Products).[55, 56]

34.   From an economic perspective, putative Class members who were not misled by the Challenged Claim (i.e., those whose interpretations or perceptions of the Challenged Claim were in line with the actual product they received) were not harmed by the

---

[51]   *See* Kumar Deposition, pp. 191 – 193.

[52]   Scheiber Deposition, pp. 106 – 107.

[53]   Mueller Deposition (10/22/2015), pp. 342 – 343 and 349.

[54]   Mueller Deposition (10/22/2015), p. 286.

[55]   *See, e.g.*, Filippo Berio Extra Light Olive Oil Back Labels (SNA-0000067 – 071); Filippo Berio Extra Virgin Olive Oil Back Labels (SNA-0000077 – 081); Filippo Berio Organic Extra Virgin Olive Oil Back Labels (SNA-0000123 – 127); and Filippo Berio Delicato Extra Virgin Olive Oil Back Label (SNA-0000065).

[56]   In addition, from an economic perspective, there likely are differences across consumers with respect to consumers' preferences for various olive oil product attributes and the weight each consumer places on each attribute.   Hence, different consumers may look for different attributes (and different information) on an olive oil product label.   From an economic and claimed damages perspective, putative Class members who did not look for information about geographic origin, did not read the "Imported from Italy" statement, or did not place weight on the "Imported from Italy" statement on the product label were not misled by the "Imported from Italy" claim.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

Challenged Claim.   Such putative Class members received the value that was paid for, and a common proof approach would not isolate these putative Class members from the claimed damages calculation.   Hence, individual putative Class members' knowledge and perceptions relating to the Challenged Claim are an important inquiry relevant to evaluating and quantifying claimed injury, if any.   This information can be gathered only through individualized inquiry.

35. Mr. Weir asserted that "[i]ndividual interpretation of the Claim is irrelevant to the determination of Class-wide price premium damages" because "[i]f the market price for the Products was higher as a result of the Claim, then ALL consumers will have paid a higher price than if the Claim had not been made, regardless of their personal interpretations."[57]   Again, Mr. Weir incorrectly suggests that there is one uniform "market price" for the Challenged Products and one uniform claimed "price premium" that all putative Class members were obligated to pay regardless of individualized circumstances (i.e., across all retailers, geographic locations, and over time and regardless of individual interpretations of the Challenged Claim).   Mr. Weir is incorrect.

36. For example, when setting retail prices of olive oil products, if a particular retailer attempted to charge more for olive oil products labeled "Imported from Italy" than comparable products without the claim, but not as much as for olive oil products made with 100% Italian olives, that retailer could attempt to target consumers who are not willing to pay for products made from 100% Italian olives but who nevertheless prefer to purchase olive oils blended and bottled by a company in Italy (e.g., because of quality control) regardless of the geographic origin of the olives used in producing the olive oil.

---

[57] Weir Declaration, pp. 24 – 25.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

_____

If such consumers paid a premium for the Challenged Products based upon a literal interpretation of the Challenged Claim, then those consumers were not misled by the Challenged Claim and did not suffer economic harm (i.e., value paid was consistent with value received).

37.   Alternatively, if a particular retailer at a particular time attempted to charge a price for the Challenged Products similar to the prices of olive oil products made from 100% Italian olives (based upon the alleged misleading interpretation of the Challenged Claim), many consumers (e.g., those with a literal interpretation of the Challenged Claim) may not be willing to purchase the Challenged Products at such prices.  Instead, consumers with a literal interpretation of the Challenged Claim may choose to purchase the products from a different retailer (i.e., a retailer that does not price the Challenged Products in line with products made from 100% Italian olives) or any other of the purchase options discussed previously (e.g., wait for the product to go "on sale" or obtain a coupon or shopper card in order to receive a discount).

38.   Contrary to Mr. Weir's assertions, it is incorrect to assume that all putative Class members suffered economic harm in the form of a uniform claimed "price premium" regardless of their individual interpretations of the Challenged Claim.   Given the complexities associated with putative Class members' actual purchase decisions (and retailers' pricing decisions), Mr. Weir is incorrect to suggest that all putative Class members had no choice but to pay a claimed price premium associated with an alleged misleading interpretation.   Additionally, Mr. Weir's methodology cannot isolate a claimed price difference paid by consumers who were not misled or injured by the

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

Challenged Claim (e.g., based upon the literal interpretation) from a claimed price difference paid by those who allegedly were misled by the Challenged Claim.

   **3.  The Wide Range Of Prices Paid By Putative Class Members Necessitates An Individualized Approach To Determining Whether Putative Class Members Paid A Claimed Price Premium Due To The Challenged Claim**

39.  Knowing the prices paid by individual putative Class members is an important factor in evaluating whether (and to what extent) an individual Class member suffered economic harm.  However, analysis of retail pricing data indicates that there is not a single (i.e., uniform) purchase price that can be used to evaluate claimed damages on a Class-wide basis.  Rather, the data demonstrate that there are wide variations in retail prices associated with the Challenged Products (and wide variations in the aggregate quantities purchased at various retail prices).  Without individualized inquiry, one cannot determine the specific price(s) an individual putative Class member paid for the Challenged Product(s) or the extent to which the price paid may or may not have been greater than the value received by that individual – rendering attempts to quantify claimed damages on a Class-wide basis inaccurate and unreliable.

40.  Mr. Weir's proposed approach does not and cannot establish that a particular consumer who purchased a particular Challenged Product at a particular retailer at a particular time necessarily paid a price premium attributable to the Challenged Claim.  Rather, Mr. Weir's proposed approach would be conducted using "aggregate pricing and product attribute information,"[58] which masks the significant variation in actual prices paid (and actual price premiums paid, if any) associated with putative Class members' purchases of the Challenged Products.  Depending upon the actual prices that consumers paid for the

_____

[58]  Weir Declaration, p. 8.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

_____

Challenged Products (including any promotional discounts available at the time of purchase), many consumers may have paid no price premium attributable to the Challenged Claim.   Mr. Weir failed to address how his proposed price premium calculation on a Class-wide basis would overcome the hurdle of potential windfall gains to consumers who purchased Challenged Products from a low-priced retailer and/or at a significant discount, potentially exceeding the claimed "price premium."

41.    Analysis of retail pricing data indicates that the prices putative Class members paid for the Challenged Products differ depending upon the circumstances surrounding their purchases, including date of purchase, sales channel, promotional activity, and bottle size, among other factors.   Because of the wide variations in the Challenged Products' retail prices, putative Class members' claimed damages cannot be evaluated and quantified reliably on a Class-wide basis using common proof (or using just one average price).

42.    In conducting my analysis, I relied upon retail sales and pricing data collected by IRI. The IRI data includes the following weekly data for California retail sales of Filippo Berio olive oil products and other olive oil products: ███████████████

███████████████████████████████████████████████

███████████████████████████████   The data is available for the weeks ended January 10, 2010 through February 21, 2016 and includes data for the ███████████████████████████ [59]   Given that the putative Class period covers May 23, 2010 to August 31, 2015, I have analyzed Filippo Berio sales and pricing over the weeks ended May 30, 2010 through August 30, 2015.

_____

[59] IRI California Olive Oil Retail Sales and Pricing Data received March 8, 2016 ("REP1.xlsx" and "REP2.xlsx," collectively "IRI Data").   I understand that IRI defines ████████████████████████ .   The IRI Data also includes retail sales and pricing information for the ████████████████ .   However, sales of Filippo Berio olive oil products as reported by IRI were ███████ .

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

### i.   Retail Prices Vary Depending Upon Date Of Purchase

43.   Analysis of the IRI data indicates that average retail prices of the Challenged Products varied significantly depending upon the date of purchase.  Examples of the significant variations in California weekly average retail prices of the Challenged Products are presented in **Figure 1** for Filippo Berio Extra Virgin Olive Oil 16.9 fl. oz. and in **Figure 2** for Filippo Berio Extra Virgin Olive Oil 25.3 fl. oz.[60]  (See **Table 3**.)  In each figure, weekly average retail prices (left hand scale) and the corresponding weekly ███████ (right hand scale) are presented.  It is clear from both figures that putative Class members generally purchased greater quantities of the Challenged Products during periods of time when prices were lower.

**Figure 1**
**Filippo Berio Extra Virgin Olive Oil (16.9 Fl. Oz.)**
**California Weekly Average Retail Prices: May 24, 2010 – August 30, 2015**



_____

[60] For the purpose of providing illustrative examples of variation in retail prices in the narrative to my declaration, I have used as examples Filippo Berio Extra Virgin Olive Oil products in 16.9 fl. oz., 25.3 fl. oz., and 50.7 fl. oz. bottle sizes. Analyses of retail prices of additional sizes and varieties are provided in the exhibits to my declaration.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

**Figure 2**
**Filippo Berio Extra Virgin Olive Oil (25.3 Fl. Oz.)**
**California Weekly Average Retail Prices: May 24, 2010 – August 30, 2015**



**Table 3**
**Filippo Berio Extra Virgin Olive Oil**
**California Weekly Average Retail Prices: May 24, 2010 – August 30, 2015**

44.     As illustrated above, weekly average retail prices of Filippo Berio Extra Virgin Olive Oil
products in California varied significantly over the putative Class period.   Other varieties
of the Challenged Products exhibited similar variation in California weekly average retail
prices over time, as presented in **Exhibit 5**.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

---

### ii.  Retail Prices Vary By Sales Channel

45.     Analysis of the IRI data indicates that prices paid for the Challenged Products vary significantly depending upon the sales channel in which the purchase is made.   A comparison of annual weighted average retail prices in California ████████████ ████████████       ████[61] is presented for Filippo Berio Extra Virgin Olive Oil 16.9 fl. oz. in **Figure 3**.   Dollar differences and percentage differences in weighted average retail prices of Filippo Berio Extra Virgin Olive Oil across sales channels over the full time period from May 24, 2010 to August 30, 2015 are presented in **Table 4**.

**Figure 3**
**Filippo Berio Extra Virgin Olive Oil (16.9 Fl. Oz.)**
**California Average Retail Prices By Sales Channel: May 24, 2010 – August 30, 2015**



---

[61]  The ████████ category includes the ████████████████████████████████.
Filippo Berio retail sales and pricing data for the ████████████ category was calculated by subtracting sales in the ████████████████████ from sales in the ████████ set of sales channels.

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

_____

**Table 4**
**Filippo Berio Extra Virgin Olive Oil**
**California Average Retail Prices By Sales Channel: May 24, 2010 – August 30, 2015**



46.     As illustrated in the table above, average retail prices of Filippo Berio Extra Virgin Olive Oil products in California varied significantly across sales channels.   Other varieties of the Challenged Products exhibited similar variation in average retail prices across sales channels, as presented in **Exhibit 6**.

### iii.  Retail Prices Vary By Package Size

47.     Analysis of the IRI data indicates that prices paid for the Challenged Products vary significantly based upon the bottle size purchased.   A comparison of annual weighted average retail prices in California for 16.9 fl. oz., 25.3 fl. oz., and 50.7 fl. oz. bottles of Filippo Berio Extra Virgin Olive Oil is presented in **Figure 4** on a ▮▮▮▮▮▮▮ and in **Figure 5** on a ▮▮▮▮▮▮▮▮▮▮▮.   As illustrated in these figures, annual weighted average retail prices vary substantially between bottle sizes – both on a ▮▮▮▮▮▮▮▮ and on a ▮▮▮▮▮▮▮.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

**Figure 4**
**Filippo Berio Extra Virgin Olive Oil**
**California Annual Weighted Average Retail Prices**



**Figure 5**
**Filippo Berio Extra Virgin Olive Oil**
**California Annual Weighted Average Retail Prices**



HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

48.    Annual weighted average retail prices also vary across bottle sizes for other varieties of

Challenged Products, as presented in **Exhibit 7**.

### iv.  Retail Prices Vary Depending Upon Promotional Activity

49.    Analysis of the IRI data indicates that prices paid for the Challenged Products vary

significantly depending upon whether or not the purchase was made during an active

███████████████████████████).   A comparison of annual weighted average

███████████████████ retail prices in California is presented for Filippo Berio

Extra Virgin Olive Oil 25.3 fl. oz. in **Figure 6**.



**Figure 6**
**Filippo Berio Extra Virgin Olive Oil (25.3 Fl. Oz.)**
**California ███████████████ Average Retail Prices**



50.    Other  sizes  and  varieties  of  the  Challenged  Products  exhibited  similar  variation  in

██████████████████ retail prices, as presented in **Exhibit 8**.

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

### v.  Summary Of Variation In Retail Prices

51.    Analyses of the IRI retail sales and pricing data demonstrate that there were wide
variations in retail prices of the Challenged Products depending upon the circumstances
surrounding putative Class members' purchases, including at least the date of purchase,
sales channel, bottle size purchased, and promotional activity.   There are many
individual variables affecting prices and many individual actual prices paid – all of which
negate the ability of a common proof approach to yield a reliable and accurate estimate of
claimed damages on a Class-wide basis.   Under these varied conditions and varied
prices, to determine the actual price paid by any particular putative Class member (and
whether there was any price premium paid that was caused by the Challenged Claim)
would require consideration of circumstances particular to that transaction (i.e.,
individual inquiry would be necessary).   The aforementioned conclusion also applies to
any proposed monetary remedy using an aggregation of total expenditures by putative
Class members (with the inference that such an aggregation would then be distributed
back down to individual putative Class members).

### B.  Mr. Weir's Proposed Approach Assumes No Variation In The Impact Of The Challenged Claim

52.    Mr. Weir failed to acknowledge that the impact (if any) of the Challenged Claim might
vary for different groups of putative Class members.   For example, the effect of the
Challenged Claim on prices in one time period may not be the same as its effect on prices
in another time period.   Mr. Weir's proposed approach would yield a result that by
construction would be constant (as a dollar amount or as a percentage of purchase price)
over time, even if the impact of the Challenged Claim on prices actually varies
substantially over time.   The same would be true of differences depending upon

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

_____

promotional activity, retailer, geographic location, and other differences between putative Class members' purchases.  Mr. Weir's suggested approach includes no mechanism for evaluating potentially different claimed price premiums (if any) associated with the Challenged Claim based upon these differing circumstances.[62]  Hence, Mr. Weir has not offered any proposed methodology that could reliably and accurately determine a claimed price premium applicable to all purchases of the Challenged Products by all putative Class members during the Class period.

C. **Mr. Weir's Proposed Approach Contradicts Economic Evidence Of No Discernible, Systematic, And Persistent Retail Price Difference For Challenged Products Before And After "Imported From Italy" Claim Was Removed**

53.     It is my understanding that the "Imported from Italy" claim appeared on the labels of the Challenged Products since prior to the start of the Class period on May 23, 2010 (or upon introduction for products launched subsequently) and then was removed (and replaced with an "Imported" label statement) in 2015.[63]  Mr. Mueller estimated that Filippo Berio olive oil products without the "Imported from Italy" label began appearing in U.S. retail stores between the first quarter and third quarter of 2015, with <u>all sizes</u> of Filippo Berio olive oil products without the "Imported from Italy" label statement beginning to appear

_____

[62]  The extent to which any individual putative Class member suffered economic harm, if any, depends in part upon the price paid by that individual.  The wide variations in prices paid by individual putative Class members reflect that there are varying market conditions influencing retail prices for the Challenged Products in different sales channels and over time, *inter alia*.  Examples of these varying market conditions include differences in consumer preferences, retailer characteristics, and competitive pressures across sales channels and over time as well as differences in promotional activities or coupon discounts, among other factors.  These varying market conditions influence the extent to which the Challenged Claim may contribute to any claimed price premium for a Challenged Product paid by an individual putative Class member.  Under these varied conditions, to determine the actual price paid by any particular putative Class member (and whether there was any price premium paid that was associated with the Challenged Claim) would require consideration of circumstances particular to that transaction.

[63]  *See* Filippo Berio Olive Oil Labels (SNA-0000043 – 047); Filippo Berio Extra Light Olive Oil Labels (SNA-0000072 – 076); Filippo Berio Extra Virgin Olive Oil Labels (SNA-0000082 – 085); Filippo Berio Organic Extra Virgin Olive Oil Labels (SNA-0000128 – 132); Filippo Berio Robusto Extra Virgin Olive Oil Labels (SNA-0000133 – 134); and Filippo Berio Delicato Extra Virgin Olive Oil Label (SNA-0000066).

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

on U.S. retail shelves by the end of the third quarter of 2015.[64]   SNA's label change

allows for price comparisons between:

a.  prices of the Challenged Products before the label change (i.e., while bearing the
    "Imported from Italy" claim prior to the first quarter of 2015); and

b.  prices of the same products after the label change (i.e., without the "Imported from
    Italy" claim, during the time period after approximately the third quarter of 2015
    through the end of the available data in February 2016).

54.   If the retail prices that all putative Class members paid for the Challenged Products were

affected by the presence of the "Imported from Italy" claim on the product label as

asserted by Mr. Weir, then the average prices of the Challenged Products would

experience a <u>discernible, systematic, and persistent decrease</u> following the removal of the

"Imported from Italy" claim.  However, an analysis of the observed and actual pricing

patterns for the Challenged Products demonstrates that such a price decrease did not

occur.  This analysis indicates that there was no retail "price premium" associated with

the "Imported from Italy" claim that could be quantified on a Class-wide basis.

55.   Four-week average retail prices of the Challenged Products in California before, during,

and after the implementation of the label change that removed the "Imported from Italy"

claim are presented in **Figure 7** for Filippo Berio Extra Virgin Olive Oil 16.9 fl. oz. and

**Figure 8** for Filippo Berio Extra Virgin Olive Oil 25.3 fl. oz. The data is available for the

weeks ended January 10, 2010 through February 21, 2016 and includes ████████

████████████████████████████████████.[65]

---

[64]  Mueller Deposition (10/21/2015), pp. 114 – 120.

[65]  The analysis described in the aforementioned charts was conducted using the ████████ IRI data discussed
earlier in my declaration.    I understand that IRI defines ████████ measures as the aggregation of sales in the
████████████████████████████████  For the purpose of this analysis, I
have aggregated the weekly retail sales and pricing data provided by IRI into four-week measures of weighted
average retail prices for the period covering the four weeks ended January 26, 2014 to the four weeks ended
February 21, 2016.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

**Figure 7**
**Filippo Berio Extra Virgin Olive Oil (16.9 Fl. Oz.)**
**Four-Week Average Retail Prices Over Time**



**Figure 8**
**Filippo Berio Extra Virgin Olive Oil (25.3 Fl. Oz.)**
**Four-Week Average Retail Prices Over Time**



HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

56.    The figures above illustrate that the removal of the "Imported from Italy" claim from the labels of the Challenged Products did not result in a <u>discernible, systematic, and persistent</u> decrease in retail prices across sizes and varieties of the Challenged Products. In other words, Challenged Product prices still vary, but (a) not at a discernibly lower level (especially given the variability in pricing), (b) not at a systematically lower level (whether looking at one Challenged Product or <u>across</u> Challenged Products), and (c) not persistently over time.  Pricing patterns for other sizes and varieties of the Challenged Products are presented in **Exhibit 9**.  These additional price comparisons also demonstrate that there was no discernible, systematic, and persistent retail "price premium" associated with the "Imported from Italy" claim.

57.    This analysis is consistent with deposition testimony from Mr. Mueller, stating that the removal of the "Imported from Italy" statement has had no effect on the prices SNA charges its customers and has not been identified by retailers, wholesalers, or distributers as a basis for negotiating the pricing of the products.[66]   Mr. Mueller further testified that to his knowledge, the removal of the "Imported from Italy" statement has had no impact on consumer demand for the products or retail prices paid by consumers.[67]

   **D.  <u>Mr. Weir Provided No Method For Allocating Claimed Damages To Putative Class Members Without Individualized Inquiry</u>**

58.    Mr. Weir failed to acknowledge that on an individual putative Class member basis, there likely would be a lack of economic evidence to allow a reliable determination of the claimed economic injury resulting from the Challenged Claim.  Putative Class members are <u>unlikely</u> to (a) have kept all or any of the receipts from purchases of the Challenged

_____

[66]  Mueller Deposition (10/22/2015), p. 427.

[67]  Mueller Deposition (10/22/2015), pp. 427 – 428.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

_____

Products or (b) remember the quantities, prices, or timing of their purchases.   For example, Ms. Kumar testified that she purchased "at least one bottle" of Filippo Berio extra virgin olive oil,[68] but:

    a.  she could not recall the date(s) of such purchase(s), the "exact price[s]" paid or whether she purchased at a discount, or whether she purchased at Target and/or Berkeley Bowl in addition to Safeway;[69] and

    b.  she has no documents evidencing that she purchased Filippo Berio olive oil products, the date(s) of such purchase(s), the Filippo Berio olive oil bottle size(s) purchased, or the price(s) paid for such purchase(s).[70]

59.    As discussed throughout my declaration, purchasers of the Challenged Products have paid a wide range of prices for their purchases.   Complicating this diversity in prices paid is the likelihood that putative Class members would not be able to produce documentary evidence to substantiate their purchases, including the quantity purchased and the actual prices paid.   In this matter, not only do the facts and circumstances indicate that analyses concerning alleged economic injury are not amenable to Class-wide common proof, but this is compounded by a lack of evidence that would be needed to determine the alleged economic injury.   In the absence of such evidence, it would not be possible to reliably determine the claimed damages allegedly suffered by individual putative Class members using common proof.

60.    Mr. Weir opined that calculating claimed price premium damages in this matter is a "simple" and "straightforward" calculation consisting of multiplying a claimed price premium (obtained from his proposed regression) by the sales of each Challenged

---

[68]  Kumar Deposition, pp. 62 – 63.

[69]  Kumar Deposition, pp. 61 – 63, 130, and 149 – 150.

[70]  Kumar Deposition, pp. 37 – 42.

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

Product to yield a total claimed damages amount.[71]  Importantly, Mr. Weir did not provide a methodology for allocating total claimed damages to individual Class members. Awarding a claimed price premium "on a dollar basis" (if he were to take that approach) would require information on the quantity of Challenged Products each putative Class member purchased – information that most likely is not available.  Awarding a claimed price premium "on a percentage basis" requires even greater information from each putative Class member (i.e., both the purchase price and quantity of Challenged Products each individual purchased).  Mr. Weir did not address the complications associated with allocating total claimed damages to individual Class members.[72]

## VII.  MR. WEIR'S PRELIMINARY REGRESSION ANALYSIS IS UNRELIABLE AND INCAPABLE OF DEMONSTRATING OR QUANTIFYING CLAIMED ECONOMIC HARM ON A CLASS-WIDE BASIS

61.  Mr. Weir presented a preliminary hedonic regression analysis and asserted that it "confirms the existence of a price premium attributable to the 'Imported from Italy' Claim."[73]  Mr. Weir asserted that the results of his preliminary hedonic regression analysis indicate that "consumers place a high value on the 'Imported from Italy' Claim, and that market wide, there is a substantial price premium attributable to this Claim."[74] However, as explained throughout this section of my report, Mr. Weir's preliminary regression analysis is unreliable and incapable of demonstrating that all putative Class Members paid a claimed price premium associated with the Challenged Claim.

---

[71]  Weir Declaration, pp. 22 – 23.

[72]  To the extent that Mr. Weir may attempt to determine different claimed price premiums across the various factors affecting retail prices (and consequently any claimed price premiums) discussed throughout my declaration, information also would be required regarding date of purchase, sales channel, package size purchased, and promotional discounts applicable to each purchase of the Challenged Products.

[73]  Weir Declaration, p. 17.

[74]  Weir Declaration, p. 21.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

### A. **Mr. Weir's Regression Conflates The Impact (If Any) Of The Challenged Claim With The Impact Of Other Italy-Related Claims**

62.    Mr. Weir's regression analysis does not identify a claimed "price premium" attributable to the specific Challenged Claim at issue in this matter (i.e., "Imported from Italy"). Rather, Mr. Weir's preliminary analysis conflates the impact (if any) of the Challenged Claim with the impact of other Italy-related claims (e.g., "100% Italian Olives") on retail prices of olive oil products.

#### 1. **Mr. Weir's Regression Analysis Is Designed To Ignore Differences In The Effects (If Any) Of Various Different Italy-Related Label Statements**

63.    Mr. Weir acknowledged in his declaration that he assumed label statements such as "Product of Italy" and "Imported from Italy" were "similar enough to be grouped by country or region of origin" and "all products which made similar claims about originating from Italy are categorized [in his analysis] as 'Italy' claims."[75]   Based upon a review of Mr. Weir's support materials, all of the label statements identified in **Table 5** were "grouped" together (and effectively replaced with just the word "Italy" as an explanatory variable) in Mr. Weir's regression analysis.

_____

[75]  Weir Declaration, pp. 14 – 15.    (Bracketed text added for clarification.)

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

**Table 5**
**Label Statements That Mr. Weir "Grouped" As Italy-Related Claims[76]**

| Label Statement As It Appears In Mr. Weir's Label Data | Label Statement As "Grouped" In Mr. Weir's Regression |
|---|---|
| **Imported from Italy** | **Italy** |
| 100% Italian Olives | Italy |
| Premium 100% Italian | Italy |
| Italy's No. 1 Olive Oil Brand | Italy |
| Product of Italy, Premium Italian, 100% Certified Italian | Italy |
| Italia, 100% Italian Olives, Prodotto D'Italia | Italy |
| Product of Italy | Italy |
| Italy on Front | Italy |

64.     As a result of the "grouping" performed by Mr. Weir, his regression analysis cannot separately identify whether or to what extent each of the "grouped" label statements affected average retail prices of olive oil products bearing those specific claims. For example, if products labeled "100% Italian Olives" or "Premium 100% Italian" tend to be priced higher than products labeled "Imported from Italy" (all else equal), Mr. Weir's regression analysis is not capable of distinguishing between the effects of those different label statements. Moreover, in that scenario, the estimated "price premium" for Italy-related claims generated by Mr. Weir's regression would <u>overstate</u> the impact (if any) of the actual Challenged Claim (i.e., "Imported from Italy") or suggest that there is a claimed price premium associated with the Challenged Claim even if there is not.

**2.    Mr. Weir's Assertion That His Grouping Of Italy-Related Label Statements Is Supported By The Named Plaintiff's Theory Of Liability Is Incorrect**

65.     Mr. Weir testified that he viewed his decision to group together all Italy-related label statements in his regression analysis as "in line with Plaintiff's theory of liability."[77]

---

[76] *See* Weir Support Materials, "Olive Oil Label Spreadsheet.xlsx" and "Salov.do."

[77] Weir Deposition, p. 50.

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

However, from an economic and claimed damages perspective, Mr. Weir's decision to group together all Italy-related claims renders his regression analysis <u>incapable</u> of providing a claimed damages estimate tied to the Named Plaintiff's theory of liability. Mr. Weir's regression results do <u>not</u> provide a measure of the impact on retail prices of the phrase "Imported from Italy" as it appeared on the labels of the Challenged Products.

66.    Mr. Weir failed to consider that even if consumers uniformly interpreted "Imported from Italy" to mean the products are made from 100% Italian olives (as Ms. Kumar alleges she did), retail prices (and price differences) are not determined solely by consumers' interpretations of label statements alone and without other input.   Rather, economic theory indicates that prices (and therefore price differences) are determined by the interaction of supply and demand factors.   Mr. Weir failed to consider that retail price differences may exist between olive oil products labeled "100% Italian Olives" compared to olive oil products labeled "Imported from Italy" not only because of differences in label statements (i.e., a factor that may affect demand) but also because of differences in the costs of production (i.e., a factor that affects supply).

67.    Mr. Weir's regression analysis cannot distinguish between (a) a price difference driven by consumer demand (which may be affected by label statements) and (b) a price difference driven by differences in the costs of production (which may be affected by using 100% Italian olives rather than olives sourced from various other regions).   In other words, Mr. Weir's regression analysis cannot inform the Court as to whether a price difference for olive oil products labeled "100% Italian Olives" is driven by the presence of the label statement itself or by the fact that the product actually was produced from 100% Italian olives (and the associated costs of production).   By "grouping" the

_____

Challenged Claim with other Italy-related label statements such as "100% Italian Olives," Mr. Weir conflated and attributed to the Challenged Claim estimated price differences that may be driven by differences in costs of production rather than label statements.[78]

### 3. Mr. Weir's Regression Shows No Statistically Significant Impact On Retail Prices When Adjusted To Separate The Challenged Claim From Other Italy-Related Label Statements

68. When Mr. Weir's preliminary analysis is adjusted (within his framework) to attempt to identify the impact (if any) of the "Imported from Italy" claim separate from other Italy-related claims, the adjusted regression analysis shows no statistically significant, positive impact of the Challenged Claim on average retail prices.  Mr. Weir testified that he did not recall running a regression where the different Italy-related label statements were not grouped together.[79]   However, Mr. Weir's regression model can be modified to allow the different Italy-related label statements to remain separate explanatory variables in his regression instead of "grouping" them together.

69. For illustrative purposes, I have adjusted Mr. Weir's model to separate the "Imported from Italy" claim from various distinct Italy-related label statements such as "100% Italian Olives" (or similar "100% Italian" claims), "Italy's No. 1 Olive Oil Brand," "Product of Italy," and a statement Mr. Weir referred to as "Italy on Front," as summarized in **Table 6**.

_____

[78] In addition, Mr. Weir's methodology assumes that the phrase "Imported from Italy" has the same effect on average retail prices as not only "100% Italian Olives" but also several other claims, such as "Italy's No. 1 Olive Oil Brand."   From an economic and claimed damages perspective, the Named Plaintiff's theory of liability does not provide support for Mr. Weir's assumption that "Imported from Italy" and "Italy's No. 1 Olive Oil Brand" (among other Italy-related statements) are indistinguishable label statements in the marketplace.

[79] Weir Deposition, p. 50.   Mr. Weir testified that the support materials he produced (which include computer code for Stata statistical software to execute only the one regression he presented in his declaration) reflect the "sole record" of "the hedonic regression work that has been done in this case."   (Weir Deposition, pp. 50 – 51.)

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

---

**Table 6**
**Illustrative Identification Of Distinct Italy-Related Label Statements[80]**

| Label Statement As It Appears<br>In Mr. Weir's Label Data | Label Statement As Used<br>In Modified Regression |
|---|---|
| Imported from Italy | Imported from Italy |
| 100% Italian Olives | 100% Italian |
| Premium 100% Italian | 100% Italian |
| Italy's No. 1 Olive Oil Brand | Italy's No. 1 Olive Oil Brand |
| Product of Italy, Premium Italian, 100% Certified Italian | 100% Italian |
| Italia, 100% Italian Olives, Prodotto D'Italia | 100% Italian |
| Product of Italy | Product of Italy |
| Italy on Front | Italy on Front |

70.     For the purpose of this illustrative adjustment within Mr. Weir's methodology, I have performed this modification to Mr. Weir's regression model without making any other adjustments (i.e., without correcting the other errors in Mr. Weir's analysis that are discussed throughout my declaration).   The results of this adjustment are contained in **Table 7**, which is color-coded to indicate whether the estimated effects of the Challenged Claim (relative to having no geographic origin-related claim) were estimated to be (a) positive and statistically significant (no color), (b) statistically insignificant or unable to be estimated (light gray), or (c) negative and statistically significant (dark gray).   (The complete results of this modified regression analysis are presented in **Exhibit 10**.)

---

[80] *See* Weir Support Materials, "Olive Oil Label Spreadsheet.xlsx" and "Salov.do."   For the purpose of the illustrative adjustment presented here, Mr. Weir's "Italy" variable (which he defined as described in **Table 5**) was separated into five different variables, including a "dummy" (i.e., binary) variable for each of the following claims (or categories of claims): (1) "Imported from Italy"; (2) "100% Italian" (and similar claims); (3) "Italy's No. 1 Olive Oil Brand"; (4) "Product of Italy"; and (5) "Italy on Front" (as summarized in **Table 6**).   As an alternative approach, I also performed an illustrative adjustment to Mr. Weir's model in which his "Italy" variable was separated into only two different variables: (1) "Imported from Italy" and (2) all other Italy-related label statements. This alternative adjustment yielded similar results for the "Imported from Italy" claim as those presented in **Table 7**. Specifically, the estimated effect of the "Imported from Italy" claim was (a) <u>negative</u> and statistically significant for extra virgin olive oil and (b) <u>statistically insignificant</u> for extra light and pure olive oil products.

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

_____

**Table 7**
**Adjustment To Mr. Weir's Preliminary Regression Analysis**
**Adjusted Claimed Effects Of "Imported From Italy" Label Statement On Prices**
*Separating The Challenged Claim From Other Label Statements Grouped By Mr. Weir[81]*

| Claimed Premium Type | Adjusted Results Of Mr. Weir's Analysis[82] | | | |
|---|---|---|---|---|
| | Estimated Coefficient | T-Statistic | Claimed Price Premium | Claimed Price Premium Factor |
| Extra Virgin/"Imported from Italy" (vs. Extra Virgin/No Claim) | ███ | ███ | ███ | ███ |
| Extra Light Tasting/"Imported from Italy" (vs. Extra Light Tasting/No Claim) | ███ | ███ | ███ | ███ |
| Olive Oil/"Imported from Italy" (vs. Olive Oil/No Claim) | ███ | ███ | ███ | ███ |

71.     As shown in **Table 7**, when Mr. Weir's regression model is adjusted to measure the

claimed effects of the various Italy-related label statements separately, the estimated

effect of the "Imported from Italy" claim is (a) <u>negative</u> and statistically significant for

extra virgin olive oil and (b) <u>statistically insignificant</u> for extra light tasting and pure olive

oil products.[83]   <u>Under Mr. Weir's methodology</u> (which remains flawed for reasons

discussed throughout my declaration) but adjusted to isolate "Imported from Italy" as a

separate explanatory variable, these adjusted results suggest that (a) prices of pure and

_____

[81] The shading of cells in the table indicates whether the estimated effect was positive and statistically significant (no color), statistically insignificant or unable to be estimated (light gray), or negative and statistically significant (dark gray) using a two-tailed t-test and 5% significance level (i.e., 95% confidence level).

[82] For purposes of the illustrative adjustments to Mr. Weir's regression analysis presented in my declaration, claimed price premiums and claimed price premium factors were calculated using the same methodology that Mr. Weir described in his declaration. (*See* Weir Declaration, p. 19, n. 47.) Because Mr. Weir's regression uses a log-linear specification, estimated coefficients must be exponentiated to undo the log transformation reflected in the dependent variable (i.e., log price per fluid ounce). (Example calculation: exp(███ – 1 = ███.) The calculation of a claimed price premium factor reflects the assumption, made by Mr. Weir, that actual retail prices were affected by the presence of the relevant product attributes (e.g., the "Imported from Italy" claim). (Example calculation: ███████████)

[83] Mr. Weir stated that t-statistics can be used to evaluate whether an effect estimated by regression analysis is "meaningful in a statistical sense." (Weir Declaration, p. 12.)   Mr. Weir asserted that his preliminary regression results were "all statistically significantly different from zero at the 95-99% confidence level." (Weir Declaration, p. 21.)   However, even at the lower (i.e., easier to meet) 95% confidence level, when Mr. Weir's preliminary regression analysis is adjusted to allow price effects to vary across different Italy-related label statements, the estimated effects of the "Imported from Italy" claim on prices are statistically insignificant at least for extra light and pure olive oil products (and negative and statistically significant for extra virgin olive oil).

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

extra light tasting olive oil products bearing the "Imported from Italy" claim are not statistically significantly different than prices of those with no geographic origin claim and (b) the retail prices of extra virgin olive oil products bearing the "Imported from Italy" claim tend to be <u>lower</u> than those with no geographic origin claim, all else equal.[84] These results are obtained within the context of Mr. Weir's proposed hedonic regression framework and contradict the Named Plaintiff's price premium theory. In particular, these results suggest that under Mr. Weir's own framework, the Named Plaintiff would not have paid a price premium for her alleged purchase of a Filippo Berio extra virgin olive oil product.[85]

---

[84] These results also contradict Mr. Weir's assertions that the fact that he obtained a positive, statistically significant estimate for his grouped "Italy" variable indicates that "there is not wide variation in the valuation of the individual claims grouped in the group" and that his grouped "Italy" variable's estimated effect "provides a reasonable estimate of the valuation of each of the individual claims that are grouped together." (Weir Deposition, pp. 56 – 57.) Those assertions by Mr. Weir are incorrect – as demonstrated by the lack of a positive, statistically significant result for the un-grouped "Imported from Italy" claim in the adjusted regression results presented above. To further illustrate that Mr. Weir's assertions about the acceptability of his "grouping" methodology are incorrect, I performed an additional adjustment to Mr. Weir's regression analysis in which <u>all</u> claims regarding geographic origin were "grouped" into one binary variable indicating whether or not a product had <u>any</u> geographic origin claim (instead of separating claims into the categories used by Mr. Weir: "California," "Mediterranean," "Italy," "Spain," and "Imported"). If Mr. Weir's assertions were correct, then "grouping" all geographic origin claims together would not yield a positive, statistically significant result because according to Mr. Weir's own regression results, there are wide variations in the estimated effects of each geographic origin category. (*See* Weir Declaration, Exhibit 3.) However, when Mr. Weir's regression analysis is adjusted to "group" together all geographic origin claims, the estimated coefficient for the grouped geographic origin variable is positive, statistically significant, and similar to the estimated coefficient that Mr. Weir presented in his declaration for the "Italy" category. This adjustment further demonstrates that obtaining a positive, statistically significant estimate for a "grouped" variable does <u>not</u> imply that there is not wide variation in the effects of the individual claims in the group or that the "grouped" variable's estimated effect provides a reasonable estimate of the effect of each of the individual claims in the group. (In fact, if Mr. Weir's assertions were correct, then the results of this adjusted regression would imply that there is no meaningful difference in claimed price effects between an "Imported from Italy" claim and an "Imported" claim. If that were the case, Mr. Weir's methodology would suggest that consumers paid no more for the Challenged Products than they would have paid if the Challenged Claim had been replaced with the non-misleading "Imported" label statement.)

[85] Ms. Kumar testified that she purchased various brands of extra virgin olive oil during the time period from 2010 to 2014, including "at least one bottle" of Filippo Berio extra virgin olive oil. (Kumar Deposition, pp. 44 – 47, 62 – 63, and 182 – 183.)

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016



### B. Mr. Weir's Regression Results Are Driven By A Data Categorization Error That, When Fixed, Eliminates The Estimated Claimed Price Premium For ▮ Of Challenged Product Sales

72.   Setting aside Mr. Weir's failure to separate the various Italy-related claims, Mr. Weir also significantly overstated the claimed "price premium" associated with the "grouped" Italy-related claims due to a mis-categorization of certain retail sales and pricing data underlying his analysis.   Mr. Weir erroneously treated the ▮▮▮▮ and ▮▮▮▮ fields in the IRI data he obtained as pertaining to ▮▮▮▮[86]   I have reviewed and analyzed additional retail sales and pricing data that IRI provided to counsel for SNA, which includes retail sales and pricing data separately for ▮▮▮▮ ▮▮▮▮ ▮▮▮▮ for the same products as those included in the data obtained by Mr. Weir.[87]   The additional data provided by IRI confirms that the ▮▮▮▮ ▮▮▮▮ fields in the data Mr. Weir obtained represent sales and pricing figures for ▮▮▮▮[88]

---

[86] This observation is based upon a review of the Stata computer code Mr. Weir provided in "Salov.do" and a comparison of Mr. Weir's calculations in "Salov Damage Calculations.xlsx" to the IRI data he obtained ("IRI_OliveOil_0001^Highly Confidential - Attorneys Eyes Only - Stata.xlsx" ("Weir IRI Data")).

[87] IRI California Olive Oil Retail Sales and Pricing Data received March 8, 2016 ("REP1.xlsx" and "REP2.xlsx").

[88] For example, the ▮▮▮ figures in Mr. Weir's data match the ▮▮▮ figures in the additional IRI data ▮ in approximately ▮▮▮▮▮   The ▮▮▮ figures in Mr. Weir's data (which he treated as ▮▮▮ figures in the additional IRI data that appear in both data sets.

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

73.  Mr. Weir's mis-categorization of the IRI data he obtained renders his regression incapable of reliably isolating ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[89]  As a result, Mr. Weir's regression cannot reliably identify and isolate the impact of promotional activity (e.g., temporary price reductions) from the impact of his variables of interest (such as geographic origin claims).  To illustrate the impact of this error on Mr. Weir's regression results, I have adjusted Mr. Weir's regression model to correctly categorize ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ without making any other adjustments (i.e., without correcting Mr. Weir's other errors, including his "grouping" methodology with respect to Italy-related label statements[90]).

74.  The results of this adjustment are contained in **Table 8**, using the same color coding as the previous table (i.e., light gray indicates statistically insignificant results).  (The complete results of this modified regression analysis are presented in **Exhibit 11**.)

---

[89]  Mr. Weir's regression analysis is conducted using quarterly ▮▮▮▮▮ and quarterly weighted average retail prices (which Mr. Weir aggregated from weekly ▮▮▮▮▮ and weekly average retail prices in the IRI data he obtained). Mr. Weir attempted to separate ▮▮▮▮▮ and average retail prices into (a) ▮▮▮▮▮ and associated average retail prices and (b) ▮▮▮▮▮ and associated average retail prices.  Mr. Weir included a ▮▮▮▮▮ variable in his regression model, which was intended to distinguish between those two types of retail sales ▮▮▮▮▮ and control for the impact of promotional activity on retail prices (i.e., isolate the effects of promotional activity from the effects of other variables of interest).  However, the sales data Mr. Weir categorized as ▮▮▮▮▮ appears to include both ▮▮▮▮▮ sales combined ▮▮▮▮▮ and overall weighted average retail prices.  Consequently, the ▮▮▮▮▮ Mr. Weir included in his regression model does not accurately identify or reliably control for the impact of promotional activity on retail prices.

[90]  Mr. Weir's "grouping" of Italy-related label statements is summarized in **Table 5**.  By "grouping" the Challenged Claim with other Italy-related label statements, Mr. Weir's regression analysis does not separately identify whether or to what extent each of the "grouped" label statements (including the Challenged Claim) individually affected average retail prices of olive oil products bearing those specific claims.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

_____

**Table 8**
**Adjustment To Mr. Weir's Preliminary Regression Analysis**
**Adjusted Claimed Effects Of Italy-Related Label Statements On Prices**
*Correcting Categorization Of* ███████████████ *Sales*[91]

| Claimed Premium Type | Adjusted Results Of Mr. Weir's Analysis | | | |
| --- | --- | --- | --- | --- |
| | Estimated Coefficient | T-Statistic | Claimed Price Premium | Claimed Price Premium Factor |
| Extra Virgin/Italy (vs. Extra Virgin/No Claim) | ███ | ███ | ███ | ███ |
| Extra Light Tasting/Italy (vs. Extra Light Tasting/No Claim) | ███ | ███ | ███ | ███ |
| Olive Oil/Italy (vs. Olive Oil/No Claim) | ███ | ███ | ███ | ███ |

75.    As shown in **Table 8**, when Mr. Weir's data is categorized correctly, the estimated effect

of the "group" of Italy-related label statements is (a) <u>statistically insignificant</u> for extra

virgin olive oil and extra light tasting olive oil and (b) reduced by more than ███ for

pure olive oil compared to the figures presented in the Weir Declaration (i.e., an adjusted

claimed price premium factor of ███ rather than the ███ figure Mr. Weir presented

for pure olive oil).[92]   <u>Under Mr. Weir's methodology</u> (which remains flawed for reasons

discussed throughout my declaration) but adjusted to properly isolate ███████████

███████████   activity, even if all Italy-related label statements are erroneously

"grouped" together, there is no statistically significant effect of Mr. Weir's "group" of

Italy-related label statements on the price of extra virgin or extra light tasting olive oil

products.   The challenged extra virgin and extra light tasting olive oil products account

for approximately ███ of the total Challenged Product sales estimated by Mr. Weir.[93]

_____

[91]  The shading of cells in the table indicates whether the estimated effect was positive and statistically significant (no color), statistically insignificant or unable to be estimated (light gray), or negative and statistically significant (dark gray) using a two-tailed t-test and 5% significance level.

[92]  *See* Weir Declaration, p. 20.   Calculation: ███████████████████ reduction.

[93]  *See* Weir Declaration, p. 22.   In Mr. Weir's Table 2, extra virgin and extra light tasting olive oil products account for ███ of the ███████ in total California retail sales he estimated for the Challenged Products

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

_____

These results are obtained within the context of Mr. Weir's proposed hedonic regression framework.  Thus, under Mr. Weir's own framework, the Named Plaintiff would not have paid a price premium for her alleged purchase of a Filippo Berio extra virgin olive oil product.[94]

76.     Moreover, when Mr. Weir's regression model is adjusted to correctly categorize ███████████████████████ sales (i.e., correcting Mr. Weir's mis-categorization of data) in combination with separating the "Imported from Italy" claim from other Italy-related label statements, Mr. Weir's adjusted preliminary regression analysis yields no statistically significant, positive claimed price premium for the "Imported from Italy" claim on any grade of olive oil.[95]   In other words, consistent with the results presented in **Table 7**, adjusting Mr. Weir's analysis to separate the "Imported from Italy" claim from other Italy-related label statements yields no statistically significant, positive claimed price premium for the "Imported from Italy" claim regardless of whether Mr. Weir's model is adjusted to correctly categorize ███████████████████ sales.

_____

during the putative Class period.   Correcting Mr. Weir's categorization of the IRI sales data he obtained reduces his estimate of total retail sales from ████████████ to ████████████ .   The additional IRI data I have reviewed also indicates that total retail sales of the Challenged Products identified in Mr. Weir's Table 2 amounted to ████████ ████████ during the putative Class period, of which ████████ was associated with extra virgin and extra light tasting olive oil products.

[94]  *See* Kumar Deposition, pp. 44 – 47, 62 – 63, and 182 – 183.

[95]  This result is obtained when the "Imported from Italy" claim is separated from other Italy-related label statements either in the manner summarized in **Table 6** or by using the alternative approach of separating Mr. Weir's "Italy" variable into (1) "Imported from Italy" and (2) all other Italy-related label statements.   Under either approach, Mr. Weir's adjusted preliminary regression analysis yields no statistically significant, positive claimed price premium for the "Imported from Italy" claim on any grade of olive oil.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

_____

### C. **Mr. Weir's Regression Does Not Demonstrate That All Putative Class Members Paid A Claimed Price Premium For Italy-Related Claims (Let Alone For The Challenged Claim)**

77.   Mr. Weir asserted that his preliminary regression analysis (and his proposed regression approach in general) "can identify both whether a particular effect is present (such as to confirm that the Claim does increase the price of the Products) and the overall amount of such an effect (by how much does the Claim increase the cost of the Products)."[96] However, the preliminary analysis proffered by Mr. Weir does not appropriately account for numerous factors affecting the actual prices putative Class members paid (and price premiums paid, if any) for the Challenged Products.

78.   Within Mr. Weir's proposed framework, the results of his proposed regression analysis represent <u>average</u> effects of a given claim (or, in his preliminary regression, a "group" of Italy-related label statements) across all putative Class Members, not common effects that are identical across the putative Class.[97]   Calculating an average effect across a group of individuals (e.g., the putative Class) does not demonstrate that all individuals in the group experienced that average effect.

79.   For example, Mr. Weir's preliminary regression model assumes that for each grade of olive oil, there is one claimed price premium for Italy-related label statements across all years of the putative Class period.   However, many factors that influence prices (and therefore claimed price premiums) may have changed during the time period included in

_____

[96] Weir Declaration, pp. 6 – 7.

[97] Weir Declaration, pp. 17 – 18.   Mr. Weir stated that his preliminary regression results "pertain to sales throughout California and all of the challenged Salov Products, across all sizes, and across multiple years." However, Mr. Weir only calculated an <u>average</u> effect across various products, sizes, and years and on a state-wide basis.   He did <u>not</u> perform separate calculations for specific products (other than by grade of olive oil), sizes, years, or geographic areas, or demonstrate that the results of such calculations would be similar across those dimensions if calculated separately.   In other words, he <u>assumed</u> that the average effects he calculated apply to all purchases, but he did not demonstrate that to be the case.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

——————————————————————————————————————————————

Mr. Weir's regression analysis.  To investigate this possibility, I applied Mr. Weir's preliminary model (modified to correctly categorize ███████████████████ data) separately for each year in the putative Class period (without correcting Mr. Weir's other errors, including his "grouping" methodology with respect to Italy-related label statements [98] ).  This adjustment to Mr. Weir's approach allows the alleged price premiums associated with the "group" of Italy-related label statements to be analyzed over time under Mr. Weir's own framework (which remains flawed for the reasons stated above).[99]  The results of this adjustment are contained in **Table 9**, using the same color coding as the previous tables (i.e., light gray indicates statistically insignificant results). (*See* **Exhibit 12**.)

———

[98] Mr. Weir's "grouping" of Italy-related label statements is summarized in **Table 5**.  By "grouping" the Challenged Claim with other Italy-related label statements, Mr. Weir's regression analysis does not separately identify whether or to what extent each of the "grouped" label statements (including the Challenged Claim) individually affected average retail prices of olive oil products bearing those specific claims.

[99] For the purpose of this comparison, the only changes I have made to Mr. Weir's preliminary regression model are those directly related to allowing for an analysis of the alleged price premiums over time (i.e., performing separate regressions for separate years) and correcting Mr. Weir's mis-categorization of sales data.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

**Table 9**
**Adjustment To Mr. Weir's Preliminary Regression Analysis**
**Adjusted Claimed Effects Of Italy-Related Label Statements On Prices**
*By Year And Correcting Categorization Of Sales* [100]

| Claimed Premium Type | Adjusted Results Of Mr. Weir's Analysis | | | |
| | Estimated Coefficient | T-Statistic | Claimed Price Premium | Claimed Price Premium Factor |
|---|---|---|---|---|
| **Extra Virgin/Italy (vs. Extra Virgin/No Claim)** | | | | |
| 2010 (Q2 to Q4) | ■ | ■ | ■ | ■ |
| 2011 | ■ | ■ | ■ | ■ |
| 2012 | ■ | ■ | ■ | ■ |
| 2013 | ■ | ■ | ■ | ■ |
| 2014 (Q1 to Q2) | ■ | ■ | ■ | ■ |
| **Extra Light Tasting/Italy (vs. Extra Light Tasting/No Claim)** | | | | |
| 2010 (Q2 to Q4) | ■ | ■ | ■ | ■ |
| 2011 | ■ | ■ | ■ | ■ |
| 2012 | ■ | ■ | ■ | ■ |
| 2013 | ■ | ■ | ■ | ■ |
| 2014 (Q1 to Q2) | ■ | ■ | ■ | ■ |
| **Olive Oil/Italy (vs. Olive Oil/No Claim)** | | | | |
| 2010 (Q2 to Q4) | | ■ | ■ | ■ |
| 2011 | ■ | ■ | ■ | ■ |
| 2012 | ■ | ■ | ■ | ■ |
| 2013 | ■ | ■ | ■ | ■ |
| 2014 (Q1 to Q2) | ■ | ■ | ■ | ■ |

80.     As shown in **Table 9**, when Mr. Weir's preliminary regression analysis is adjusted to allow price effects to vary over time (even without correcting other errors in Mr. Weir's methodology aside from correctly categorizing sales data), the estimated price differences associated with Mr. Weir's "group" of Italy-related label statements are not statistically significant for (a) extra virgin olive oil products in any year; (b) extra light tasting olive oil products in any year, and (c) pure olive oil products in 2010 and 2012.   Hence, even

---

[100] The shading of cells in the table indicates whether the estimated effect was positive and statistically significant (no color), statistically insignificant or unable to be estimated (light gray), or negative and statistically significant (dark gray) using a two-tailed t-test and 5% significance level.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016
_____

without correcting Mr. Weir's "grouping" methodology, these results suggest that putative Class members who purchased in the years indicated above likely did not pay a systematic price premium associated with Italy-related label statements.  Again, under Mr. Weir's own framework, the Named Plaintiff would not have paid a price premium for her alleged purchase of a Filippo Berio extra virgin olive oil product.[101]

### D. Mr. Weir's Preliminary Analysis Ignores Important Variables That Would Have Affected The Claimed Price Premium Associated With The Challenged Products Under His Framework

81.    Mr. Weir described the regression analysis presented in the Weir Declaration as "preliminary" and testified that he would expect to refine his analysis as additional information becomes available (e.g., additional product label information).[102]  Mr. Weir described "the identification of explanatory variables" as "an ongoing process" and stated that "[s]ometimes a variable may seem relevant theoretically, but may later be discovered to not be proper for inclusion in the model, and vice versa."[103]  However, it appears that Mr. Weir excluded from his model product attribute data that was available in the IRI data he relied upon, which if included in his model, would have affected his estimates of a claimed price premium for his "group" of Italy-related label statements.

82.    For example, in the product attribute data Mr. Weir relied upon, it is possible to identify whether each olive oil product in Mr. Weir's sample included a ▬▬▬▬▬ label statement, referring to the process by which the olives were pressed to produce olive

---

[101]  *See* Kumar Deposition, pp. 44 – 47, 62 – 63, and 182 – 183.

[102]  Weir Deposition, p. 33.   *See also* Weir Declaration, pp. 17 – 20.

[103]  Weir Declaration, p. 11.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

oil.[104]   I understand that all extra virgin olive oils are cold pressed during the production

process.   However, a review of the product attribute data Mr. Weir relied upon indicates

that not all extra virgin olive oil products bear a ██████████ label statement.[105]

Therefore, under Mr. Weir's methodology, it is possible that the addition of a ████

██████ label statement may affect retail prices when compared to those of extra virgin

olive oil products that do not bear a ██████████ label statement.[106]

83.   As shown in **Table 10**, adding the omitted ██████████ variable to Mr. Weir's

preliminary regression model (without correcting other errors in Mr. Weir's methodology

aside from correctly categorizing sales data) not only yields a statistically significant

estimated effect of the added variable but also affects the estimation of the variables Mr.

Weir did include in his model, including the estimated effects of Mr. Weir's "group" of

Italy-related label statements.[107]   When this omitted variable is added to the model, Mr.

Weir's adjusted preliminary regression analysis yields no statistically significant, positive

claimed price premium for his "group" of Italy-related label claims on any grade of olive

---

[104] *See* Weir Support Materials, "IRI_OliveOil_0001^Highly Confidential - Attorneys Eyes Only – Stata.xlsx" and "Salov_IRI_Sales.dta."   The IRI data Mr. Weir relied upon contained a column labeled ██████████ which Mr. Weir used to determine whether each olive oil product was labeled ██████████ That same ██████████ column also identified whether each product was labeled ██████████ Mr. Weir included ██████████ as explanatory variables in his preliminary model.   However, Mr. Weir did not include ██████████ as an explanatory variable in his model.

[105] Extra virgin olive oil products that do *not* bear a ██████████ label statement account for approximately ██ of ██████ of extra virgin olive oil products included in Mr. Weir's regression analysis.

[106] The omission of an important explanatory variable can render a regression analysis prone to omitted variable bias.   Omitted variable bias occurs when one or more relevant explanatory variables are omitted from a regression model.   If this occurs, the results of that regression generally are biased in that the impact of the omitted considerations are "spread across" the considerations that are included in the regression analysis.   One exception is when the omitted variable is uncorrelated with the included variables.   However, "uncorrelated explanatory variables are rare."   *See Undergraduate Econometrics*, Second Edition, Hill, R.C., Griffiths, W.C., and Judge, G.G., pp. 185 – 187.

[107] Mr. Weir's "grouping" of Italy-related label statements is summarized in **Table 5**.   By "grouping" the Challenged Claim with other Italy-related label statements, Mr. Weir's regression analysis does not separately identify whether or to what extent each of the "grouped" label statements (including the Challenged Claim) individually affected average retail prices of olive oil products bearing those specific claims.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

---

oil, further contradicting Mr. Weir's assertions that his preliminary results are "robust" and produce "stab[le] … results across different model specifications."[108]   (**Exhibit 13**.)

**Table 10**
**Adjustment To Mr. Weir's Preliminary Regression Analysis**
**Adjusted Claimed Effects Of Italy-Related Label Statements On Prices**
*Adding* ▮▮▮▮▮▮ *" Variable And Correcting Categorization Of Sales* [109]

| Claimed Premium Type | Adjusted Results Of Mr. Weir's Analysis | | | |
|---|---|---|---|---|
| | Estimated Coefficient | T-Statistic | Claimed Price Premium | Claimed Price Premium Factor |
| Extra Virgin/▮▮▮▮ (vs. Extra Virgin/No Claim) | ▮▮ | ▮ | ▮▮ | ▮▮ |
| Extra Virgin/Italy (vs. Extra Virgin/No Claim) | ▮▮ | ▮ | ▮▮ | ▮▮ |
| Extra Light Tasting/Italy (vs. Extra Light Tasting/No Claim) | ▮▮ | ▮ | ▮▮ | ▮▮ |
| Olive Oil/Italy (vs. Olive Oil/No Claim) | ▮▮ | ▮ | ▮▮ | ▮▮ |

84.     The illustrative adjustments presented throughout this section of my report demonstrate the unreliable nature of Mr. Weir's preliminary regression analysis and the wide variations in estimated coefficients, statistical significance, and claimed price premiums that result from correcting the numerous errors and omissions in Mr. Weir's analysis. Even adjusting Mr. Weir's preliminary analysis to correct a small subset of Mr. Weir's errors leads to the conclusion that his regression model cannot show a statistically significant, positive price premium associated with Italy-related label statements for any grade of olive oil products, let alone a systematic claimed price premium paid by all putative Class members specific to the Challenged Claim.

---

[108]  Weir Declaration, p. 19.

[109]  The shading of cells in the table indicates whether the estimated effect was positive and statistically significant (no color), statistically insignificant or unable to be estimated (light gray), or negative and statistically significant (dark gray) using a two-tailed t-test and 5% significance level.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

---

85.     As an additional observation, a regression model that seeks to explain the prices of food
products generally should control for the impact of advertising expenditures on prices.
This is because more frequent advertising may result in higher prices or differential price
effects (given that advertising may alter the relative demands for competing products,
may represent a higher cost for some products that needs to be recouped, or provide
support for the higher brand name value associated with certain products).   I understand
that SNA advertises Filippo Berio olive oil products on television and other media.[110]
However, Mr. Weir did not identify advertising expenditures as an explanatory variable
he would include in his proposed regression analysis.   Hence, Mr. Weir's proposed
methodology would be at risk of conflating a price premium (if any) caused by
differences in advertising with the alleged impact of the Challenged Claim.   In order to
properly control for the effects of advertising, Mr. Weir would need to obtain relevant
advertising expenditure data for SNA and its competitors.   Mr. Weir did not discuss in
his declaration whether the necessary advertising expenditure data for SNA or its
competitors is available or could be reliably obtained in this matter, particularly in the
level of detail that would be necessary to use in his proposed regression analysis.[111]

*   *   *   *   *   *

---

[110]   *See*, *e.g.*, Scheiber Deposition, pp. 134 – 135 and 139.

[111]   Mr. Weir's preliminary regression analysis was conducted using quarterly retail ████████ and quarterly
weighted average retail prices for various olive oil products offered by SNA and various competitors in California
from the second quarter of 2010 through the second quarter of 2014.   To incorporate advertising expenditures into
his proposed regression analysis at the same level of detail would require quarterly advertising expenditure data for
SNA and its competitors by brand and/or specific variety of olive oil products advertised in California during the
same time period.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY

Declaration of Keith R. Ugone, Ph.D.
March 15, 2016

_____

86.     My analyses, observations, and opinions contained in this declaration are based upon information available to date.  I reserve the ability to review documents, deposition transcripts, or other information still to be produced by the parties to this dispute and to supplement my opinions based upon that review.


        I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

        Executed in Dallas, Texas on March 15, 2016.


        _____
        Keith R. Ugone, Ph.D.

HIGHLY CONFIDENTIAL / ATTORNEYS' EYES ONLY