WILLIAM I. CHAMBERLAIN (SBN 306046)
COMPETITIVE ENTERPRISE INSTITUTE
CENTER FOR CLASS ACTION FAIRNESS
1310 L Street NW, 7th Floor
Washington, DC 20005
Voice: 202-331-2255
Email: will.chamberlain@cei.org
Admitted only in California; supervision by members of the D.C. Bar.

*Attorney for Objector Theodore H. Frank*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

ROHINI KUMAR, individually on behalf of himself and all others similarly situated,

Plaintiffs,

v.

SALOV NORTH AMERICA CORP., *et al.*,

Defendants,

THEODORE H. FRANK,

Objector.

Case No. 4:14-cv-02411-YGR

**OBJECTION TO PROPOSED SETTLEMENT AND FEE REQUEST**

Judge: Hon. Yvonne Gonzalez Rogers
Courtroom: 1
Date: May 30, 2017
Time: 2:00 P.M.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ II

INTRODUCTION ........ 1

I. THEODORE H. FRANK IS A MEMBER OF THE CLASS AND HAS STANDING TO OBJECT. ........ 3

II. THE DISTRICT COURT HAS A FIDUCIARY DUTY TO THE CLASS AS A WHOLE. ........ 4

III. THIS SETTLEMENT MUST BE HELD TO A HIGHER STANDARD OF FAIRNESS BECAUSE THE PARTIES EXPANDED THE CLASS NATIONWIDE. ........ 6

IV. THE SETTLEMENT IS NOT FAIR, REASONABLE, OR ADEQUATE, VIOLATING RULE 23(E). ........ 7

A. The settlement contains all the signs of impermissible self-dealing identified by the Ninth Circuit in *Bluetooth*. ........ 7

1. Class counsel's fee request for 80% of the class benefit reflects a selfish settlement where class counsel is the primary beneficiary. ........ 7

2. The settlement contains "clear-sailing" and "kicker" provisions that are designed to insulate the disproportionate fee from scrutiny. ........ 10

B. There is no justification for class counsel's disproportionate fee, so the settlement must be rejected under rule 23(e). ........ 11

1. Ninth Circuit law proscribes lodestar hours from controlling the fairness of allocation; the fee must be proportionate to class recovery. ........ 12

2. Prospective, duplicative injunctive relief cannot justify a disproportionate fee. ........ 12

3. The notice and administrative costs of the settlement cannot justify the disproportionate fee. ........ 16

C. The settlement is unfair because it throttles the number of claims by excluding a large part of the class from monetary recovery. ........ 16

V. CLASS COUNSEL ARE INADEQUATE UNDER RULE 23(G)(4) BECAUSE THE SETTLEMENT INCENTIVIZES CLASS COUNSEL TO LIMIT CLAIMS AND CLASS COUNSEL DESIGNED A CLAIMS PROCESS THAT DEPRESSED THE NUMBER OF CLAIMS. ........ 17

VI. THE AGREEMENT ARBITRARILY CREATES A ZERO-RECOVERY SUBCLASS, MAKING THE CLASS REPRESENTATIVES INADEQUATE UNDER RULE 23(A)(4). ........ 20

VII. THIS COURT SHOULD NOT CONSIDER THE NUMBER OF OBJECTORS WHEN EVALUATING SETTLEMENT FAIRNESS, ESPECIALLY BECAUSE THE SETTLEMENT AGREEMENT UNNECESSARILY BURDENS OBJECTIONS. ........ 22

CONCLUSION ........ 25

## TABLE OF AUTHORITIES

**Cases**

*Allen v. Bedolla*, 787 F.3d 1218 (9th Cir. 2015) ........ 1, 7

*Allen v. Similasan Corp.*, 318 F.R.D. 423 (S.D. Cal. 2016) ........ 6, 19

*Amchem Prods. v. Windsor*, 521 U.S. 591 (1997) ........ 6, 15

*In re Baby Products Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013) ........ 5, 11

*Banks v. Nissan N. Am., Inc.*, No. 11-cv-2022-PJH, 2015 WL 7710297 (N.D. Cal. Nov. 30, 2015) ........ 8

*In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011) ........ passim

*Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331 (4th Cir. 1998) ........ 19

*In re Chiron Corp. Sec. Litig.*, No. C-04-4293 VRW, 2007 WL 4249902 (N.D. Cal. Nov. 30, 2007) ........ 21

*Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ........ 6

*In re Classmates.com Consol. Litig.*, No. 09-cv-0045-RAJ, 2012 WL 3854501 (W.D. Wash. Jun. 15, 2012) ........ 3

*Creative Montessori Learning Ctrs., v. Ashford Gear LLC*, 662 F.3d 913 (7th Cir. 2011) ........ 17

*Daniels v. Aeropostale West*, No. C 12-05755 WHA, 2014 WL 2215708 (N.D. Cal. May 29, 2014) ........ 19

*Dennis v. Kellogg Co.*, 697 F.3d 858 (9th Cir. 2012) ........ 4, 6, 10

*Dewey v. Volkswagen AG*, 681 F.3d 170 (3d Cir. 2012) ........ 16, 18, 19

*Dewey v. Volkswagen of Am.*, 909 F. Supp. 2d 373 (D.N.J. 2012) ........ 19

*Ferrington v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2012 WL 1156399 (N.D. Cal. Apr. 6, 2012) ........ 18, 19, 20

*Gennari v. Weichert Co. Realtors*, 691 A.2d 350 (N.J. 1997) ........ 2, 18

*In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995) ........ 5, 7, 17

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ........ 5, 6, 7, 15

*Hofmann v. Dutch Llc*, No. 3:14-cv-02418-GPC-JLB, 2017 WL 840646, (S.D. Cal. Mar. 2, 2017) ........ 13

*In re HP Inkjet Printer Litig.*, 716 F.3d 1173 (9th Cir. 2013) ........ 4, 7, 11

*Johnson v. Comerica*, 83 F.3d 241 (8th Cir. 1996) ........ 7

*Keirsey v. Ebay, Inc.*, No. 12-cv-01200-JST, 2014 WL 644738 (N.D. Cal. Feb. 18, 2014) ........ 11

*Koby v. ARS Nat'l Servs.*, 846 F.3d 1071 (9th Cir. 2017) ........ 5, 12, 13

*Larson v. AT&T Mobility LLC*, 687 F.3d 109 (3d Cir. 2012) ........ 17

*Lobatz v. U.S. West Cellular of Cal. Inc.*, 222 F.3d 1142 (9th Cir. 2000) ........ 17

*In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010) ........ 4

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004) ........ 5

*Molski v. Gleich*, 318 F.3d 937 (9th Cir. 2003) ........ 6

*Myles v. AlliedBarton Sec. Servs.*, No. 12-cv-05761-JD, 2014 WL 6065602 (N.D. Cal. Nov. 12, 2014) ........ 14

*Newman v. Americredit Fin. Servs. Inc.*, No. 3:11-cv-03041-DMS-BLM, 2014 U.S. Dist. LEXIS 15728 (S.D. Cal. Feb. 3, 2014) ........ 15, 16

*In re Online DVD Antitrust Litig.*, 779 F.3d 934 (9th Cir. 2015) ........ 14

*Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) ........ 20

*Otey v. Crowdflower, Inc.*, No. 12-cv-05524-JST, 2014 WL 1477630 (N.D. Cal. Apr. 15, 2014) ........ 8

*Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) ........ passim

*Pierce v. Visteon Corp.*, 791 F.3d 782 (7th Cir. 2015) ........ 17

*In re Prudential Ins. Co. America Sales Practices Litig.*, 148 F.3d 283 (3d Cir. 1998) ........ 8

*Radcliffe v. Experian Info Solutions*, 715 F.3d 1157 (9th Cir. 2013) ........ 5, 15

*Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014) ........ 1, 4, 11, 14

*Retta v. Millennium Prods.*, No. CV 15-1801 PSG, 2016 WL 6520138 (C.D. Cal. Sept. 21, 2016) ........ 5

*Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277 (7th Cir. 2002) ........ 13

*Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181 (D.D.C. 2013) ........ 3

*Rodriguez v. West Publ'g Corp.*, 563 F.3d 948 (9th Cir. 2009) ........ 15

*Silber v. Mabon,* 957 F.2d 697 (9th Cir. 1992) ........ 5

*Sobel v. Hertz Corp.*, No. 3:06-CV-00545-LRH-RAM, 2011 WL 2559565 (D. Nev. Jun. 27, 2011) ........ 11

*In re Sony PS3 "Other OS" Litig.*, No. 10-cv-01811-YGR, 2017 WL 424716 (N.D. Cal. Jan. 31, 2017) ........ 8

*Staton v. Boeing*, 327 F.3d 938 (9th Cir. 2003) ........ passim

*Strong v. BellSouth Telecommns., Inc.*, 137 F.3d 844 (5th Cir. 1998) ........ 10

*In re Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608 (8th Cir. 2017) ........ 5

*Trabakoolas v. Watts Water Tech., Inc.,* No. 3:12-cv-01172-WHO (EDL) (Dkt. 276) (N.D. Cal. Feb. 14, 2013) ........ 21

*In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634 CRB, 2015 WL 3396829 (N.D. Cal. May 26, 2015) .......... 14

*True v. Am. Honda Co.*, 749 F. Supp. 2d 1052 (C.D. Cal. 2010) .......... 5, 12, 18, 20

*In re Washington Pub. Power Supply Sys. Litig.,* 19 F.3d 1291 (9th Cir. 1994) .......... 4

*Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518 (1st Cir. 1991) .......... 9

**Statutes and Rules**

15 U.S.C. § 77z-1(a)(6) .......... 9

15 U.S.C. § 78u-4(a)(6) .......... 9

28 U.S.C. § 1654 .......... 22

Fed. R. Civ. P. 23(a)(4) .......... 16

Fed. R. Civ. P. 23(g)(4) .......... 16

Fed. R. Civ. P. 23(c)(2)(B) .......... 18

N.J.S.A. § 56:8-2 .......... 3, 19

**Other Authorities**

American Law Institute, *Principles of the Law of Aggregate Litig.* § 3.05(c) (2010) .......... 5

Brickman, Lester, *Lawyer Barons* (2011) .......... 10

Bush, Evan, *Your grocery bill may help King County track unlicensed pets*, Seattle Times (Nov. 2, 2016) .......... 17

Erichson, Howard, *Aggregation as Disempowerment*, 92 Notre Dame L. Rev 859 (2016) .......... 6

Federal Judicial Center, Manual for Complex Litigation (Fourth) § 21.71 (2004) .......... 8

Fitzpatrick, Brian T., *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009) .......... 4

Liptak, Adam, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. Times, Aug. 13, 2013, at A12 .......... 3

Newberg, Herbert & Conte, Alba, 4 Newberg on Class Actions (4th ed. 2009) .......... 5

Notes of Advisory Committee on 2003 Amendments to Rule 23 .......... 7

Silver, Charles, *Due Process and the Lodestar Method*, 74 Tul. L. Rev. 1809 (2000) .......... 1

**INTRODUCTION**

The most basic principles of class action settlement law require that class members—not class counsel—be the primary beneficiaries of the settlement, and that class members be protected from conflicts of interest. This settlement violates these principles and should be rejected on three independent grounds.

*First*, class counsel's fee request captures an astounding 80% of the class benefit. Class counsel is set to receive almost $1,000,000 in fees under the settlement,[1] while the class, based on the most recent claims data, will likely receive less than $200,000 in monetary relief.[2] This disproportionate fee request is protected by clear-sailing and kicker clauses,[3] meaning that the settlement contains all three indicia of self-dealing disfavored by the Ninth Circuit.[4]

Class counsel argues their fee request is justified because defendants have "made available" $5,000,000 for the settlement.[5] That figure is ephemeral and irrelevant—when evaluating the fairness of the settlement and fee award, the amount the class *actually* receives is what matters.[6] Objector Frank is not arguing that the settlement did not extract enough money, in the aggregate, from defendants. The litigation value of the claims at issue might be $1.2 million, or $6 million, or $20 million. Whatever the value, Ninth Circuit law requires that class counsel only take their fair share, and not pretend that a $1.2 million settlement is really a $6 million settlement in order to justify a disproportionate fee. The settlement is unfair under 23(e) because it allocates the lion's share of the benefit to class counsel.

Class counsel points to other factors to try and justify the misallocation of settlement proceeds, but

---

[1] *See* Settlement Agreement ¶ 6.1 ("Plaintiff's Counsel may apply to the Court for an award . . . of their Attorneys' Fees and Costs in a total amount not to exceed $982,500.").

[2] *See* Declaration of Jeanne C. Finegan, Dkt. 154-9 ("Finegan Decl.") ¶ 20 (attesting that as of April 6, 38,768 claims were filed for an average of 7.7 bottles, and an additional 29 valid claims were filed with proof of purchase for more than 10 bottles). If we assume that the proof of purchase claimants claimed an average of 30 bottles, at $0.50 per bottle, the total current value of claims is roughly $150,000. A finalized claims administrator declaration is not due until after the objection deadline.

[3] *See* Settlement Agreement ¶ 6.3 (clear sailing); *id.* ¶¶ 6.6, 6.8 (kicker).

[4] *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).

[5] Plaintiff's Motion for Final Approval ("MFA"), Dkt. 154 at 10.

[6] *See Allen v. Bedolla*, 787 F.3d 1218, 1224 & n.4 (9th Cir. 2015) (noting that the ratio of fee to class recovery must be examined in "economic reality" with actual claims rates); *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014) ("The ratio that is relevant to assessing the reasonableness of the attorneys' fee that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received.").

they are insufficient. The prospective, duplicative injunctive relief, which merely enjoins the defendants from using puffery it had already stopped using, does not provide any incremental value to the class.[7] Further, class counsel's high lodestar cannot justify a disproportionate fee—nor can the $450,000 in administrative costs. This insulated, disproportionate fee request renders the settlement unfair under 23(e).

*Second*, the settlement agreement creates a zero-recovery subclass. Anyone who purchased Filippo Berio Olive Oil in the relevant time period is a class member[8]—but only those purchasers who attest that they relied on its "Imported From Italy" labeling can get monetary relief.[9] This distinction, irrelevant to the primary cause of action in the amended complaint,[10] unfairly freezes out purchasers who are indifferent to the provenance of their olive oil. The settlement is thus unfair under Rule 23(e) because it throttles the number of claims by excluding a large part of the class from monetary recovery. This intraclass conflict also makes the class representative inadequate, precluding class certification under rule 23(a)(4) and providing a separate, independent ground for rejection.

*Third*, the agreement gives the defendants the unilateral right to cancel the settlement—and thereby annul class counsel's fees—if the value of class members' claims plus administrative costs exceeds $5 million.[11] This creates a substantial conflict of interest between class counsel and class members, because class counsel will not get paid if too many class members file claims. Ironically, while class counsel argues that the settlement

---

[7] *Compare* Settlement Agreement ¶ 3.1 ("Defendant represents that during the pendency of . . . this Litigation, it removed the phrase 'Imported from Italy' from all Products imported into the United States, and it replaced that phrase with the word "Imported."") *with id.* ¶ 3.2 ("Defendant agrees not to use the phrase[] 'Imported from Italy,' . . . and instead to use the designation 'Imported' on the front panel, until at least three years after the effective date.").

[8] *See id.* ¶¶ 2.34, 2.39.

[9] *See id.* ¶ 4.3(e) ("[T]he Settlement Class Member . . . must . . . certify . . . that [they] would not have paid the price charged and/or made the purchase(s) in the absence of the phrase 'Imported from Italy.'").

[10] *See* First Amended Class Action Complaint, Dkt. 153 ("Amended Complaint") ¶¶ 37-47 (alleging that Defendants violated the New Jersey Consumer Fraud Act); N.J.S.A. § 56:8-2 (making unlawful deceptive commercial practices "whether or not any person has in fact been misled, deceived, or damaged thereby . . . ."); *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 366 (N.J. 1997) (noting that liability under the New Jersey Consumer Fraud Act "does not require proof of reliance").

[11] *See* Declaration of Adam J. Gutride Ex. 1, Dkt. 140-1 ("Settlement Agreement") ¶ 9.5 ("Defendant shall have the sole and exclusive right to terminate this Agreement . . . if its total costs . . . are projected to exceed $5,000,000."); *id.* ¶ 7.13 ("[I]f . . . the Agreement is terminated pursuant to Section 9.5, then no term or condition of this agreement . . . shall have any effect . . . .").

should be valued by the $5 million relief "made available," class counsel has every incentive in the world to make sure that claims do not approach $4,550,000 so they can protect their $1 million fee request which gets paid whether defendants pay class members $200,000 or $4,549,999. Not surprisingly, class counsel structured a claims process designed to depress the number of claims and realizes the conflict created by the termination provision. This provision makes class counsel inadequate under rule 23(g)(4), precluding settlement approval.

## I. Theodore H. Frank is a member of the class and has standing to object.

Objector Theodore H. Frank is a member of the proposed settlement class. *See* Declaration of Theodore H. Frank ("Frank Decl.") ¶¶ 3-10. Frank's business address is Competitive Enterprise Institute, 1310 L Street NW, 7th Floor, Washington, DC 20005. *See id.* ¶ 2. His phone number is (202) 331-2263. *See id.* Frank intends to appear at the May 30, 2017 fairness hearing through his *pro bono* attorney William I. Chamberlain of the Competitive Enterprise Institute's Center for Class Action Fairness ("CCAF"). Chamberlain is a member of the bar of the Northern District of California.

CCAF represents class members *pro bono* in class actions where class counsel employs unfair class action procedures to benefit themselves at the expense of the class. *See, e.g.*, *Pearson v. NBTY, Inc.*, 772 F.3d 778, 787 (7th Cir. 2014) (observing that CCAF "flagged fatal weaknesses in the proposed settlement" and demonstrated "why objectors play an essential role in judicial review of proposed settlements of class actions"); *In re Dry Max Pampers Litig.* ("*Pampers*"), 724 F.3d 713, 716-17 (6th Cir. 2013) (describing CCAF's client's objections as "numerous, detailed, and substantive") (reversing settlement approval and certification); *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 205 (D.D.C. 2013) (describing CCAF's client's objection as "comprehensive and sophisticated" and noting that "[o]ne good objector may be worth many frivolous objectors in ascertaining the fairness of a settlement.") (rejecting settlement approval and certification); Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. Times, Aug. 13, 2013, at A12 (calling Frank "[t]he leading critic of abusive class-action settlements").

Since it was founded in 2009,[12] CCAF has won over $100 million for class members. *See, e.g.*, *In re Classmates.com Consol. Litig.*, No. 09-cv-0045-RAJ, 2012 WL 3854501, at *9 (W.D. Wash. Jun. 15, 2012) (noting

[12] In 2015, CCAF merged with the Competitive Enterprise Institute and became a division within CEI's law and litigation program.

that CCAF's client "was relentless in his identification of the numerous ways in which the proposed settlements would have rewarded class counsel . . . at the expense of class members" and "significantly influenced the court's decision to reject the first settlement and to insist on improvements to the second").

Because it has been CCAF's experience that class action attorneys often employ *ad hominem* attacks in attempting to discredit objections, it is perhaps relevant to distinguish CCAF's mission from the agenda of those who are often styled "professional objectors." A "professional objector" is a specific term referring to for-profit attorneys who attempt or threaten to disrupt a settlement unless plaintiffs' attorneys buy them off with a share of the attorneys' fees. Some courts presume that such objectors' legal arguments are not made in good faith. *See* Edward Brunet, *Class Action Objectors: Extortionist Free Riders or Fairness Guarantors*, 2003 U. Chi. Legal F. 403, 437 n.150 (2003). This is not CCAF's *modus operandi*. *See* Paul Karlsgodt & Raj Chohan, *Class Action Settlement Objectors: Minor Nuisance or Serious Threat to Approval*, BNA: Class Action Litig. Report (Aug. 12, 2011) (distinguishing CCAF from professional objectors). CCAF refuses to engage in *quid pro quo* settlements and does not extort attorneys; and has never withdrawn an objection in exchange for payment. Instead, it is funded entirely through charitable donations and court-awarded attorneys' fees. *See* Frank Decl. ¶ 30.

To avoid doubt about his motives, Frank is willing to stipulate to an injunction prohibiting him from accepting compensation in exchange for the settlement of his objection. *See generally* Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L. Rev. 1623 (2009) (suggesting inalienability of objections as solution to objector blackmail problem). Frank brings this objection through CCAF in good faith to protect the interests of the class. *See* Frank Decl. ¶¶ 29-32.

At this time, Frank does not intend to call any witnesses at the fairness hearing, but reserves the right to make use of all documents entered on the docket by any settling party, objector, or *amicus*. Frank also reserves the right to cross-examine any witnesses who testify at the hearing in support of final approval.

## II. The district court has a fiduciary duty to the class as a whole.

"Class-action settlements are different from other settlements. The parties to an ordinary settlement bargain away only their own rights—which is why ordinary settlements do not require court approval." *Pampers*, 724 F.3d at 715. Unlike ordinary settlements, "class-action settlements affect not only the interests of the parties and counsel who negotiate them, but also the interests of unnamed class members who by definition

are not present during the negotiations. *Id.* "[T]hus, there is always the danger that the parties and counsel will bargain away the interests of unnamed class members in order to maximize their own." *Id.*

To guard against this danger, a district court must act as a "fiduciary for the class . . . with 'a jealous regard'" for the rights and interests of absent class members. *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988, 994 (9th Cir. 2010) (quoting *In re Washington Pub. Power Supply Sys. Litig.,* 19 F.3d 1291, 1302 (9th Cir. 1994)). It "must remain alert to the possibility that some class counsel may urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *In re HP Inkjet Printer Litig.* ("*HP Inkjet*"), 716 F.3d 1173, 1178 (9th Cir. 2013) (citation and internal quotation omitted). And it must not "assume the passive role" that is appropriate when confronted with an unopposed motion in ordinary bilateral litigation. *Redman v. RadioShack Corp.*, 768 F.3d 622, 629 (7th Cir. 2014). In particular, settlement valuation "must be examined with great care to eliminate the possibility that it serves only the 'self-interests' of the attorneys and the parties, and not the class, by assigning a dollar number to the fund that is fictitious." *Dennis v. Kellogg Co.*, 697 F.3d 858, 868 (9th Cir. 2012). It is error to exalt fictions over "economic reality." *Allen*, 737 F.3d at 1224.

There should be no presumption in favor of settlement approval: the proponents of a settlement bear the burden of proving its fairness. *See, e.g.*, *Koby v. ARS Nat'l Servs.*, 846 F.3d 1071, 1079 (9th Cir. 2017) (citing *Pampers*, 724 F.3d at 719); *True v. Am. Honda Co.*, 749 F. Supp. 2d 1052, 1080 (C.D. Cal. 2010) (citing Herbert Newberg & Alba Conte, 4 Newberg on Class Actions § 11:42 (4th ed. 2009); *accord* American Law Institute, *Principles of the Law of Aggregate Litig.* § 3.05(c) (2010) ("*ALI Principles*"). Any such presumption would be "inconsistent with [the] probing inquiry" required in this Circuit. *Retta v. Millennium Prods.*, No. CV 15-1801 PSG, 2016 WL 6520138, at *4 (C.D. Cal. Sept. 21, 2016) (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)). "Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members. The court cannot accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re GMC Pick-Up Truck Fuel Tank Prod. Liab. Litig.* ("*GMC Pick-Up*"), 55 F.3d 768, 785 (3d. Cir. 1995) (internal quotation and alteration omitted).

Likewise, in determining whether the class can be certified, "[a] trial court has a continuing duty in a class action case to scrutinize the class attorney to see that he or she is adequately protecting the interests of the class." Herbert Newberg & Alba Conte, 4 Newberg on Class Actions § 13:20 (4th ed. 2009); *see also In re*

*Target Corp. Customer Data Sec. Breach Litig.*, 847 F.3d 608, 612-14 (8th Cir. 2017) (vacating settlement class certification where analysis "was the product of summary conclusion rather than rigor" and district court refused to consider the representatives' adequacy in light of the settlement). The Court must "make sure that class counsel are behaving as honest fiduciaries for the class as a whole." *In re Baby Products Antitrust Litig.* ("*Baby Products*"), 708 F.3d 163, 175 (3d Cir. 2013) (quoting *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004)). More than that, it must protect against "even the appearance of divided loyalties of counsel." *Radcliffe v. Experian Info Solutions*, 715 F.3d 1157, 1167 (9th Cir. 2013).

Ultimately, "[b]oth the class representative and the courts have a duty to protect the interests of absent class members." *Silber v. Mabon,* 957 F.2d 697, 701 (9th Cir. 1992).

## III. This settlement must be held to a higher standard of fairness because the parties expanded the class nationwide.

"[W]here the court is '[c]onfronted with a request for settlement-only class certification,' the court must look to the factors 'designed to protect absentees."' *Molski v. Gleich*, 318 F.3d 937, 953 (9th Cir. 2003) (quoting *Amchem Prods. v. Windsor*, 521 U.S. 591, 620 (1997)). "[S]ettlements that take place prior to formal class certification require a higher standard of fairness." *Id.* "[P]re-certification settlement agreements require that we carefully review the entire settlement, paying special attention to 'terms of the agreement contain[ing] convincing indications that the incentives favoring pursuit of self-interest rather than the class's interest in fact influenced the outcome of the negotiations."' *Dennis*, 697 F.3d at 867 (quoting *Staton v. Boeing*, 327 F.3d 938, 960 (9th Cir. 2003)). "These concerns warrant special attention when the record suggests that settlement is driven by fees; that is, when counsel receive a disproportionate distribution of the settlement." *Hanlon*, 150 F.3d at 1021; *In re Bluetooth Headset Prods. Liab. Litig.* ("*Bluetooth*"), 654 F.3d 935, 947 (9th Cir. 2011). Where the Court confronts a pre-certification settlement, consideration of the eight *Churchill Village*[13] factors "alone is not enough to survive appellate review." *Bluetooth*, 654 F.3d at 946.

This settlement is a pre-certification settlement. Plaintiff did win certification for a class of California consumers, but for the purposes of settlement, the parties agreed to expand the class nationwide, and Plaintiff asserts claims under New Jersey law. *See* Settlement Agreement ¶¶ 7.1, 2.3, 2.39. This is understandable, as

[13] *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

"[i]n settlement . . . defendants prefer the broadest class definition they can obtain for a reasonable price . . . . The more claim preclusion the defendant can get for its settlement dollars, the happier the defendant." Howard Erichson, *Aggregation as Disempowerment*, 92 Notre Dame L. Rev 859, 895 (2016). But such an expansion creates the specter of a settlement "crafted to provide protection to [Defendant] and not to benefit the unnamed Plaintiffs." *Allen v. Similasan Corp.*, 318 F.R.D. 423, 428 (S.D. Cal. 2016); *accord* Erichson, 92 Notre Dame L. Rev at 895-97 (designating an expanded class definition as a red flag for an unfair settlement). The proposed class in this settlement has not been certified; as such, the settlement must be subjected to heightened scrutiny.

## IV. The settlement is not fair, reasonable, or adequate, violating Rule 23(e).

### A. The settlement contains all the signs of impermissible self-dealing identified by the Ninth Circuit in *Bluetooth.*

This settlement features all three indicia of impermissible self-dealing identified by the Ninth Circuit: (1) a disproportionate distribution of fees to counsel; (2) a "clear sailing agreement" that defendants will not challenge the fee request; and (3) a "kicker" that ensures any reduction in fees will revert to the defendant. *See Bluetooth*, 654 F.3d at 947; *Allen v. Bedolla*, 787 F.3d 1218, 1224 (9th Cir. 2015).

#### 1. Class counsel's fee request for 80% of the class benefit reflects a selfish settlement where class counsel is the primary beneficiary.

The first sign of self-dealing in this settlement is counsel's receipt of a "disproportionate distribution of the settlement." *Bluetooth*, 654 F.3d at 947 (quoting *Hanlon*, 150 F.3d at 1021). The benchmark for a reasonable award in the Ninth Circuit in a case alleging economic injury is 25% of the class benefit. *See, e.g.*, *id.* at 942; *HP Inkjet*, 716 F.3d at 1190. Here, class counsel stands to receive $982,500. *See* Settlement Agreement ¶ 6.1. As of April 6, 38,797 claims have been filed, with an approximate total value of $150,000. Finegan Decl. ¶ 20. This means that class counsel is receiving more than 80% of the net settlement funds, if administrative

costs are excluded[14]—more than three times this Circuit's 25% benchmark.

Plaintiffs argue that the settlement is worth $6 million, because the defendant has "agreed to make available at least $5 million . . . for payments to class members, for use to pay claims and settlement notice and administration." MFA at 10. That is not how it works. The value of the settlement is not what the Defendant "makes available," but what class members actually receive. *Allen*, 787 F.3d at 1224 n.4 (zeroing in on the "economic reality" of actual claims); *see also* Notes of Advisory Committee on 2003 Amendments to Rule 23 (suggesting that "it may be appropriate to defer some portion of the fee award until *actual payouts* to class members are known" (emphasis added)); *id.* (noting that the "fundamental focus is the result *actually achieved* for class members" (emphasis added); *id.* (citing 15 U.S.C. §§ 77z-1(a)(6); 78u-4(a)(6) (noting that the fee award should not exceed a "reasonable percentage of the amount of any damages and prejudgment interest *actually paid* to the class" (emphasis added))). *See also ALI Principles* § 3.13; Federal Judicial Center, Manual for Complex Litigation (Fourth) § 21.71 (2004) (urging that "the fee awards should be based only on the benefits *actually delivered*."). "[N]umerous courts have concluded that the amount of the benefit conferred logically is the appropriate benchmark against which a reasonable common fund fee charge should be assessed." *In re Prudential Ins. Co. America Sales Practices Litig.*, 148 F.3d 283, 338 (3d Cir. 1998) (citation and internal quotation omitted).

Thus, the relevant ratio for determining attorneys' fees is "(1) the fee to (2) the fee plus what the class

---

[14] The parties may argue that the settlement did not create a common fund. This should make no difference. "That the defendant in form agrees to pay the fees independently of any monetary award or injunctive relief provided to the class in the agreement does not detract from the need carefully to scrutinize the fee award." *Staton,* 327 F.3d at 964. A "defendant is interested only in disposing of the total claim asserted against it." *Id.* "The rationale behind the percentage of recovery method also applies in situations where, although the parties claim that the fee and settlement are independent, they actually come from the same source." *GMC Pick-Up*, 55 F.3d at 820-21. "[P]rivate agreements to structure artificially separate fee and settlement arrangements cannot transform what is in economic reality a common fund situation into a statutory fee shifting case." *Id.* at 821; *see also id.* at 820 (severable fee structure "is, for practical purposes, a constructive common fund"). "[I]n essence the entire settlement amount comes from the same source. The award to the class and the agreement on attorney fees represent a package deal." *Johnson v. Comerica*, 83 F.3d 241, 246 (8th Cir. 1996). "If an agreement is reached on the amount of a settlement fund and a separate amount for attorney fees" then "the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class, with the agreed-on fee amount constituting the upper limit on the fees that can be awarded to counsel." *Manual for Complex Litigation* § 21.71 (4th ed. 2008).

members received." *Pearson*, 772 F.3d at 781 (internal quotation marks omitted).[15] Otherwise, class counsel has an incentive to "connive with the defendant in formulating claims-filing procedures that discourage filing and so reduce the benefit to the class." *Id.* As discussed *supra*, this leaves class counsel with 80% of the total settlement fund, if administrative costs are excluded. Class action settlements may not confer such preferential treatment upon class counsel to the detriment of class members. "Such inequities in treatment make a settlement unfair" for neither class counsel nor the named representatives are entitled to disregard their "fiduciary responsibilities" and enrich themselves while leaving the class behind. *Pampers*, 724 F.3d at 718-21 (citation and internal quotation omitted) (reversing settlement where class counsel received $2.73 million and absent class members were offered a money-back refund program with a likely small claims rate, prospective labeling changes, and a *cy pres* donation).

Negotiating disproportionate fees suggests self-dealing, which infects the entire settlement, not just the fee request. *Bluetooth*, 654 F.3d at 945-46. To be lawyer-driven and self-dealing, a settlement need not be actually collusive. Courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations." *Id.* at 947 (citing *Staton*, 327 F.3d at 960); *see also id.* at 948 ("The Rule 23(e) reasonableness inquiry is designed precisely to capture instances of unfairness not apparent on the face of the negotiations."). There need only be acquiescence for such self-dealing to occur: "a defendant is interested only in disposing of the total claim asserted against it" and "the allocation between the class payment and the attorneys' fees is of little or no interest to the defense." *Staton*, 327 F.3d at 964 (quoting *GMC Pick-Up*, 55 F.3d at 819-20); *accord Bluetooth*, 654 F.3d at 949.

Class counsel's 80% fee request is a *Bluetooth* sign of self-dealing, and their efforts to disguise this fact

---

[15] This Court consistently follows this approach. *See In re Sony PS3 "Other OS" Litig.*, No. 10-cv-01811-YGR, 2017 WL 424716 at *1 (N.D. Cal. Jan. 31, 2017) (rejecting constructive common fund settlement that would have sustained counsel with $2.25 million fee while absent class member claimants would have obtained less than 10% of that total); *Banks v. Nissan N. Am., Inc.*, No. 11-cv-2022-PJH, 2015 WL 7710297 at *13 (N.D. Cal. Nov. 30, 2015) (characterizing constructive common fund settlement that allowed class counsel to obtain 80% of the gross settlement as the "tail wagging the dog"); *Otey v. Crowdflower, Inc.*, No. 12-cv-05524-JST, 2014 WL 1477630 at *9 (N.D. Cal. Apr. 15, 2014) (finding that constructive common fund fees of "74.3 of the total settlement payment…grossly exceed the 25% benchmark").

with an audacious $6 million valuation of the settlement ignores binding Ninth Circuit precedent requiring that "the attorney's fee award [be] examined in terms of 'economic reality'". *Allen*, 787 F.3d at 1224 & n.4 (internal citation and quotation omitted). The reality is that the class is receiving less than $200,000; the ephemeral $5 million that defendants "made available" lays well beyond class members' grasp.

**2. The settlement contains "clear-sailing" and "kicker" provisions that are designed to insulate the disproportionate fee from scrutiny.**

The settlement includes the additional *Bluetooth* warning signs of self-dealing. A "clear sailing" agreement, under which the defendant agrees "not to oppose or to submit any evidence or argument challenging or undermining Plaintiff's application for attorney's fees." Settlement Agreement ¶ 6.3. This "red-carpet treatment on fees" creates a substantial incentive for class counsel to accept an unfair settlement on behalf of the class. *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524-25 (1st Cir. 1991) ("[T]he very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of value to the class."); *accord Bluetooth*, 654 F.3d at 947-48.

The settlement also segregates attorneys' fees from class recovery with a "kicker" provision. That is, any reduction in fees reverts, or is "kicked back," to the defendant *See* Settlement Agreement ¶ 6.6 ("[T]he denial, downward modification, failure to grant the request for Attorney's Fees and Costs . . . or the reversal or modification on appeal of any such awards . . . shall not constitute grounds for modification . . . of the settlement."). The parties further agreed that if the "award of attorney's fees, costs, or expenses is later reversed on appeal then . . . Plaintiff's counsel shall repay to Defendant the amount received, plus interest," *Id.* ¶ 6.8. These clear sailing and kicker provisions ensure that "fees not awarded revert to the defendants" rather than being added to the class' recovery. *Bluetooth,* 654 F.3d at 947.

Especially when combined with "clear-sailing" provisions, "kicker" provisions have the self-serving effect of protecting class counsel by deterring scrutiny of the fee award. The combination ensures that the only beneficiary of a fee reduction (the defendant, due to the kicker) cannot argue for reduced fees—leaving *no one* with the both the incentive and ability to make those arguments. *See* Charles Silver, *Due Process and the Lodestar Method*, 74 Tul. L. Rev. 1809, 1839 (2000) (arguing that such a fee arrangement is "a strategic effort to insulate a fee award from attack"); Lester Brickman, *Lawyer Barons* 522-25 (2011) (arguing the same; further arguing that reversionary kicker should be considered *per se* unethical); *Pearson*, 772 F.3d at 786-87 (describing a kicker

as a "gimmick" and holding that there "should be a strong presumption of its invalidity").

The "kicker," in addition to being an indicia of unfairness under *Bluetooth*, also makes the settlement substantively unfair. The "economic reality is that a settling defendant is concerned only with its total liability." *Pampers*, 724 F.3d at 717 (cleaned up); *accord Staton*, 327 F.3d at 964. This settlement demonstrates that defendants are willing to pay at least $1.6 million to make this case go away. Even if this were a fair number, the kicker makes it impossible for this Court to give the class the relief *that Defendant is willing to pay*. There is "no apparent reason the class should not benefit from the excess allotted for fees." *Bluetooth*, 654 F.3d at 949. It would be reversible error to approve a fee of $987,500 out of a $1.2 million constructive common fund (excluding administrative costs): that would be "clearly excessive" under this Circuit's 25% benchmark. *Dennis*, 697 F.3d at 868. If the Court instead reduces the fee, it cannot pass that money on to the class; that money reverts to the defendants. The parties have prevented the Court from correcting the fees and class relief to an appropriate allocation.

Again, Frank is not arguing that this case is worth $1.6 million or $10 million or $20 million. The settlement is unfair because class counsel is appropriating an excessive amount of the settlement value for themselves. Ninth Circuit law and Rule 23(e) requires that class members—not attorneys—be the foremost beneficiary of that recovery.

### B. There is no justification for class counsel's disproportionate fee, so the settlement must be rejected under rule 23(e).

"If fees are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members or less injunctive relief for the class than could otherwise have obtained." *Staton*, 327 F.3d at 964; *accord Bluetooth*, 654 F.3d at 947. Because class counsel's fee projects to be roughly five times greater than the class' monetary recovery, and because this settlement contains all the indicia of self-dealing identified by the Ninth Circuit in *Bluetooth*, this Court must reject the settlement unless it is "supported by a clear explanation of why the disproportionate fee is justified and does not betray the class's interests." 654 F.3d at 949. Class counsel attempts to justify their excessive fee based on 1) their high lodestar; 2) the injunctive relief; and 3) the settlement administrative costs. These arguments fail.

**1. Ninth Circuit law proscribes lodestar hours from controlling the fairness of allocation; the fee must be proportionate to class recovery.**

Class counsel's request for nearly 80% of the constructive common fund cannot be justified based on the fact that their fee request is less than their lodestar. *See* MFA at 15. As the Ninth Circuit explained in *HP Inkjet*, "although class counsel's hard work on an action is presumably a necessary condition to obtaining attorney's fees, it is never a sufficient condition. Plaintiffs' attorneys don't get paid simply for working; they get paid for obtaining results." 716 F.3d at 1182. "[H]ours can't be given controlling weight in determining what share of the class action settlement pot should go to class counsel." *Redman*, 768 F.3d at 635. The reason for that is basic fairness. "Just as the Court would not deprive Class Counsel of all of their potential profit in cases [where their recovery is substantial], it cannot insulate Class Counsel from the risk of pursuing an unprofitable case." *Keirsey v. Ebay, Inc.*, No. 12-cv-01200-JST, 2014 WL 644738, at *3 (N.D. Cal. Feb. 18, 2014).

To grant a lodestar award is equivalent to asking the class to settle, while treating class counsel "as if it had won [the] case outright." *Sobel v. Hertz Corp.*, No. 3:06-CV-00545-LRH-RAM, 2011 WL 2559565, at *14 (D. Nev. Jun. 27, 2011). Thus, numerous cases have rejected efforts to excuse a disproportional fee simply because counsel only seeks a fraction of its lodestar. *See, e.g.*, *Bluetooth*, 654 F.3d at 943 (reversing even though lodestar "substantially exceed[ed]" fee award); *HP Inkjet*, 716 F.3d at 1177 (fee award not justified merely because it was less than one third of the base lodestar); *Baby Products*, 708 F.3d at 180 n.14 (lodestar multiplier of 0.37 not "outcome determinative"). Class counsel gets paid for results. Class counsel's lodestar cannot justify their fee request because the results here give class counsel *five times* the amount class members will receive.

**2. Prospective, duplicative injunctive relief cannot justify a disproportionate fee.**

The proponents of a settlement must bear "the burden of demonstrating that class members would benefit from the settlement's injunctive relief." *Koby v. ARS Nat'l Servs.*, 846 F.3d 1071, 1079 (9th Cir. 2017); *Pampers*, 724 F.3d at 719 (compiling authorities). The parties have not and cannot satisfy this burden. The purported injunctive relief to the class—requiring that the defendants continue their current practice of not referring to their products as "Imported from Italy"[16]—is neither relief, nor is it directed to the class. Based on controlling Ninth Circuit precedent, the parties cannot rely on this prospective, duplicative injunctive relief

[16] *See* Settlement Agreement ¶¶ 3.1, 3.2.

to justify class counsel's disproportionate fee.

In *Koby*, the parties argued that a class would benefit from the modification of debt collection practices by the defendant, but the injunction "was worthless to most class members." 843 F.3d at 1079. This is because the injunction was prospective: it applied to all *future* debtors contacted by the defendant, whether or not they were class members, which was "an obvious mismatch between the injunctive relief provided and the definition of the proposed class." *Id.* Precisely such a mismatch exists here. The class includes people who have purchased Filippo Berio Olive Oil in the past, but the beneficiaries of label changes are *future* customers. As in *Koby*, the fact that a class member purchased Filippo Berio Olive Oil between 2010 and 2015 "does not without more establish that he or she would likely" to purchase it now. *Id.*

Under the proposed settlement, as in *Koby*, all consumers will receive the same dubious relief—the deletion of two words on the defendant's packaging. Even if this were valuable, and even if class counsel was not the primary beneficiary of the agreement, this "relief" is conferred on *all* future Filippo Berio consumers, regardless of class membership, regardless of whether they release their claims. Changes in future labeling will *not* benefit class members who, by definition, are past purchasers already allegedly misled by the defendants' previous conduct. *See, e.g.*, *id.*; *True v. Am. Honda Co.*, 749 F. Supp. 2d 1052, 1077 (C.D. Cal. 2010) ("No changes to future advertising by Honda will benefit those who already were misled by Honda's representations regarding fuel economy."); *Pampers*, 724 F.3d at 720 ("The fairness of the settlement must be evaluated primarily on how it *compensates class members*—not on whether it provides relief to other people, much less on whether interferes with defendant's marketing plans.") (cleaned up). "[F]uture purchasers are not members of the class, defined as it is as consumers who have purchased [the product]." *Pearson*, 772 F.3d at 786.

Moreover, to the extent defendants already made this change, the injunctive relief does not provide even hypothetical incremental value to the class—it is duplicative. Defendants already "took that step for its own business reasons (presumably to avoid further litigation risk), not because of any court-or settlement-imposed obligation." *Koby*, 846 F.3d at 1080 (injunction is "of no real value" where "it does not obligate [defendant] to do anything it was not already doing"). When valuing a settlement, it is only the "*incremental* benefits" that matter, not ones that preceded settlement. *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 286 (7th Cir. 2002) (emphasis in original); *Hofmann v. Dutch Llc*, No. 3:14-cv-02418-GPC-JLB, 2017 WL 840646, at *7 (S.D. Cal. Mar. 2, 2017) (refusing to credit injunctive relief when the defendant had voluntarily revised its

labeling before the settlement).

Indeed, the revision provides no benefit to class members like Objector Frank who did not rely on the "Imported from Italy" puffery. *See* Frank Decl. ¶ 8. As explained below, the settlement creates a zero-recovery subclass because those class members who did not rely on the "Imported from Italy" are part of the class but are not entitle to submit a claim for relief. *See* Section IV.C and Section VI. That zero-recovery subclass is in a *worse* position than non-class members because they are being compelled "to relinquish their right to seek damages in any other class action" only to enjoy the same "relief" all consumers will enjoy. *Koby*, 846 F.3d at 1079. Loyal fiduciaries would have to urge members of this subclass to opt out. The treatment of this subclass makes the settlement unfair under rule 23(e), in addition to making the class representative inadequate under rule 23(a)(4)*, see* Section VI, *infra.*

Finally, plaintiffs have failed to prove that the injunctive relief has any value. Plaintiffs claim that the injunctive relief is worth over $19 million to the class, relying on a complex expert report that contains significant redactions. *See* MFA at 10; Declaration of Colin B. Weir ("Weir Decl."), Dkt. No. 84-34.[17] Mr. Weir's report fails to prove any price reduction has occurred under the revised label because he simply disregards actual sales data, which show no savings to class members. *See* Declaration of Keith R. Ugone, Ph.D., Dkt. No. 95 ("Ugone Decl.") at 33-36. Mr. Weir used pre-May 2015 sales data to construct a model purporting to show that products indicating Italian origin sell for more money, controlling for confounding variables like brand, wholesale price, promotions, and so forth. *See* Weir Decl. ¶¶ 49, 64-79. Of course, Mr. Weir's analysis could not control for the underlying characteristics of the product itself like taste, *see* Ugone Decl. at 3, and his data included sales by numerous brands, grades, and label claims, Dkt. 84-34 at 14-15, but does not analyze data of Berio sales under a revised label. Mr. Weir has access to such data, but he refuses to use it. No later

[17] Given the clear-sailing agreement, and the fact that the report relies on redacted information, Plaintiff should not be allowed to rely on it. Frank's counsel attempted to obtain access to Mr. Weir's unredacted reports purporting to document his methodology. Counsel was advised they have been sealed at the request of a third party. Defendant is thus the party best positioned to challenge plaintiff's expert, but Defendant cannot challenge the valuation, because of the clear-sailing agreement. *See* Settlement Agreement ¶ 6.3. Under these circumstances, the court should not allow class counsel's fee to be based on such injunctive relief, because the court cannot be confident that it will accurately ascertain the injunctive relief's value. *See Staton*, 327 F.3d at 974 ("[O]nly in the unusual instance where the value to individual class members of benefits deriving from injunctive relief can be accurately ascertained may courts include such relief as part of the value of a common fund for purposes of applying the percentage method of determining fees.").

than September 2015, all Berio products at issue had removed "from Italy" from their packaging, Ugone Decl. at 3, so he could easily test his "price premium" hypothesis by analyzing whether the price to consumers dropped after September 2015. The only expert to look at actual sales data after Berio's label change found no discernable effect on actual sale prices. Mr. Weir's report simply ignores or dismisses the relevance of the post-label change sales data, which are available to him.[18] For example, Mr. Weir disregarded the "before and after" analysis in his reply, because "Defendant made other changes to its label at the same time, including replacing the 'Imported from Italy' Claim with a different 'Imported' claim." Dkt. 108-5, ¶ 44. That is, Mr. Weir criticized Dr. Ugone's before-and-after analysis because Berio's new label was different in other ways that might have made it no less expensive to class members. Perhaps Berio's voluntary label changes *did* introduce confounding variables that increased its perceived value and therefore sales price to class members. If so, the revised label could not conceivably provide any price benefit because the alleged injunctive relief uses the same label. This explains why Mr. Weir's recent report makes no reference of the confounding effect he flagged in his reply. Instead, he asserts: "a so-called 'Before and After' comparison of shelf prices is inappropriate in this litigation and provides no information about the effect of removing the 'Imported from Italy' Claim, holding all else constant." Dkt. 154-8, ¶ 20. Remarkably, Mr. Weir asserts that before-and-after data concerning the same product, same brand, and same wholesale cost provides *no information* about the removal of the claim.

In any event, only before-and-after data show whether *actual* benefits flow to class members, which is the key question for valuing the purported injunction. If Mr. Weir admitted that Berio's label changes produced no measurable effect on the sales price (as the only expert to examine the issue concluded), he would be forced to admit that the settlement likewise provides no savings to consumers, regardless of the platonic value of the phrase "from Italy." This is unsurprising because Berio hasn't changed the wholesale price of the products. *See* Dkt. 154-8, ¶ 24. Plaintiff's conspicuous failure to use actual sales data should lead this Court to infer that the injunctive relief has no value to the class.

[18] Mr. Weir says that the IRI data ends in May 2015, Dkt. 154-8 at ¶ 12, but this is simply untrue. While he did not account for later data in his model, IRI provided data through February 21, 2016. *See* Ugone Decl., Dkt. No. 95 at 34.

**3. The notice and administrative costs of the settlement cannot justify the disproportionate fee.**

The parties attempt to claim that the notice and administrative costs are a benefit. *See* MFA at 10. While the Ninth Circuit gives courts the discretion to calculate the percentage-of-recovery on the gross fund,[19] it is better to calculate percentage-of-recovery *after* expenses have been deducted from the settlement. *Redman*, 768 F.3d at 630 ("[T]he roughly $2.2 million in administrative costs should not have been included in calculating the division of spoils between class counsel and class members . . . ."); *In re Transpacific Passenger Air Transp. Antitrust Litig.*, No. C 07-05634 CRB, 2015 WL 3396829, at *1 (N.D. Cal. May 26, 2015) ("This Court has had a longstanding preference for using the net, and is not alone in that preference."); *Myles v. AlliedBarton Sec. Servs.*, No. 12-cv-05761-JD, 2014 WL 6065602 at *5 (N.D. Cal. Nov. 12, 2014) ("[T]he fees paid to the settlement administrator—do[] not constitute a benefit to the class members."); *see also Bluetooth*, 654 F.3d at 945 (remanding where fee award was far greater than 25% of the fund when notice costs were excluded). Excluding notice and administration costs properly aligns the incentives of class counsel with the class, so that they want to both maximize class recovery and minimize extraneous costs. Class counsel wish to receive double credit for the price of informing a class member that they can make a claim (or in Frank's case that they are ineligible to make a claim). Class benefits, however, are measured on the value received by the class, not the cost to defendant. *Bluetooth*, 654 F.3d at 944.

Still, even if the notice and administrative costs incurred to date were treated as a benefit, class counsel's fee would be disproportionate. At this time, costs amount to $450,000. *See* Finegan Decl. ¶ 24. If this is treated as a class benefit, then class counsel would still be asking for nearly $1,000,000 out of a roughly $1,600,000 settlement or 62.5% of the benefit—still well above this Circuit's 25% benchmark.

**C. The settlement is unfair because it throttles the number of claims by excluding a large part of the class from monetary recovery.**

"Settlements in which . . . a significant subclass will receive no benefit have been rejected by courts because such agreements are not fair, adequate, and reasonable for all class members." *Ferrington v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2012 WL 115639 at *8 (N.D. Cal. April 6, 2012) (citing cases). Here, a significant subclass is being excluded from monetary recovery. The class definition includes "all natural persons who,

[19] *See In re Online DVD Antitrust Litig.*, 779 F.3d 934, 953 (9th Cir. 2015).

between May 23, 2010 and June 30, 2015, purchased, in the United States, any Product for personal use, not resale." Settlement Agreement ¶ 2.39. But, in order to file a claim for monetary relief, class members must attest that they "would not have paid the price charged and/or made the purchase(s) in the absence of the phrase "Imported from Italy." *Id.* ¶ 4.3(e). Thus, the settlement excludes from recovery class members like Objector Frank, who purchased Filippo Berio olive oil, but did not rely on the "Imported from Italy" representation when making his purchase. *See* Frank Decl. ¶ 8.

This arbitrary exclusion makes the settlement unfair under Rule 23(e). For example, in *True*, the Central District rejected analogous attempts to infuse a settlement with an eligibility requirement based on class members' subjective beliefs, noting that "those class members who complained to class counsel did not suffer any different injuries, do not have different legal claims, and are no more 'aggrieved' than those class members who contacted other attorneys or no attorneys at all." 749 F. Supp. 2d at 1068. This gerrymandering, the court held, constituted a "patently unfair" "arbitrary distinction among class members with identical legal claims and injuries, [allowing] some to receive a cash award, and others only [injunctive relief]." *Id.* at 1069. The court, in part because of the "differential treatment of class members," rejected the settlement on 23(e) fairness grounds. *Id.* at 1082. *Ferrington*, discussed in depth *infra* in part VI, also found that the releasing the claims of a zero-recovery subclass rendered the settlement unfair under Rule 23(e). *See* 2012 WL 1156399 at *8-*10.

## V. Class counsel are inadequate under Rule 23(g)(4) because the settlement incentivizes class counsel to limit claims and class counsel designed a claims process that depressed the number of claims.

Adequate representation is a prerequisite to class certification. Fed. R. Civ. P. 23(a)(4), (g)(4). As a first principle, it is "altogether proper" to inspect the terms of settlement when evaluating whether adequacy is met. *Amchem*, 521 U.S. at 593; *accord Radcliffe*, 715 F.3d at 1166.

"An absence of material conflicts of interest between the named plaintiffs *and their counsel* with other class members is central to adequacy and, in turn, to due process for absent members of the class." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 959 (9th Cir. 2009) (emphasis added). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020. Here, class counsel have created a substantial conflict of interest

with unnamed class members.

Under the agreement, Defendant has "the sole and exclusive right to terminate this Agreement" if total costs from notice, administration, and claims are "projected to exceed $5,000,000." Settlement Agreement ¶ 9.5. If the Defendant terminates the agreement, the amended complaint will be withdrawn, the settlement canceled, and no attorneys' fees will be awarded. *Id.* ¶ 7.13. Thus, class counsel's fees are in jeopardy *if too many class members make claims*, putting the interest of class counsel at direct odds with the class's interest in maximizing its recovery. Class counsel should not have any reason to "connive with the defendant in formulating claims-filing procedures that discourage filing and so reduce the benefit to the class," *Pearson*, 772 F.3d at 781, but this termination provision incentivizes such conduct.

In *Newman v. Americredit Fin. Servs. Inc.*, a class-action settlement contained a similar termination provision, allowing the defendant in that case to terminate the agreement "if the number of class members to be paid exceed[ed] 2,070,000." No. 3:11-cv-03041-DMS-BLM, 2014 U.S. Dist. LEXIS 15728 at *19 (S.D. Cal. Feb. 3, 2014). Judge Sabraw noted that the provision "raise[d] . . . fairness issues" because it "appear[ed] to work contrary to the purpose of the notice and claims process to result in the maximum number of valid claims being submitted," and ultimately rejected the settlement. *Id.*

Here, the mere existence of the termination provision creates an untenable conflict between class counsel, the named representative, and absent class members. The named representative is subject to the same conflict as class counsel. If the termination threshold is reached, he loses his unopposed $2500 incentive award. Settlement Agreement ¶¶ 6.2, 7.13. This conflict defeats adequacy regardless of whether the termination provision has actually caused the representatives to act contrary to the class's interests. *See Dewey v. Volkswagen AG*, 681 F.3d 170, 189 n.19 (3d Cir. 2012) ("The adequacy requirement provides *structural* protections during the process of bargaining for settlement. The fact that the stars aligned and the class members' interests were not actually damaged does not permit representative plaintiffs to bypass structural requirements." (emphasis in original)).

Compounding the problem, the class notice does not even mention the termination provision that creates the conflict of interest. Neither does plaintiffs' motion for final approval (Dkt. 154), which speaks obliquely and misleadingly about the Defendant agreeing to make $5 million available. MFA at 10, 21. In the typical case, when a settling party discusses a certain amount being made available, the consequence of

exceeding that ceiling is reducing claim values *pro rata*. As in *Rodriguez*, "failing to disclose the [conflict] in connection with class certification compound[s] [the] problem by depriving the court, and the class, of the safeguard of informed judicial consideration of the adequacy of class representation." 563 F.3d at 960. The parties might offer to sever this termination provision from the agreement, but this cannot cure the infirmity. This proposed settlement was negotiated under the cloud of the conflicted representation. Once the termination provision was negotiated, class counsel was "provided a *disincentive* . . . to care about the adequacy of relief for unnamed class members." *Pampers*, 724 F.3d at 722 (emphasis in original) (holding that the class representative in that case was inadequate under Rule 23(a)(4)). Therefore, the provision undermines the necessary "confidence that [class counsel] would prosecute the case in the interest of the class . . . rather than just in their interest as lawyers." *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 917 (7th Cir. 2011) (citations omitted). If this court concludes that the provision creates a material conflict of interest for class counsel, severance is no remedy.

Moreover, this was not merely a technical conflict of interest—the parties did, in fact, design a claims process and notice program that throttled the number of claims and ensured that claims would not exceed or even approach $5 million. First, they excluded class members who did not rely on the "Imported from Italy" misrepresentation when making their purchase. *See* part IV.C, *supra;* part VI, *infra*. Second, they negotiated a notice program that did not provide any individualized notice.[20] Class counsel's conflict has resulted in a settlement that has produced less than $200,000 in claims and frozen out a large segment of the class entirely.

Class counsel cannot meet the Rule 23(g)(4) adequacy standard under the terms of this settlement agreement; their interests conflict directly with the proper goal of a zealous advocate: maximizing the total

[20] While parties must provide "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," Fed. R. Civ. P. Rule 23(c)(2)(B), the parties here failed to provide any individual notice whatsoever. Absolutely no individual notice was provided to class members in this suit, nor was any effort—let alone reasonable effort—made to identify absent class members through, for example, direct internet sales and shopper loyalty programs. For example, King County, Washington purchased such marketing data in order to identify unlicensed pet owners. *See* Evan Bush, *Your grocery bill may help King County track unlicensed pets*, Seattle Times (Nov. 2, 2016), available at: http://www.seattletimes.com/life/pets/your-grocery-bill-may-help-king-county-track-unlicensed-pets/. "[I]ndividual notice to identifiable class members is not a discretionary consideration to be waived in a particular case. It is, rather, an unambiguous requirement of Rule 23." *Larson v. AT&T Mobility LLC*, 687 F.3d 109, 128 (3d Cir. 2012) (remanding settlement to evaluate adequacy of notice where defendant's records not used to provide individual notice).

recovery of the class. *See Pierce v. Visteon Corp.*, 791 F.3d 782, 787 (7th Cir. 2015) ("[I]t is unfathomable that the class's lawyer would try to sabotage the recovery of some of his own clients."). Yet to preserve their own excessive fee, class counsel have acquiesced to the termination provision "to the detriment of class plaintiffs" and thereby "breached their fiduciary duty to the class." *Lobatz v. U.S. West Cellular of Cal. Inc.*, 222 F.3d 1142, 1147 (9th Cir. 2000). As such, the settlement class certification must be rejected on this basis alone.

## VI. **The agreement arbitrarily creates a zero-recovery subclass, making the class representatives inadequate under Rule 23(a)(4).**

A class may only be certified if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Rule 23(a)(4) is vital to ensure that absent class members can "fairly be bound by the decisions of the class representatives" including the release and settlement of their claims. *Amchem*, 521 U.S. at 621. But, when the "structure of the settlement agreement itself . . . divides a single class into two groups of plaintiffs that receive different benefits, [it] supports the inference that the representative plaintiffs are inadequate." *Dewey*, 681 F.3d at 187. This is because "a settlement that offers considerably more value to one class of plaintiffs than to another may be trading the claims of the latter group away in order to enrich the former group." *GMC Pick-Up*, 55 F.3d at 797; *accord Ferrington v. McAfee, Inc.*, No. 10-CV-01455-LHK, 2012 WL 1156399, at *7 (N.D. Cal. Apr. 6, 2012).

That is what happened here. The parties agreed to expand a class of California consumers to a nationwide class of consumers, and to have Plaintiffs file an amended complaint asserting claims only under New Jersey law. *See* Settlement Agreement ¶ 7.1. Plaintiffs obliged, filing an amended complaint, which asserted false advertising claims under the New Jersey Consumer Fraud Act, §§ 56:8-1 *et seq. See* Amended Complaint ¶¶ 37-47. The new, expanded class definition includes "all natural persons who, between May 23, 2010 and June 30, 2015, purchased, in the United States, any Product for personal use, not resale." Settlement Agreement ¶ 2.39. But, in order to file a claim for monetary relief, class members must attest that they "would not have paid the price charged and/or made the purchase(s) in the absence of the phrase "Imported from Italy." *Id.* ¶ 4.3(e). This, in effect, creates a zero-recovery subclass—class members who purchased Filippo Berio olive oil, but who did not rely on the "Imported from Italy" representation when making their purchase.

But reliance is *not required* to maintain a false advertising claim under the New Jersey Consumer Fraud

Act. *See, e.g.*, N.J.S.A. § 56:8-2 (making deceptive commercial practices unlawful "whether or not any person has in fact been misled, deceived, or damaged thereby. . . ."); *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 366 (N.J. 1997) (noting that liability under the New Jersey Consumer Fraud Act "does not require proof of reliance"). If the subclass's claims are worthless, it is not because they cannot prove reliance—so it is not fair to exclude them from monetary recovery on that basis. *See, e.g.*, *True v. Am. Honda Motor Co.*, 749 F. Supp. 2d 1052, 1068-69 (C.D. Cal. 2010). There is no legitimate reason to exclude this *de facto* subclass because there is *no difference* between the class's claims and the subclass's claims.

A settlement agreement that arbitrarily creates a zero-recovery subclass must be rejected on 23(a)(4) grounds. *Ferrington*, cited *supra*, is a prime example of this situation. The plaintiffs in *Ferrington* sued two software companies, McAfee, Inc. and Arpu, Inc., under California's consumer fraud laws. 2012 WL 1156399 at *1. The complaint alleged that when consumers purchased McAfee's anti-virus software, they were presented with a "Try It Now" pop-up button on their screens. *Id.* If they clicked the button, they were automatically subscribed to a 30-day trial for Arpu's "PerfectSpeed" software, after which they were charged $4.95/month. *Id.* The class definition included anyone who clicked the pop-up button and was charged for the PerfectSpeed software by Arpu. *See id.* at *3. But, to make a claim, class members had to also attest that that they never *downloaded* the Arpu product; monetary relief not available to those who had, in fact, downloaded the product. *Id.*

Judge Koh concluded that this hidden, zero-recovery subclass—class members who had been enrolled in the free trial *and* downloaded the PerfectSpeed software—had not been adequately represented, in violation of Rule 23(a)(4). *See id.* at *7. She reasoned that denial of final approval was "necessary . . . to protect the rights of the absent class members of the subclass of claimants who downloaded the Arpu software and who are essentially releasing their claims against McAfee and Arpu for no consideration." *Id.* at *13. A decisive factor was that the settlement released all of the uncertified subclasses claims "despite the potential viability of some of [them]" *Id.* This settlement in the instant case is actually *worse* than the settlement in *Ferrington*, where "the claims of the downloader subclass [were] relatively weak." *Id.* at *9. Here, there is *no difference* between the zero-recovery subclass' claims and the class members' claims under New Jersey law.

In *Dewey*, a case involving leaky Volkswagen sunroofs, the settling parties arbitrarily gerrymandered the class to preclude a subset of class members from claiming reimbursement damages under the proposed settlement. 681 F.3d at 174-76. The Third Circuit concluded that the exclusion of the disfavored subclass from

the primary fund created "a fundamental intra-class conflict" between the class representatives, all of whom were in the favored subclass, and the class members in the disfavored subclass. *Id.* at 189. Again, the conflict here is worse than in *Dewey*, because at least disfavored class members there were allowed to access a residual "goodwill" fund, which remained after the preferred subclass had received reimbursement. *Id.* at 177 n.7. Here, Frank and similarly-situated class members are frozen out entirely. On remand in *Dewey*, the parties amended the settlement to incorporate the uncertified subclass back into the general pool of class members allowed full access to the fund. *Dewey v. Volkswagen of Am.*, 909 F. Supp. 2d 373, 383 (D.N.J. 2012).

If the named representatives are disregarding the zero-recovery subclass, then they are not adequate representatives. See *Broussard v. Meineke Disc. Muffler Shops*, 155 F.3d 331, 338 (4th Cir. 1998) ("The premise of a class action is that litigation by representative parties adjudicates the rights of all class members, so basic due process requires that named plaintiffs possess undivided loyalties to absent class members."). "No one should have to give a release and covenant not to sue in exchange for zero (or virtually zero) dollars." *Daniels v. Aeropostale West*, No. C 12-05755 WHA, 2014 WL 2215708, at *3 (N.D. Cal. May 29, 2014); *cf. also Allen v. Similasan Corp.*, 318 F.R.D. 423, 428 (S.D. Cal. 2016) (noting that if class members "knew and understood the terms of the Settlement Agreement, they would know that they would be better off opting out, since they would receive the same benefits of the injunctive relief in the Settlement Agreement but would not be giving up their right to sue"). Instead, the only reason to require claimants to attest to relying on the "Imported from Italy" language is to winnow the eligible claimants down so that that settlement's costs were kept under $5,000,000*, see* Settlement Agreement ¶ 9.5, and reflects the perverse incentives created by the improper termination provision. *See* part V, *supra.* In any event, there is no reason to exclude this particular subset of class members from recovery.

"[I]ntraclass equity" is a "requirement" of any settlement. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 863 (1999). Here, the disparate treatment of identically-situated class members undermines that requirement and demands rejection of the settlement for failure to satisfy Rule 23(a)(4).

VII. **This Court should not consider the number of objectors when evaluating settlement fairness, especially because the Settlement Agreement unnecessarily burdens objections.**

One should not infer settlement endorsement from the fact of a low number of objections. *See ALI*

*Principles* § 3.05 *cmt. a* at 206 ("Just as it is uneconomic to bring class-action litigation as individual litigation, it is even more uneconomic to object to an unfair class-action settlement."); Christopher R. Leslie, *The Significance of Silence: Collective Action Problems and Class Action Settlements*, 59 Fla. L. Rev. 71, 73 (2007); *see also GMC Pick-up*, 55 F.3d at 812-13; Theodore Eisenberg & Geoffrey Miller, *The Role of Opt-Outs and Objectors in Class Action Litigation: Theoretical and Empirical Issues*, 57 Vand. L. Rev. 1529, 1561 (2004) ("Common sense dictates that apathy, not decision, is the basis for inaction."). There will never be a large number of objectors in a class-action settlement, so the absence of thousands of objectors says nothing about the fairness of a settlement.

It is "naïve" to think a small number of objections is meaningful. *Redman*, 768 F.3d at 628; *accord In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 217-18 (5th Cir. Apr. 1981) ("[A] low level of vociferous objection is not necessarily synonymous with jubilant support. In many class actions, the vast majority of class members lack the resources either to object to the settlement or to opt out of the class and litigate their individual cases."). There will never be a large number of objectors in a class-action settlement, so the absence of thousands of objectors indicates nothing. *See Vought v. Bank of Am., N.A.*, 901 F. Supp. 2d 1071, 1093 (C.D. Ill. 2012) (citing, *inter alia*, a 1996 FJC survey that found between 42% and 64% of settlements engendered no filings by objectors). Objections should be judged on quality not quantity. *See, e.g.*, *Pampers*, 724 F.3d at 716 (reversing settlement binding a multi-million-member class though only three objectors and only a single appellant); *Baby Prods.*, 708 F.3d 163 (reversing settlement binding a multi-million member class though only few objectors and three appellants). Allowing the lack of objections to control is tantamount to relieving the settling parties of their "burden of proving the fairness of the settlement." *Id.* at 719 (citing authorities).

Where, as here, the settling parties create unnecessarily burdensome objection procedures that discourage objections, the court should be even more skeptical of this metric. *See In re Chiron Corp. Sec. Litig.*, No. C-04-4293 VRW, 2007 WL 4249902 at *10 (N.D. Cal. Nov. 30, 2007) ("Frustrating the settlement is exactly what class members are entitled to do, if they think the settlement is not fair. The class' 'frustration rights' should not themselves be frustrated."). This settlement contains two such procedures. *First*, the settlement agreement requires objections to contain the objecting class member's signature even if they are represented by an attorney. *See* Settlement Agreement ¶ 7.5. This provision is contrary to Federal Rule of Civil Procedure 23(c)(2)(B)(iv), which provides that a class member "may enter an appearance through an attorney if the member so desires," and 28 U.S.C. § 1654, which allows individuals to appear and conduct their cases

through counsel.

*Second*, the settlement agreement requires that objections include "a detailed list of any other objections submitted by the Settlement Class Member, or his/her counsel, to any class actions submitted in any state or federal court in the United States in the previous five years." *See* Settlement Agreement ¶ 7.5. Such requirement is ineffective at preventing bad-faith objectors but merely creates an additional hurdle for objectors to jump through. *See Trabakoolas v. Watts Water Tech., Inc.,* No. 3:12-cv-01172-WHO (EDL) (Dkt. 276), at *4 (N.D. Cal. Feb. 14, 2013) (excising from class notice the requirement to list past suits in which the objector or his attorney has objected); *see generally* Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide, 5 (2010), available at https://www.fjc.gov/sites/default/files/materials/2017/NotCheck.pdf (last visited April 27, 2017) (directing courts to avoid notice language that places "burdensome hurdles" for "free exercise of rights, such as onerous requirements to submit a 'satisfactory' objection or opt-out request").

Based on the inclusion of these onerous procedures,[21] this court should infer that the parties wished to undermine the autonomous decisions of class members, which serves as yet another indicator that the settlement is unreasonable. *See McClintic v. Lithia Motors*, No. C11-859RAJ, 2012 U.S. Dist. LEXIS 3846, at *17 (W.D. Wash. Jan. 12, 2012) ("One hallmark of a reasonable settlement agreement is that it makes participation as easy as possible, whether class members wish to make a claim, opt out, or object.").

[21] Other infirmities in the Long-form Notice and claims form are worth noting. First, the Long Form Notice contains a lengthy list of requirements for objectors, but only starts itemizing the list at item (vii), making it incomprehensible. *See* Long Form Notice ¶ 11; Frank Decl. ¶ 12. The long-form notice also differs from the preliminary approval order in an important respect. The long form notice says that objections "must be electronically filed … *or* delivered to the Clerk of Court by mail, express mail, or personal delivery . . . on or before May 2, 2017." Long Form Notice ¶ 11 (emphasis added). The preliminary approval order states that objections must be "filed with the Clerk of court *and* postmarked no later than May 2, 2017." Order Granting Preliminary Approval of Class Action Settlement ("Preliminary Approval Order,") Dkt. 151 ¶ 13 (emphasis added). This is a recipe for an improper filing: the long form notice suggests that ECF filing alone is sufficient, while the Preliminary Approval Order suggests that any objections must be mailed to the Clerk of Court. Finally, the required reliance attestation is ambiguous, *see* Frank Decl. ¶ 8, and varies between the claim form and the settlement agreement, further adding to the confusion. *Compare* Settlement Agreement ¶ 4.3(e) *with* Declaration of William I. Chamberlain, Ex. 1, at 2.

## CONCLUSION

This court should deny final approval of the settlement and reject certification of the settlement class.

Dated: May 2nd, 2017

Respectfully submitted,

William I. Chamberlain (SBN 306046)
**COMPETITIVE ENTERPRISE INSTITUTE**
**CENTER FOR CLASS ACTION FAIRNESS**
1310 L Street NW
7th Floor
Washington, DC 20005
Email: will.chamberlain@cei.org
Voice: 209-954-8042
Admitted only in California; Supervision by members of the D.C. Bar.

*Attorney for Objector Theodore H. Frank*

I, Theodore H. Frank, personally attest that I have discussed the foregoing Objection with my counsel and I have reviewed and endorse the Objection.

Dated: May 2nd, 2017

Theodore H. Frank
*Objector*

PROOF OF SERVICE

I hereby certify that on this day I electronically filed the foregoing Objection using the CM/ECF filing system thus effectuating service of such filing on all ECF registered attorneys in this case.

DATED this 2nd day of May, 2017.

*/s/ William I. Chamberlain*
William I. Chamberlain

Pursuant to the Preliminary Approval Order (Dkt. 151) and the long-form notice to the class, I hereby certify that on this day I caused service of the forgoing on the following party by first class mail, postmarked as of this date:

Kumar v. Salov Claim Administer
c/o Heffler Claims Group
P.O. Box 58476
Philadelphia, PA 19102-8476

DATED this 2nd day of May, 2017.

*/s/William I. Chamberlain*
William I. Chamberlain