UNITED STATES DISTRICT COURT

*ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

ROHINI KUMAR, an individual,)       Motions Hearing
on behalf of herself, the  )
general public and those   )
similarly situated,       )
                    )
       Plaintiff,    )
                    )
  vs.               )       NO. C 14-02411 YGR
                    )
SALOV NORTH AMERICA CORP.,  )       **Pages 1 - 20**
                    )
       Defendant.    )       Oakland, California
_____)       Tuesday, January 24, 2017

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

For Plaintiff:        Gutride Safier LLP
                  100 Pine Street, Suite 1250
                  San Francisco, California  94111
            BY:  ADAM J. GUTRIDE, ATTORNEY AT LAW

                  Tycko & Zavareei LLP
                  1828 L Street, M.W., Suite 1000
                  Washington, D.C  20036
            BY:  ANNA C. HAAC, ATTORNEY AT LAW

For Defendant:        Sidley Austin LLP
                  555 W. Fifth Street, 40th Floor
                  Los Angeles, California  90013
            BY:  SEAN A. COMMONS, ATTORNEY AT LAW

Reported By:         Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 502-6175*

| | |
|---|---|
| 1 | Tuesday, January 24, 2017                    3:28 p.m. |
| 2 | P R O C E E D I N G S |
| 3 | THE CLERK:  Calling civil action 14-2411, Kumar |
| 4 | versus Salov North America. |
| 5 | Counsel, please state your appearances. |
| 6 | MR. GUTRIDE:  Good afternoon, Your Honor.  Adam |
| 7 | Gutride on behalf of plaintiff and the class. |
| 8 | MS. HAAC:  Good afternoon, Your Honor.  Ana Haac, |
| 9 | also on behalf of plaintiff and the class. |
| 10 | MR. COMMONS:  Good afternoon, Your Honor.  Sean |
| 11 | Commons on behalf of the defendant. |
| 12 | THE CLERK:  And so one of you stand in front of the |
| 13 | mic, and there's a mic over here if you want, but don't stand |
| 14 | in between. |
| 15 | (Pause in the proceedings.) |
| 16 | THE COURT:  So I need you to discuss the *Bluetooth* |
| 17 | factors, because, again, I've got concerns with this case. |
| 18 | MR. GUTRIDE:  Okay.  Thank you, Your Honor. |
| 19 | Forgive me if I get them in the wrong order, but the -- |
| 20 | with regard to the amount that was at stake in this litigation |
| 21 | and how the settlement relates to the amount at stake in |
| 22 | litigation, our expert on the damages issue was Colin Weir. |
| 23 | He declared in the context of class certification that he |
| 24 | had run a regression analysis of the prices in the marketplace |
| 25 | for olive oil with representations about Italy on the bottle |

1    and without representations about Italy and found that there

2    was a modest price premium for the bottles that did have an

3    Italian representation such that the potential damages that

4    could be recovered by the class -- at that time we were

5    talking about a California class -- was approximately

6    $1.2 million.

7         The defendant obviously disputes that analysis on a number

8    of grounds.  One of the grounds that they argue is that

9    Mr. Weir is overestimating the amount at stake because he is

10   including in the bottles that say something about Italy ones

11   that have representation that the oil is 100 percent Italian

12   and that that inflates the price differential between the

13   bottles with and without statements about Italy.

14        Their view is that if you only combine -- compare the

15   bottles that say "Imported from Italy" from the bottles that

16   don't say anything or that just say "Imported," that there is

17   no price differential.

18        We would have obviously had that fight at trial.  The

19   defendants also, by the way, have provided us data which we

20   describe in the declarations in support of the settlement that

21   when they changed their labels after the initiation of the

22   case to remove the words "From Italy," that they did not

23   change the pricing and that the pricing, if anything, has gone

24   up.

25        So best case scenario is $1.2 million.  It -- It amounts

1    to an average of 34 cents per bottle.

2           THE COURT:  So talk to me about the choice of a

3    claims-made approach versus a coupon, because that's one of

4    the things that I'm struggling with.  And --

5        Let me look around you guys.  All right.  Not press.

6           MS. HAAC:  No, she's with --

7           THE COURT:  I suspect that some people in here before

8    were, so --

9        But it is -- it is a concern in these consumer class

10   actions, and it's something that I haven't quite settled on in

11   terms of trying to figure out how these things need to work.

12       When you have a -- a settlement -- as you can see in the

13   very first case that I dealt with, here is a product where the

14   recovery, you know, if you could prove it, was $55, right, a

15   much bigger product than the bottle of olive oil that we're

16   dealing with here.

17       On the other hand, I am a huge, huge user of olive oil.

18   If I buy a particular brand, I'm buying three or four bottles

19   at a pop.  And certainly over the holidays, given the number

20   of people we feed, I'm using lots of olive oil.

21       And especially if you're sophisticated enough to want to

22   buy the extra virgin-type olive oil or the Italian olive

23   oil -- my family in Texas can't believe how much time I spend

24   in the olive oil section trying to figure out, you know, which

25   is the better, et cetera.

1    So $2?  $5?  Who's going to -- Who's going to do anything

2    for that kind of recovery?  And if they're not and what we are

3    trying to do here is promote better disclosures, more honest

4    disclosures on products that we're approving, then why not a

5    fund?  I mean, I'm -- or why not a combination so that you

6    have some real sustainable type of result?

7              **MR. GUTRIDE:**  I think those are fantastic questions,

8    Your Honor.  And I just want to say that this is -- it's

9    not -- they're not easy questions to answer.  I'll do my best

10   and I think also the defendants should also give -- defense

11   counsel should give his view on those questions.

12       I will say this, though, that settlement is really about

13   the art of the possible.  And it happens in the context of

14   what is likely to occur or -- or might occur at trial.

15              **THE COURT:**  Right.

16              **MR. GUTRIDE:**  So in this case, we have -- we have a

17   person who the defendant argues is a terrible human being.

18   Obviously, we take -- we take the facts differently on that.

19       We -- We have allegations that Your Honor saw fit to

20   certify, which we obviously agree with, but they're not

21   slam-dunks by any stretch.

22       The defendant says this product cleared customs every time

23   so how can you possibly complain that there's a Tariff Act

24   violations (sic).  And they say that there's nothing

25   misleading about this because, in fact, the main work is done

1   in Italy. It's where the people blend the oil and come --

2   find out the right taste profile.

3      So we have a case like that. And even if we overcome all

4   of those issues, we are likely to recover, at best, 34 cents

5   per bottle.

6      And then, as Your Honor said in the -- in the class

7   certification order, there would be some procedure by which

8   people would then get their 34 cents per bottle. There'd be a

9   claims process essentially. And they'd have to put in

10   something -- at a minimum an affidavit. And perhaps Your

11   Honor would be suspicious if somebody said, well, yeah, I

12   purchased, you know, 10,000 bottles last year.

13          **THE COURT:** Well, maybe 10,000, but --

14          **MR. GUTRIDE:** Right.

15          **THE COURT:** But certainly not 12 -- you know, a

16   bottle a month or something like that. Whoever knows?

17          **MR. GUTRIDE:** Well, 12 might be the right number, and

18   that's why we said, you can get -- claim for up to ten bottles

19   with no proof whatsoever.

20      And so that was where the -- that's where the kind of die

21   fell on that. And that was hard fought. I will tell you we

22   spent probably six hours on that -- that very issue of how

23   many bottles could someone put in for proof -- with or without

24   proof purchase and under what conditions and would it be 50

25   cents or some other number. And there were many different

1  structures that were considered in that process.

2      The -- I -- even -- even though *Briseno*, as Your Honor

3  pointed to in the other argument, you know, is a very

4  favorable opinion for my side, I'm not sure that it resolves

5  the ultimate issue of what happens after trial.

6          **THE COURT:**  No, it doesn't at all.  And I -- And it

7  was clear that Judge Fletcher punted on that particular topic.

8  I haven't talked to him about his punting.  But, you know,

9  that's why we're trial judges and they're judges on the Court

10 of Appeal, 'cause they get to pronounce what it is we need to

11 think about and do, and then we have to go figure out how to

12 do it.  But that's all right.

13         **MR. GUTRIDE:**  So I've certainly had defendants argue

14 to me and I -- I don't recall if it came up in this case.

15 They've argued to the courts, in fact, that they have a due

16 process right to challenge every claimant after trial and

17 to -- to question the validity of that affidavit.

18     So if the person says, I purchased, you know, 35 bottles,

19 to require them to, you know, come and be examined --

20 cross-examined.  I imagine Your Honor would reject that, but

21 nevertheless, these are open questions, let's just say.

22     And as the last counsel said, we -- we do have a new

23 appellate position being filled, so we don't know what's going

24 to happen.

25         **THE COURT:**  That's true, but I didn't say it in that

1    case, given the issues going on there -- the reality is that I

2    suspect that we'll get a conservative just like we had a

3    conservative so nothing will necessarily change, at least not

4    this round in terms of where the Supreme Court was, so I'm not

5    sure I buy that.

6         But it's -- there could be a change if there was something

7    beyond the first appointment.

8         **MR. GUTRIDE:**  Right.  So, you know, our -- our view

9    of this settlement is -- and just to get back to the very

10   question -- you asked specifically about a common fund, so

11   obviously we -- we start every negotiation demanding a common

12   fund, and the -- we would prefer obviously to have as big a

13   fund as possible and to have the money go -- if there's

14   leftover money to go to *cy pres*.  And the defendant's

15   extremely resistent to that idea.

16        And there are things that need to be traded off in that

17   context.  So for example, you have a large fund, but then

18   there are issues about, well, what are the proof of purchase

19   requirements going to be?  Is the defendant going to be -- is

20   going to be less willing to do a more robust notice program,

21   et cetera?  So we are taking all of those things into account.

22        In this case, we got I think a very lenient proof of

23   purchase requirement in that you can get $5 with no proof

24   whatsoever.  And beyond that, you get $2 just for filing a

25   claim on the first bottle.  That we have a extremely robust

1   notice program, where we have a claim administrator who's

2   doing magazine advertisements and press release to thousands

3   of publications and million -- hundreds of millions or hundred

4   and fifty million online impressions.

5       We have an extremely simple claim form, which all that it

6   requires essentially is your contact information and some

7   approximate dates of purchase.

8           **THE COURT:**  But this is something that has to be

9   downloaded and mailed or -- I mean --

10          **MR. GUTRIDE:**  No.

11          **THE COURT:**  It can all be done online?

12          **MR. GUTRIDE:**  Absolutely, Your Honor.

13          **THE COURT:**  With an electric (sic) signature.

14          **MR. GUTRIDE:**  Yes.

15          **MR. COMMONS:**  Yes, Your Honor.  We just have the

16   download option for people who, for whatever reason, don't

17   want to submit electronically.

18          **MR. GUTRIDE:**  Right.  And the -- Not only that,

19   people -- even if you are submitting for more than $5 and you

20   have proof of purchase that you'd like to submit, you can do

21   that online as well.  There's a way to just upload your, you

22   know, photograph that you take with your phone of your

23   receipt, so it's a completely online process for people who

24   want to do.

25       I've done several of these settlements now in the very

1   similar framework, and my experience is that you can complete

2   the claim form and upload any proof of purchase, if you have

3   any, in less than about two or three minutes.

4           **THE COURT:**  I don't remember seeing the electronic

5   piece in the agreement.

6           **MR. GUTRIDE:**  Yes, Your Honor.  I can point that out

7   to you.  It's in section -- Let's see.

8       It's Section 4.2, which says at the election of the

9   settlement class member, claim forms may be submitted in paper

10  via First Class mail or online at the settlement website.

11      And then it goes on to explain that for claim forms

12  submitted online, the class member shall have the opportunity

13  to upload proof of purchase image files, to preview and

14  confirm information entered, and so forth.

15      The claim form, which is attached as Exhibit A, is a -- a

16  mock-up which then specifies the information that will appear

17  online versus paper.

18      And the way we did that is we had in brackets -- I'm

19  sorry -- in kind of these curlicue brackets the information

20  that would only be in the paper version, for example, the

21  mailing address, but the online doesn't have that.

22      So the -- you know, we're -- we're certainly hopeful that

23  there will be a significant number of claims.

24      I'll say one more thing about that, Your Honor, which is

25  Your Honor pointed to the -- the goals of class action

1    litigation.  And I think Your Honor mentioned that one thing

2    that we're trying to do is to get the defendants to improve

3    their practices, and we have done that in this case.  They

4    have, in fact, changed the labeling.

5        There is obviously a goal of a deterrent effect, and there

6    are -- beyond the costs of paying claimants, the defendant is

7    bearing pretty significant costs in this case, not only the --

8    the cost of their extremely able counsel thus far, but also

9    the costs of the notice, which is going to be very

10   significant; the costs of administration, which will also be

11   significant; the costs of paying claims and whatever

12   attorneys' fees Your Honor sees fit to award to -- to

13   plaintiffs' counsel.

14           **THE COURT:**  And it sounded like you have done this

15   particular procedure before, so what do you anticipate those

16   costs to be in terms of real dollars, notice,

17   administration --

18           **MR. COMMONS:**  I --

19           **THE COURT:**  -- et cetera.

20           **MR. COMMONS:**  I could --

21           **MR. GUTRIDE:**  I think the defendant knows actually.

22           **MR. COMMONS:**  We expect that the notice and

23   administration will cost $450,000.  And actually, that's --

24   that is the -- the amount we've agreed to pay for our notice

25   administration.

1      **THE COURT:**  And in terms of your prior experience

2   with claims done in this way, national consumer actions, is --

3      **MR. GUTRIDE:**  Yes, Your Honor.

4      **THE COURT:**  And so what do you anticipate?

5      **MR. GUTRIDE:**  It's -- It's so hard to know, Your

6   Honor.  I think there is a very wide variance, but I

7   certainly -- well, it's just -- it's so hard to know.  I think

8   that there will be tens of thousands of claims and perhaps

9   hundreds of thousands of claims.  Whether there would be more

10   than that, I -- I don't know at this point.  Perhaps.

11      **MR. COMMONS:**  Your Honor, if I may, there was one

12   point you'd raised that this is an appropriate time to address

13   regarding the number of bottles that we have for -- without

14   proof of purchase.

15      Your -- Your personal experience is a good example.  In my

16   household, too, it's sort of -- we buy three or four bottles

17   at a time, not one or two.  But we were balancing a couple of

18   things.

19      And one of the theories that the defendant has or defense

20   is, is that at some point, if you're buying a product, either

21   you're buying it because you're loyal to our brand and that's

22   the reason you're buying it.  Or if you're a sophisticated

23   consumer like yourself who's studying bottles, you would be

24   reading the back.  And our evidence was that 80 percent of the

25   customers flip over the -- over the bottle to read the back.

1     And if that's the theory, then that's not a consumer who

2    bought our bottle because of the words "Imported from Italy"

3    on the front.  They would have been buying it for some other

4    reason, whatever that reason would be.

5     And the other reason for the ten number is that, again,

6    while you or I or maybe some other smaller group of people

7    purchase more regularly, most consumers' oil -- olive oil

8    consumption is fairly low.  It's --

9         **THE COURT:**  Is what?  I missed the last --

10        **MR. COMMONS:**  It's fairly low.  So people purchase

11    one bottle every three to six months so the average is

12    somewhere around two bottles a year.  I understand if you're

13    from a different background, your consumption --

14        **THE COURT:**  Well, maybe the difference is California

15    versus the rest of the nation.  I mean, you know, I -- I don't

16    know.  I don't know if you've done those kinds of consumer

17    surveys or not, but --

18        **MR. COMMONS:**  Yeah, actually, California is not as

19    much of an olive oil consumer as we'd like to think we are.

20    There are couple other region (sic) in the country where there

21    are more traditionally heavy olive oil users.  It just happens

22    to be that I think in certain parts of California, it's gotten

23    a lot of attention.  But it's still not as much of a food item

24    as people might think.

25     So that's on the -- the ten, that's one issue.

1    The other one was on the claims process, I think counsel

2 did address.  It's not an issue we'd ever get away from

3 because whether or not we litigated or we settle, we're going

4 to have some process where people submit, and we did look for

5 a way to make the claim form as simple as possible.

6    Your Honor, if you'd like I could go through the reasons

7 we think that there wouldn't be basis for relief even if we

8 went forward to litigate.  But one case that's helpful, I

9 believe, is the *Ben & Jerry's* case.  This was an instance

10 where the defendant showed after they removed "All Natural"

11 from their ice cream container, the price didn't change.

12    And what the court essentially said, well, if the price

13 didn't change, there isn't a basis for me to award

14 restitutionary relief.  Maybe there's a claim for injunctive

15 relief -- well, actually there wouldn't be at that point

16 'cause it came off, but if the essential finding is that

17 you're not in a position to seek monetary recovery if the

18 price isn't changing.  And that's with the evidence we have.

19 And that's a very strong factor in favor of settlement.

20    And as -- as far as *Briseno*, one thing that's sort of

21 interesting about that decision and highlights the settlement

22 process itself is that decision came down after the parties

23 settled.  And the law could change again.

24    And I don't know that the fairness of our settlement, when

25 you're trying to account for both sides, fully informed at the

1    time, weighing the risks and benefits that could have occurred

2    at that moment when they are settling --

3         **THE COURT:**  Well, I'm not sure that's your best

4    argument.  I mean, I've heard some other arguments today that

5    are -- that are helpful.  But it is the state of the law, and

6    I've not approved.

7         **MR. COMMONS:**  No, I --

8         **THE COURT:**  So I -- I approve given the state of the

9    law.

10        Go ahead.  You can finish up.

11        **MR. COMMONS:**  No, that was -- I'll definitely move

12    away from that one, Your Honor.

13        In terms of the products themselves and the amount that

14    we're offering, these products typically sell for between four

15    and six dollars an individual bottle.  So, again, if you're

16    looking at the prior case you're looking at before where the

17    amount of the purchase is in the hundreds of dollars and it's

18    some small fraction, even at 50 cents, that's a pretty

19    significant portion of the overall price of the product when,

20    of course, the defendants view is whether through *Daubert*,

21    whether we got rid of the plaintiffs' claims, whether we

22    disprove materiality or falsity or just by showing that the

23    actual price hasn't changed over the last year and a half

24    since the label has changed, all of those things would result

25    in -- a trial could result in a -- in a -- an outcome where

1    the class gets zero.

2         **THE COURT:**  I guess I'm not -- You control the price,

3    so I don't exactly know how that argument cuts.

4         So you haven't change your price.  So what?  You know

5    you're in litigation.  You know that if you change your price,

6    that might be used against you.  I think the more relevant

7    question is have your sales gone up or down.

8         **MR. COMMONS:**  So I was referring to the average

9    retail price, Your Honor, which is not the price we set.

10   We -- We sell to other stores.  They set the price in the

11   marketplace.  So I'm referring to the average retail price.

12        **THE COURT:**  I see.

13        **MR. COMMONS:**  As far as sales, my understanding is

14   they're roughly the same.

15        **THE COURT:**  All right.  And then once again, I

16   require 21 days to object before any hearing.

17        I also require attorneys' fees -- or attorneys to provide

18   billing statements for the class to look at.  Any problems

19   with changing any of those deadlines or issues you want to

20   discuss on that front?

21        **MR. GUTRIDE:**  I think, Your Honor, the first point

22   can be easily addressed in that we will just advance the date

23   by which we file the motion for attorneys' fees by one week

24   and keep all the other dates the same.

25        In other words, we'll file the final approval motion, the

1    motion for attorneys' fees, one week earlier than was

2    specified in the proposed order.

3        On the second issue, we have no problem providing

4    billing -- bills.  I just want to make sure that I understand

5    what Your Honor needs so that we protect any attorney-client

6    information and work product information.

7        So what I would propose would be something in the form of

8    summary bills.  They could be on a monthly basis of the work

9    that was performed or by -- or summaries of the work that was

10   performed by activity.  For example, work on a motion to

11   dismiss or work on a deposition, et cetera.  And the -- the

12   total by timekeeper.

13       But if Your Honor wants daily records of each timekeeper

14   with all of the detail, then there may be issues about having

15   to redact fair amount of information.

16           THE COURT:  Well, the submission that was provided to

17   me in the first case was not sufficient.  I can tell you that

18   I've had -- and have looked at attorneys' records that are

19   hundreds of pages long.  And that gives me an insight into

20   whether people are padding or not padding.

21       It kind of depends.  If the -- If there is huge

22   disproportionality, then that's going to be more of an issue.

23   If there's less, it's going to be less of an issue.

24           MR. GUTRIDE:  Okay.

25           THE COURT:  So all I can tell you is it depends.

1    **MR. GUTRIDE:** Okay, Your Honor. And then one other

2    question would be if we do admit the -- these -- all of the

3    details, do you -- you mentioned transparency. Does that mean

4    that you want all of those details to be posted on the

5    settlement website and so forth? Or would there be the

6    details to Your Honor under seal or in some other format and

7    the summary form for the class members?

8        **THE COURT:** You know, it's interesting, people always

9    want to keep this stuff hidden. And I'm not exactly sure why

10   it should be hidden. Perhaps -- and, again, think again it

11   depends.

12       If -- If the summaries are not so summary to give the

13   class the information that it needs to really evaluate that,

14   and you should assume that objectors are going -- can be

15   lawyers, then perhaps summaries with the detail under -- under

16   seal, under a request to seal are okay.

17       On the other hand, you represent the class. You represent

18   all of them. They are your clients.

19       So perhaps people need to start thinking about keeping

20   records in a way that after-the-fact redaction is not so

21   onerous; that is, to keep your monthly billings, you know, one

22   that is a publicly available attorneys' fees billing, and then

23   separate document that you could indicate whatever

24   attorney-client or work product issues would be appropriately

25   redacted so that -- I mean, I understand going through years

1  of attorneys' fees bills and redacting out things that

2  would -- would otherwise be properly redacted is -- is

3  onerous.

4      But I do think that people need to start being more

5  cognizant that this is an open public process where people

6  have a right to know.

7      I think that general notion's under attack, and I -- I'm

8  becoming, I think, much more strongly affiliated with

9  openness.

10          **MR. GUTRIDE:**  Okay.  Thank you, Your Honor.

11          **THE COURT:**  All right.  I will think about this and

12  be in touch soon unless there's anything else you want me to

13  consider.

14          **MR. COMMONS:**  The only thing, Your Honor, I mean, and

15  this is -- I only raise this just to understand for a timing

16  perspective because I understand from the settlement

17  administrator that we have some deadline by which we need to

18  make a placement order to be able to have publication notices

19  go out.

20      And so I understand if the answer is nothing further than

21  what you've already said, but if there's any guidance on when

22  you might think you would have a further direction for us

23  regarding the proposed is settlement, that would be helpful so

24  I could communicate with the settlement administrator.

25          **THE COURT:**  So what's your deadline?

1    MR. COMMONS:  The 27th is my understanding.

2    MR. GUTRIDE:  Yes.  And my understanding is that all

3  that has to happen by the 27th is that they have to pay for

4  space.  They don't need the actual text yet.

5    THE COURT:  Okay.

6    And that's -- that is to meet the deadlines that are in

7  your proposed form?

8    MR. GUTRIDE:  Yes, Your Honor.

9    THE COURT:  All right.  I'll keep that in mind.

10    MR. GUTRIDE:  Thank you, Your Honor.

11    MR. COMMONS:  Thank you, Your Honor.

12    MS. HAAC:  Thank you, Your Honor.

13    THE COURT:  Thank you.

14    (Proceedings were concluded at 3:58 P.M.)

15                        --o0o--

16              **CERTIFICATE OF REPORTER**

17        I certify that the foregoing is a correct transcript

18  from the record of proceedings in the above-entitled matter.

19  I further certify that I am neither counsel for, related to,

20  nor employed by any of the parties to the action in which this

21  hearing was taken, and further that I am not financially nor

22  otherwise interested in the outcome of the action.

23    _____

24        Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

25                 Monday, May 29, 2017